UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x

UNITED STATES OF AMERICA          :

   -v.-                            :      13 Cr. 315 (KMW)

FREDERIC CILINS,             :

                   Defendant.    :

------------------------------------------------------------------x

## THE GOVERNMENT'S MEMORANDUM
## IN SUPPORT OF DETENTION PENDING TRIAL

PREET BHARARA
United States Attorney
Southern District of New York
Attorney for the United States of America

Elisha J. Kobre
Assistant United States Attorney

Stephen J. Spiegelhalter, Trial Attorney
Criminal Division, Fraud Section

- Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -v.-                                                 :          13 Cr. 315 (KMW)

FREDERIC CILINS,                                       :

                     Defendant.          :

--------------------------------------------------------------x

## THE GOVERNMENT'S MEMORANDUM
## IN SUPPORT OF DETENTION PENDING TRIAL

A detention hearing in this matter is scheduled for June 20, 2013 at 10:30 a.m.   The Government respectfully submits this memorandum in connection with that hearing, in support of the Government's Motion for Revocation of the Order of Release and in opposition to the defendant's May 29, 2013 Motion to Amend the Conditions of Release and/or For Modification of Bond.

## PRELIMINARY STATEMENT

The defendant, Frederic Cilins, a French national charged with obstructing a federal grand jury investigation in this District by promising to pay money to an individual under subpoena by the grand jury to destroy documents crucial to that investigation and urging that person to lie to agents of the Federal Bureau of Investigation ("FBI"), poses a grave risk of flight and should be detained pending trial.   Cilins has few ties to the United States; he has provided material false and misleading information regarding his finances to pretrial services during his initial presentment in the Middle District of Florida; he has, by his own admission, access to substantial assets in the millions of dollars; and he has extensive international travel and connections.

Moreover, Cilins faces a substantial term of imprisonment if convicted.   And the evidence in this case – consisting of, among other things, audio and video recordings of meetings, which were also monitored by the FBI, during which Cilins explicitly and repeatedly urged a cooperating witness working with FBI to destroy (indeed "burn") documents under subpoena by the grand jury; directed the the grand jury witness to lie to the FBI; and presented the witness, for the witness's signature, with an "Attestation" containing false statements – is overwhelming.

The two magistrate judges who have considered Cilins's application have recognized the extraordinarily severe risk of flight posed by Cilins – including the fact that France will not extradite a French national such as Cilins to the United States.  Magistrate Judge James R. Klindt of the Middle District of Florida, where Cilins was arrested, ordered Cilins detained pending trial, finding that no conditions or combination of conditions will reasonably assure Cilins's appearance as required.   At his initial presentment in this district, the Government sought detention while Cilins renewed his argument for release.   After argument, Magistrate Judge Frank Maas imposed the conditions of release Cilins now seeks to challenge, finding that only that combination of conditions will ensure Cilins's appearance.

The factors set forth in the Bail Reform Act demonstrate overwhelmingly that Cilins poses a grave risk of flight and that "no condition or combination of conditions will reasonably assure the appearance of [Cilins] as required," 18 U.S.C. § 3142.  Cilins should therefore be detained pending trial.

## BACKGROUND AND PROCEDURAL HISTORY

### A.  Defendant's Obstruction and Witness Tampering As Alleged in the Complaint

As set forth in a detailed complaint, which is attached as Exhibit A hereto, *United States v. Frederic Cilins*, 13 Mag. 975 (the "Complaint"), Cilins called and met face-to-face on multiple occasions with a cooperating witness (the "CW") working with the FBI, offering the CW as much as $5 million for the purpose of securing the destruction of documents crucial to an ongoing grand jury proceeding and FBI investigation in this district, and to induce the CW to lie to FBI agents and sign a false "Attestation" about facts crucial to the investigation.  The attached Complaint sets forth in detail Cilins's obstruction and witness tampering and the following is therefore a brief summary of only the salient facts relevant to this motion.

As alleged in the Complaint, a federal grand jury sitting in this district has, since about January 2013, been investigating potential violations of the Foreign Corrupt Practices Act ("FCPA") and the criminal money laundering statutes relating to, among other things, the laundering into and through the United States potential bribe payments to officials of the government of the African country of Guinea for the purpose of obtaining valuable mining concessions in Guinea, including a particular valuable mining concession in Guinea's Simandou region (the "Simandou Concession").  (Complaint ¶ 8).  During the course of this investigation, the FBI learned that the government of Guinea is investigating whether a particular business entity not based in the United States engaged in the mining industry (defined in the Complaint as the "Entity") and its affiliates obtained the Simandou Concession by means of bribes paid to officials of a former government of Guinea.  (Complaint ¶ 9).  The Entity is a Switzerland-based mining conglomerate with, according to its website, operations in 12 countries and "over a billion dollar annual turnover."   As alleged in the Complaint, the Entity stands to lose the

Simandou Concession – worth billions of dollars – depending in part on the result of the ongoing corruption investigation by Guinean authorities.  (Complaint ¶ 9).

As the Complaint makes clear, Cilins previously identified himself as a representative of the Entity in connection with the Entity's efforts to obtain mining concessions in Guinea. (Complaint ¶ 11).  The Complaint alleges that Cilins and others associated with the Entity visited the CW, who was at the time the wife of the then-president of Guinea, in Guinea.  During this meeting, Cilins offered the CW $12 million, to be distributed to the CW – a woman with no relevant experience or involvement in mining – and any other ministers or officials within the government of Guinea who might be needed to secure mining rights for the Entity in Guinea. (*Id.*)  The relationship between the Entity and its affiliates and the CW – including the payment of millions of dollars in connection with the Entity's efforts to obtain various mining rights in Guinea – continued for years and is reflected in a series of contracts between the CW and the CW's company and the Entity or its affiliates (the "Contracts").  (Complaint ¶¶ 12, 13).  It is these Contracts, evidencing payments for the purpose of obtaining valuable mining rights in Guinea, among other things, that Cilins offered money to the CW to "urgently destroy." (Bates 001282).[2]

Audio recordings of meetings described in the Complaint that occurred in April 2013 – draft translations of which have been provided to the defense – demonstrate that Cilins expressed urgency and was both explicit and emphatic about destroying documents evidencing the Entity's payments to the CW, including the Contracts, and otherwise obstructing the grand jury proceeding.  By way of example, as reflected in the draft translations, the following exchange, among others, occurred between Cilins and the CW on April 11, 2013:

---

[2] "Bates NUMBER" refers to the document produced in discovery that is bates-stamped NUMBER.

> CW:   They're [the FBI] going to give me a subpoena, summon me to appear in front of the judge, in court – in front of a grand jury in court [noise] and testify and give all the-uh-documents to court.
>
> CILINS:      The documents – you told them there was – that you had no documents!
>
> CW:   Yes!
>
> CILINS:      This must be destroyed – urgent-urgent-urgent ... [sic] You must destroy this – very urgent – very, very urgent [sic]. . . .
>
> *      *      *
>
> CW:   I think that, Frederic ... it seems that the same document [noise] we want to destroy is the same the American government is looking at . . .
>
> CILINS: But I know – but it's –
>
> CW:   I don't know what to do . . .
>
> CILINS:      But everything must be destroyed! Well, I told you this, a long time ago, 'Do not keep anything here . . .' [Whispering] Make sure you're not keeping anything here, not even a [unintelligible]. . .   You must destroy everything, everything, everything . . . (Bates 001271-001272).

Later, during this same conversation, Cilins repeatedly stressed the urgency of destroying the documents, for example directing the CW: "we need to urgently, urgently, urgently destroy all of this; but it's extremely urgent for us; ex-extremely urgent!  And, in any case, you, y-y-you have nothing to do with this! You have nothing to do with this!"  (Bates 001282).  And at a subsequent meeting later that day, Cilins stated:  "I myself am going to destroy all that. . . . I'm not going to destroy it here at the airport but as soon as I get there I have a paper shredder. I can destroy everything. . ."  (Bates 001329).  (*See also* Bates 1290) ("It's necessary to find a place for the . . . to-to destroy, destroy them completely; to burn them. But don't do that at home!").

5

Importantly, Cilins made clear during these meetings that he was not working alone in his efforts to obstruct the grand jury proceeding and FBI investigation:

"I went specially to see him [a co-conspirator, "CC-1"], to have – talk about all of this very clearly. I always told him, I always told him. Again [noise] last week, I told him, [whispering] . . . [The CW] will never betray you – [the CW] will never give away any documents whatsoever. . . . 'Listen – 'He told me, 'That's good, but I want you to go see – but I want you to destroy these documents.' He told me, 'Okay, you go – since you want – I want you to tell me, 'I saw that the documents [noise] were destroyed; it's over, there are no more documents.'" (Bates 001299).

Cilins later reiterated that he was acting at the direction of others, telling the CW, by way of example, that: ". . . what I was asked to do is to watch when the documents are destroyed. That's why I asked you if you want to go together; to see, to be a hundred percent sure that everything is destroyed and [whispering] that nothing is dispersed. So if you want us to do this today, we can get it done today." (Bates 001294).

As alleged in the Complaint, Cilins not only urged the destruction of documents, he also presented the CW, during an April 11, 2013 meeting monitored by the FBI, with a one-page document titled "Attestation," containing multiple false statements within the scope of the grand jury investigation, for the CW's signature. (Complaint ¶¶ 20(n), 21). Cilins moreover explicitly directed the CW to "lie" to the FBI, threatening that if the CW was truthful the CW would not be able to remain in the United States:

Now to go back to the conversation we were having earlier when you told me 'you told me that I have to lie.' Well, of course you have to lie! You can't tell them [the FBI] . . . if you tell them, I assure you, you have to understand this, if you say to them, 'Yes, I received whatever from whomever,' not even particularly from that, from whomever. You have a very big problem! But not a small problem, a very, very big problem. You can forget about the United States. You can forget about the United States, and that's serious. (Bates 001324).

As alleged in the Complaint, during the meetings, Cilins was perfectly clear about what the CW would receive in exchange for the destruction of documents under subpoena by the

grand jury and for lying to the FBI – $1 million, with $200,000 paid up front and $800,000 at a later date.  Cilins further told the CW that, once the case is complete and the Entity is not kicked out, the CW will receive "five" – i.e., an additional $ 5 million – if the Entity retains its rights to the Simandou Concession after the Guinean corruption investigation is complete.  (Complaint ¶ 20(m)).  (Bates 001299) ("I'm telling you again, so it's very clear in your head . . . The five that are planned, will be paid, whatever happens. You will have them, if they are not kicked out; if they're still part of the project. What you will get, whatever happens, of – one million, meaning two hundred, eight hundred . . . Those, you will get them. . . ").  Cilins later reiterated that the CW will receive $5 million if the Entity was not kicked out and the $1 million regardless of the outcome.  (Complaint ¶ 20(m)).  Cilins later agreed to try "to get fifty" – $50,000 – immediately for the CW.  (Bates 001324).

As the forgoing summary of some of the evidence makes clear, the evidence against Cilins is extremely strong and the flagrancy and brazenness with which Cilins pursued his goal of knowingly and intentionally obstructing a grand jury proceeding and ongoing FBI investigation demonstrates Cilins' utter disrespect for the judicial process of the United States.

**B.  Cilins's Arrest and False Statements to Pretrial Services**

Cilins was arrested on April 14, 2013 at the Jacksonville International Airport in Jacksonville, Florida, where Cilins had just concluded yet another meeting with the CW.  Among the items recovered from Cilins's person incident to arrest was $20,000 in United States currency.

Cilins was presented the following day, April 15, 2013, before Magistrate Judge James R. Klindt in the Middle District of Florida.  Prior to his presentment, Cilins was interviewed by Pretrial Services Officer Kim Lee Watson, who later testified as part of a detention hearing

conducted by Magistrate Judge Klindt.  During the course of that hearing, it became clear that Cilins had provided Pretrial Services with false information and a material omission, including the following:

(1) Cilins reported to Pretrial Services owning only five properties in the United States, with a total value of about $779,000.  Cilins – having explicitly denied owning any other assets – in fact also co-owns, through limited liability corporations, two other properties valued at a total of $2,948,620, almost four times the value of the properties Cilins had initially disclosed.  (As explained below, Cilins's failure to disclose these two properties is particularly significant because his co-owners for those properties are closely connected with Cilins's criminal conduct in this case.).

(2)  Cilins failed to report to Pretrial Services his possession of a second French passport in addition to the passport agents found on Cilins' person incident to arrest.

Furthermore, while Cilins had promised a guaranteed $1 million to the CW, with $200,000 up front and $800,000 later, and a $5 million payment if the Entity retained its mining rights, and Cilins was arrested with $20,000 in cash, Cilins reported to Pretrial Services an annual income of just $32,578 from a French business named CWF (which Cilins said buys and sells "products," including nonperishable foods), which is the only business Cilins disclosed to Pretrial Services, and monthly rental income from his properties of $4,050.

**C. The Detention Hearing, Defendant's Further Misrepresentation Regarding His Properties, and the Order of Detention**

A detention hearing was conducted by Magistrate Judge James R. Klindt in the Middle District of Florida on April 18, 2013, and was continued on April 23, 25 and 29, 2013. Following the hearing, on April 29, 2013 Magistrate Judge Klindt ordered Cilins detained

pending trial and, on May 8, 2013, Magistrate Judge Klindt issued a decision and order of detention, which is attached hereto as Exhibit B.

During the first day of the detention hearing, counsel for Cilins placed on the record several "corrections" to Cilins's initial statement to Pretrial Services about his assets, including his ownership, through limited liability corporations, of the two additional properties with total value $2,948,620, which Cilins had previously failed to disclose (the "Surf Road Properties" owned by the "Surf Road LLCs").[3]   The defense represented that these properties were "unencumbered" and offered unsigned affidavits certifying that Cilins was alone "the legal owner" of each of the LLCs that own the Surf Road Properties and offering to mortgage those properties to secure his release.  Those affidavits are attached hereto as Exhibit C.

What Cilins failed then to disclose, after having belatedly disclosed his ownership of the Surf Road Properties worth millions of dollars, is that Cilins is not, in fact, the sole owner of the Surf Road LLCs, but rather co-owns those LLCs with two other individuals, Michael Noy and Avraham Lev Ran – each of whom is closely connected with Cilins's criminal conduct as set forth below.  It was only about one week later that the defense submitted an electronic mail to Judge Klindt, attached hereto as Exhibit D, "apologiz[ing] . . . for the massive confusion" regarding Cilins's properties and offering this additional correction.  It is these two properties—which Cilins co-owns together with Noy and Lev Ran – that constitute the bulk of the $3.6 million Cilins proposed (and persists in proposing before this Court) as security for a bond.

Crucially, as set forth in a detailed memorandum filed by the Government on April 28, 2013 in response to this latest disclosure (the "Government's April 28 Memorandum"), each of Cilins's two co-owners of the Surf Road LLCs is closely tied to Cilins's criminal conduct in this

---

[3] The two properties are: (1) a property located at 2300 Surf Road, Hollywood, Florida owned by Hollywood Beachfront Townhomes LLC, allegedly valued at  $1,320,820; and (2) a property located at 2325 Surf Road, Hollywood, Florida, owned by Hollywood Beachfront Townhomes South LLC allegedly valued at  $1,627,800.

case.  In particular, the Government's April 28 Memorandum, which is attached hereto as Exhibit E, sets forth the following information regarding Cilins's two co-owners of the LLCs, Michael Noy and Avraham Lev Ran.

With respect to the Surf Road Properties' co-owner Michael Noy, pursuant to court authorized wire intercepts of Cilins's phone, the government intercepted communications between Cilins and Noy — who has been identified by the CW as the defendant's superior within the Entity — concerning the efforts described in the Complaint to obstruct the underlying bribery investigation. These conversations, as drawn from verbatim draft English translations of the intercepted calls that were prepared by French-speaking FBI translators, include the following:

> • After the CW left the first meeting on April 11, 2013, during which Cilins had presented the CW with a false "Attestation" for the CW to sign, (Complaint ¶ 21), Cilins called a cellular phone used by Michael Noy (the "Noy Phone.").  During this call, Cilins related to Noy: "She has left, the document is done and signed."  Cilins then conveyed to Noy that Cilins had learned from the CW that U.S. government authorities had confronted the CW about the bribery scheme.  Noy asked, in substance, what the CW had told the authorities and how the meeting had ended. After responding to this request, Cilins remarked that "one should not talk too much on the phone."

> • After the CW returned later for a second monitored and recorded meeting on April 11, 2013, to provide Cilins with copies of the documents the Cilins sought to destroy (including one that had been signed by Avraham Lev Ran, the other co-owner of the LLCs as described below), Cilins directed the CW to bring the originals the next time the defendant returns to Jacksonville (Complaint ¶ 22). After the CW left, Cilins again called the Noy Phone. During this call, Cilins said "I will be back on Saturday because not everything was here, so I have to come back." Later in the call, Noy asked "did she agree to give you everything?" Cilins replied, "Yes, it's done deal, it's done deal." Noy queried, "Really?" Cilins said, "Yes. I already have here what was on one side, and the rest will be on Saturday." Noy replied, "That's good, that's good. But I believe that . . . uh, what should be done is that [the CW]  should leave."

Avraham Lev Ran, the other co-owner of the Surf Road LLCs, signed one of the Contracts, described in the Complaint, that Cilins offered money to the CW to destroy.  In

February 2006, Lev Ran signed, on behalf of Pentler Holdings LLC, a British Virgin Islands corporation, a "Lettre D'engagement" (the "Engagement Letter") with the CW, essentially granting the CW a percentage of the Entity's mining business in Guinea.  An excerpt from a draft English translation of the key portions of that contract follows:

> The PENTLER HOLDINGS LTD. Company, located in . . . British Virgin Islands, represented by Mr. Avraham LEV RAN
>
> It was previously put forward that
>
> The [Entity's Guinea Subsidiary] approached the Guinean authorities with a view to establishing a partnership for the development and exploitation of part of the iron deposits of SIMANDOU.
>
> In the context of this project, [Entity's Guinea Subsidiary] submitted to Guinean authorities a proposal allowing shareholding of the Republic of Guinea up to 15% and shareholding of [CW], as a local partner, up to 5%. To this effect, the [Entity's Guinea Subsidiary] will constitute, together with the Republic of Guinea, an incorporated company, publicly traded, which will be named Compagnie Minière de SIMANDOU [SIMANDOU Mining Company].
>
> In order to incorporate the shareholding of [CW], the [Entity's Guinea Subsidiary] will transfer 17.65% of its capital to the Pentler Holdings Ltd Company, of which 33.30% of the capital will be attributed to [CW].
>
> The information put forth above was the subject of a Protocole d'Accord, signed between [CW] as one party and the Pentler Holdings Ltd Company as the other party, on the date of February 20, 2006.
>
> It is understood that the issuance of these research permits for the benefit of the [Entity's Guinea Subsidiary] engenders, de facto, the shareholding of [CW] in this project at the gratis participation of 33.30%, as provided by the terms of the Protocole d'Accord signed between [CW] as one party and the Pentler Holdings Ltd Company as the other party, on the date of February 20, 2006.
>
> Executed in 2 original copies

11

>The Pentler Holdings Ltd Company, represented by Mr. Avraham
>LEV RAN
>PENTLER HOLDINGS LTD

Bank records also show that this same Avraham Lev Ran – a co-owner of the Surf Road LLCs – transferred $149,970 and $99,970 on July 21 and August 5, 2010, respectively, from an account in Israel to an account in Florida that belonged to the CW.

On April 29, 2013, Magistrate Judge Klindt ordered Cilins detained pending trial. A written decision and order of detention followed on May 8, 2013. (*See* Exhibit B). By order dated May 1, 2013, Cilins was ordered to be transferred to this district.

### D.  The Indictment and Defendant's Presentment in this District

On April 25, 2013, a grand jury in this district returned a five-count indictment charging Cilins, in Counts One through Three with witness tampering, in violation of 18 U.S.C. §§ 1512(b)(2)(B), 1512(b)(3), 1512(c)(2) and 2; in Count Four with Obstruction of a Criminal Investigation, in violation of 18 U.S.C. §§ 1510(a) and 2; and, in Count Five, with Destruction, Alteration, and Falsification of Records in Federal Investigations, in violation of 18 U.S.C. § 1519 (the "Indictment," attached hereto as Exhibit F).

Cilins arrived in this district on May 14, 2013 and was presented and arraigned before Magistrate Judge Frank Maas on May 15, 2013. Judge Maas conducted a detention hearing and imposed bail conditions.[4]   Judge Maas ordered that Cilins remain detained until all bail conditions are met.

---

[4] The conditions imposed by Judge Maas are: a  $15 million personal recognizance bond  secured by five financially responsible persons and further secured by $5 million cash or property; defendant's travel restricted to the Southern and Eastern Districts of New York and the Southern District of Florida; defendant to surrender all travel documents and make no new applications for travel documents; strict pretrial supervision; home incarceration; electronic monitoring; defendant to be guarded 24 hours per day, seven days per week by a reputable, capable security company approved by the United States attorney's Office for the Southern District of New York and the Court; and the defendant is required to reside at a property owned by the defendant located at Turnberry Isle South. Judge Maas further ordered that the defendant remain detained until all these conditions are met.

## APPLICABLE LAW

When an appeal is taken, pursuant to 18 U.S.C. § 3145(a), from a decision by a magistrate judge to release or bail a defendant, the district court reviews that decision *de novo*. *E.g.*, *United States* v. *Leon*, 766 F.2d 77, 80 (2d Cir. 1985) ("[I]n ruling on a motion for revocation or amendment of a detention order [the district court] should not simply defer to the judgment of the magistrate, but reach its own independent conclusion.").

Title 18, United States Code, Section 3142(e), provides that if a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the officer shall order the defendant detained pending trial. 18 U.S.C. § 3142(e). In seeking detention, the Government bears the burden of establishing risk of flight by a preponderance of the evidence. *Id.* § 3142(f). The Government is not bound by the rules of evidence in discharging its burden, *see id.*, and may proceed by proffer. *See, e.g.*, *United States* v. *Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995).

In assessing a defendant's risk of flight and the danger presented by his release, courts are to consider: (1) "the nature and circumstances of the offense charged"; (2) "the weight of the evidence against the person"; (3) the "history and characteristics of the person"; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

## DISCUSSION

The defendant should be detained pending trial. Given the severe risk of flight, nothing short of detention will reasonably assure the appearance of the defendant as required. Cilins has a strong incentive to flee, abundant means to flee, and the demonstrated willingness to flee given the disregard he has already shown for the judicial system of the United States through the

underlying conduct described above and in the Complaint and through his lies to Pretrial Services and the Court.   Cilins should be detained for at least five reasons.

*First*, "the nature and circumstances of the offense charged" demonstrate Cilins's utter disregard for the judicial proceedings in the United States.   Cilins, knowing full well of an ongoing grand jury proceeding in this district and a concurrent FBI investigation, offered large sums of money to the CW for the urgent destruction of documents under subpoena by the grand jury and to induce the CW to "lie" to the grand jury and sign an "Attestation" containing false statements within the core of the grand jury proceeding.   The same motivation driving Cilins's egregious efforts at witness tampering and obstruction – i.e., avoiding the legal consequences for criminal conduct – are only magnified in the context of his own prosecution, particularly in light of the strength of the evidence and the substantial prison term Cilins faces if convicted.   As Magistrate Judge Klindt put it, "the motive to obstruct and the motive to flee are very often one and the same."  (Detention Order, Exhibit B, at 5).

*Second*, Cilins has moreover demonstrated, through his lack of candor first with Pretrial Services and then with the Court regarding his financial resources and his second undisclosed French passport, that he cannot be trusted to appear in Court as required.  For one thing, Cilins's statement to Pretrial Services that his annual income (excluding rental income from his Florida properties) is just $32,578 from a company that buys and sells "products" is simply incredible in light of the facts that Cilins was arrested with $20,000 in cash, engages in extensive international travel "all over Africa and Europe to conduct business"; promised the CW millions of dollars in furtherance of his obstruction scheme; and owns (or co-owns) millions of dollars of real property in Florida.[5]

---

[5] Notably, bank records obtained from Wells Fargo Bank show that checks from Cilins's bank account were issued, payable to the CW, in the amounts of $100,000 and $50,000, on July 27, 2010 and August 5, 2010 respectively.

In addition, Cilins's repeated omissions to Pretrial Services and then to the Court simply cannot be excused as a mistake:

- Cilins failed to report to Pretrial Services his co-ownership of the Surf Road Properties – by far the two most valuable properties he co-owns in the United States, with a total combined value of $2,948,620 – compared with a combined value of about $779,000 for the five properties Cilins did report to Pretrial Services.  Cilins failed to disclose his ownership of these properties despite being specifically, pointedly, and repeatedly asked by the Pretrial Services officer whether he owned any other properties.

- Cilins failed to disclose to Pretrial Services that he had a second French passport, other than the passport seized by the FBI.

- Even after Cilins finally disclosed the Surf Road Properties to the Court, he persisted in failing to disclose his co-ownership of those properties with Noy and Lev Ran, going so far as to submit unsigned affidavits declaring himself "the legal owner."

That Cilins neglected to report the Surf Road Properties – the properties he co-owns with Noy and Lev Ran who were directly involved in the underlying conduct described in the Complaint – while remembering to report all of the other five properties that Cilin alone owns was likely no coincidence.  It was, rather, an effort to conceal Cilins's relationship with those individuals involved in Cilins's underlying criminal conduct.  Incredibly, Cilins's motion before this Court to modify his bond offers the same "$3.6 million in unencumbered real estate Mr. Cilins already offered as security" – including, presumably, the Surf Road Properties – without even a nod toward his co-ownership of these properties with Noy and Lev Ran.

*Third*, "the weight of the evidence" against Cilins is overwhelming.  The multiple face-to-face meeting Cilins conducted with the CW described above (and phone calls described in the Complaint) were recorded via audio and video recording devices and monitored via physical surveillance by the FBI.  Nor is there any subtlety or need to parse Cilins's words or conduct during those recorded meetings and calls.  Cilins explicitly promised money to the CW –

---

These records cast further serious doubt on Cilins's statement to Pretrial Services that his annual income is just $32,578.  (Bates 000751, 000753).

millions of dollars – to "urgently destroy" the contracts, directed the CW that "of course you have to lie" to the FBI, and physically presented an "Attestation" to the CW, for the CW's signature, which contained false statements within the scope of the grand jury proceeding and FBI investigation.

If convicted, Cilins faces a substantial term of imprisonment.  Counts One through Three and Five of the Indictment each carries a statutory maximum term of imprisonment of twenty years, while Count Four carries a statutory maximum of five years' imprisonment.  Cilins's guidelines range under the United States Sentencing Guidelines ("U.S.S.G.") is, even by the defense calculation, at least 97-121 months' imprisonment, a significant sentence, absent any additional enhancements that may apply.  (Detention Order, Exhibit B, at 7).[6]  Taken together, the weight of the evidence and the substantial sentence of imprisonment Cilins faces provide a substantial motivation for Cilins to flee.

*Fourth*, Cilins's "history and characteristics" demonstrate that Cilins is a severe flight risk.  Cilins is a French national with no family ties to the United States and no other real ties to the United States aside for his ownership of several properties in Florida, the vast majority of which he co-owns with two others – Noy and Lev Ran – both of whom, as described above, are directly connected to his criminal conduct and neither of whom themselves have any real ties to the United States.

---

[6] This conservative estimate results from the fact that the obstruction guideline, U.S.S.G. § 2J1.2 provides, as a cross-reference that "[i]f the offense involved obstructing the investigation or prosecution of a criminal offense, apply §2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than that determined above."  U.S.S.G. § 2J1.2(c).  This is precisely what Cilins was attempting to do – obstructing the investigation or prosecution of FCPA offenses.  Under U.S.S.G. § 2X3.1(a)(1), the applicable offense level is "6 levels lower than the offense level for the underlying offense."  The guideline applicable to the underlying Foreign Corrupt Practices Act violation is U.S.S.G. § 2C1.1.  Under U.S.S.G. § 2C1.1, the base offense level is 12, plus 2 offense levels because the offense "involved more than one bribe," U.S.S.G. § 2C1.1(b)(1), plus 30 offense levels because "the benefit received in return for the payment" was  more than $400,000,000, U.S.S.G. § 2C1.1(b)(2), plus another 4 offense levels because  the "offense involved a public official in a high level decision making or sensitive position."  U.S.S.G. § 2C1.1(b)(3).  This yields an offense level of 39 which, applying a capped offense level of 30 as described in U.S.S.G. §  2X3.1(a)(3), and excluding any other applicable enhancements which may apply, results in a Guidelines range of 97 to 121 months' imprisonment.

Relatedly and of crucial import, France is a country that will not extradite one of its nationals to the United States.  Thus, if Cilins were to flee to France, no recourse could be had to prosecute Cilins for the serious witness tampering and obstruction of a criminal investigation charges he faces.  *See, e.g., United States v. Abdullahu*, 488 F. Supp. 2d 433, 443 (D.N.J. 2007) ("The inability to extradite defendant should he flee weighs in favor of detention."); *United States v. Epstein*, 155 F. Supp.2d 323 (E.D. Pa. 2001) (finding that defendant's dual citizenship in Germany and Brazil, lucrative employment and property interests, and lack of an extradition treaty with Brazil weighed in favor of detention despite the fact that defendant's family lived in the United States and he owned valuable property in this country).

*Fifth*, and relatedly, Cilins undoubtedly has the financial resources and far-reaching contacts and foreign connections to flee from prosecution.  As the Complaint and draft translations of the recorded meetings with the CW make clear, Cilins has access to millions of dollars to further his goal of interfering and obstructing the grand jury proceeding and the FBI investigation.  Indeed, Cilins promised the CW $1 million, with an additional $5 million to be paid if the Entity retains its mining rights in Guinea.  Cilins was also arrested with $20,000 in cash.  And Cilins, by his own statements to the CW, and further confirmed by intercepted phone calls with Michael Noy, was working with others with the express goal of ensuring that the Entity is not "kicked out" of its multi-billion dollar mining concession in Guinea.  Thus, Cilins's own statements – along with the fact that he was in possession of $20,000 in cash at the time of his arrest – show that Cilins has access to substantial sums that would readily enable him to flee the United States.

Moreover, Cilins has extensive travel and contacts with foreign countries.  A review of Cilins's two French passports, attached hereto as Exhibit G, one of which he initially failed to

report to Pretrial Services, shows that Cilins has traveled to Senegal, Liberia, and Guinea on multiple occasions, as well as to Mali, Sierra Leone, Canada, and South Africa.[7]  Cilins, through counsel, has moreover admitted that "he travels all over Africa and Europe to conduct business." (Transcript of 4/25/2013 Proceeding, at 99; Detention Order, Exhibit B, at 6).  And the Entity, on whose behalf, Cilins purported to act, and to whose benefit Cilins was allegedly acting, is a large multinational corporation with, according to its website, operations in 12 countries and "over a billion dollar annual turnover."

Each of the factors set forth in 18 U.S.C. § 3142(g) weigh heavily in support of detention. Cilins's offense conduct; lack of ties to the United States; enormous incentive to flee in light of the strength of the evidence against him; significant term of imprisonment he faces if convicted; the Government's inability to extradite from France; and misstatements to Pretrial Services all demonstrate that Cilins poses a grave risk of flight and that no conditions or combination of conditions will reasonably assure Cilins's appearance as required.

---

[7] The FBI has also learned from the Israel Police, Interpol Unit, that Cilins traveled to Israel in 2006 using a passport bearing Passport Number 5HFO2556 and in 2003 and 2004 using a passport bearing Passport Number 3TB64021.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that there are no conditions or combinations of conditions that will reasonably ensure the defendant's return to court when required.  Accordingly, the defendant should be detained pending trial.

Dated:  New York, New York
        June 6, 2013

                          Respectfully submitted,

                          PREET BHARARA
                          United States Attorney

By:    s/ Elisha J. Kobre_____
                          Elisha Kobre
                          Assistant United States Attorney
                          Telephone: (212) 637-2599

                          JEFFREY H. KNOX
                          Chief, Criminal Division, Fraud Section
                          United States Department of Justice

By:    _____/s/_____
                          Stephen J. Spiegelhalter
                          Trial Attorney
                          Telephone: (202) 307-1423

## CERTIFICATE OF SERVICE

I, Elisha J. Kobre, Assistant United States Attorney, hereby certify that on June 6, 2013, I caused a copy of the attached Government's Memorandum in Support of Detention Pending Trial to be sent via electronic notification ("ECF") to:

Bruce H. Lehr
Lehr, Fischer & Feldman
1401 Brickell Avenue
Miami, FL 33131

_____/s/_____
Elisha J. Kobre
Assistant United States Attorney
(212) 637-2599