United States v. Frederic Cilins
3:13-mj-1087-JRK
Detention Findings

## I. Background

Defendant made his initial appearance in this District on April 15, 2013 on a criminal complaint filed in the Southern District of New York. The complaint charged Defendant with three obstruction-related counts. At the initial appearance, the Government moved to detain Defendant as a flight risk and requested a continuance of the hearing. Defendant was advised of, among other things, his right to counsel, and he requested time to explore retaining counsel.

On April 18, 2013, Defendant appeared with counsel, who announced she was ready to proceed with the detention hearing. The Government proceeded by way of proffer, which is customary in the Jacksonville Division of the Middle District of Florida. In short, the Government relied on the following to carry its burden that Defendant is a flight risk: (1) the nature and circumstances of the crimes charged; (2) Defendant's French citizenship[1] and his lack of substantial ties to the United States; (3) Defendant's alleged possession of an "unregistered" French passport; and (4) Defendant's alleged lack of candor during his interview with the pretrial services officer. As the hearing progressed, it became apparent that Defendant had not been in possession of an "unregistered" passport; instead, he has two valid French passports.

Defendant also proceeded by proffer, and he offered to post several pieces of property in South Florida valued at about $3.6 million as security. To this end, Defendant's counsel in South Florida (not trial counsel for these proceedings) prepared affidavits for

---

[1] The Government pointed out that should Defendant return to France, he could not be extradited to the United States.

Defendant to execute (and for the Court's review) stating in substance that Defendant was the sole owner of the properties. On a later date, Defendant submitted a corrected set of affidavits indicating he and two other individuals co-owned the properties. These other two individuals were willing to post their respective interests in the properties to secure Defendant's release.

As to the Government's case, Defendant attacked it on many levels, including the reliability of the cooperating witness ("CW") at the center of the obstruction charges. Defendant also raised issues about the translation of undercover recordings between Defendant and the CW.

The detention hearing was also held on April 25, 2013, and the issue of detention was addressed further on April 29, 2013 during the time set aside for the preliminary hearing. The preliminary hearing was not held because on April 25, 2013, a federal grand jury sitting in the Southern District of New York returned a five-count indictment against Defendant. The undersigned found on April 29, 2013 that the Government had carried its burden of proving by a preponderance of the evidence that Defendant is a flight risk. The transcript of the multi-day detention hearing (including the undersigned's findings) is incorporated by reference and made a part of this Order. This Order memorializes and expands upon the findings announced during the April 29, 2013 hearing.

## II. Summary of Charges

All five counts of the indictment allege various acts of obstruction occurring between about March 2013 and about April 14, 2013.

Count One (18 U.S.C. §§ 1512(b)(2)(B) and 2) alleges that from at least on or about March 2013, up to and including on or about April 14, 2013, that Defendant did knowingly

use intimidation, threaten, and corruptly persuade a person, and attempt to do so, and engage in misleading conduct towards another person with intent to cause and induce a person to alter, destroy, mutilate, and conceal an object with intent to impair the object's integrity and availability for use in an official proceeding. Specifically, Count One alleges that Defendant agreed to pay money to an individual in exchange for that individual's agreement to provide to Defendant, for destruction, documents that were to be produced before a grand jury in the Southern District of New York.

Count Two (18 U.S.C. §§ 1512(b)(3) and 2) charges that Defendant did knowingly use intimidation, threaten, and corruptly persuade a person, and attempt to do so, and engage in misleading conduct towards another person, with intent to hinder, delay, and prevent the communication to a law enforcement officer of the United States of information relating to the commission and possible commission of a federal offense. Specifically, Count Two alleges Defendant directed an individual to make false statements to special agents of the FBI regarding the commission and possible commission of federal offenses.

Count Three (18 U.S.C. §§ 1512(c)(2) and 2) charges that Defendant knowingly and corruptly did obstruct, influence, and impede an official proceeding, and did attempt to do so. Specifically, Count Three alleges Defendant agreed to pay money to an individual in exchange for that individual's agreement to provide Defendant, for destruction, documents that were to be produced before a grand jury in the Southern District of New York.

Count Four (18 U.S.C. §§ 1510(a) and 2) charges that Defendant willfully and knowingly did endeavor, by means of bribery to obstruct, delay, and prevent the communication of information relating to a violation of a criminal statute of the United States by a person to a criminal investigator. Then more specifically it alleges that

Defendant agreed to pay money to an individual in exchange for that individual's agreement to sign a document containing false statements relating to violations of criminal statutes of the United States under investigation by special agents of the FBI.

Count Five (18 U.S.C. § 1519) charges that Defendant did knowingly alter, destroy, mutilate, conceal, cover up, falsify, and make false entries in records, documents, and tangible objects and did so with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, that is, the United States Department of Justice, and in relation to and in contemplation of such matter. More specifically, Count Five alleges that Defendant provided to an individual, for that individual's signature, a document containing false statements, knowing that those false statements related to a criminal investigation being conducted by the FBI.

### III. Findings

Title 18, United States Code, Section 3142(g) directs the Court to take into account various factors in determining whether there are conditions of release that will reasonably assure the appearance of Defendant as required. The factors included in the statute, as well as additional observations, are discussed below.

As to the nature and circumstances of the alleged crime, Defendant is charged with obstructing an investigation by the federal grand jury in the Southern District of New York.[2] Generally speaking, a person who engages in obstructive conduct to thwart a criminal

---

[2] According to the complaint "from in or about January 2013 through the present," the grand jury "has been conducting a criminal investigation regarding potential violations of criminal law, including money laundering and conspiracy to commit money laundering . . . ; and violations of the Foreign Corrupt Practices Act . . . ." Compl. (Doc. No. 1) at 3.

Page 4 of 11

investigation, does so to ultimately avoid prosecution. And, generally speaking, a person flees to avoid prosecution. Although the conduct is different, the motive to obstruct and the motive to flee are very often one and the same.

As to the weight of the evidence, the Court gives this factor the least consideration and the least weight. It is very early in the case, but Defendant already has aggressively attacked the Government's evidence, especially the conduct and reliability of the CW and the accuracy of the translation of conversations between the cooperating witness and Defendant. So, although the Government has tape recorded Defendant (both over the telephone and face-to-face) during the commission of the alleged crimes, the undersigned finds this to a be a neutral factor. Just as the court noted in United States v. Khashoggi, 717 F. Supp. 1048, 1050 (S.D.N.Y. 1989), the undersigned is not intelligent enough about the strength of the case at this point in the proceedings to make a determination on whether the Government has a strong case or not.

The next consideration is the history and characteristics of the person. As to the mental and physical condition of Defendant, he appears to be in very good health, except that he does suffer from high blood pressure, and he has no mental health issues. He did provide a urine sample that yielded negative results for the presence of illegal drugs.

Defendant does not have any family ties to the United States. His wife and children reside in France. It was proffered that his wife is willing to travel from France to the United States to serve as a third-party custodian, but she would have to travel back and forth between France and the United States on occasion.

Regarding employment and financial resources, Defendant reported to pretrial services that he is self-employed and currently owns and operates a business called CWF.

He earns annually approximately 25,000 Euros, which is the equivalent of $32,578. Defendant also advised the pretrial services officer that he owns five properties, and that he receives rental income from those properties. The stated rental income monthly from the properties is $4,050 (or about $48,600 annually). The approximate market value of the properties, according to what Defendant told to the pretrial services officer, is $779,000.

During the detention hearing, defense counsel proffered that Defendant is involved in two business entities in South Florida that are related to the ownership of these properties, as well as two additional properties. Defendant's involvement in the two business entities – PHA Investments, LLC and Hollywood Beach Townhouses, LLC – was not disclosed to the pretrial services officer. According to defense counsel's proffer, taking into account the five properties Defendant disclosed and the two additional properties proffered by defense counsel, the actual real property holdings of Defendant and his partners total approximately $3.6 million.

Defendant does not have any known criminal history. He has no failures to appear.

There are other relevant matters to consider that likely fall under the "past conduct" factor. Defendant has two French passports. A review of the passports reflect that Defendant has traveled to Senegal, Liberia, and Guinea on multiple occasions, as well as to Mali, Sierra Leone, Canada, South Africa, and the United States. Of course, multinational travel itself is not illegal, but the passports (and proffers) show that Defendant has contacts in various places outside France and outside the United States. Defendant travels extensively throughout Europe and parts of Africa related to his business.

The undersigned must also take into consideration whether at the time of the current offense or arrest Defendant was on probation or some type of supervision. Of course, he

was not.

In determining whether Defendant is a flight risk, the undersigned considers the maximum penalties Defendant faces should he be convicted of all five alleged crimes. The maximum statutory penalty is 85 years' imprisonment. Although it is highly unlikely Defendant would be sentenced to 85 years' imprisonment upon conviction, it is the maximum penalty that he faces, and it is a possibility. The Government and Defendant have pointed to the sentencing guidelines as a more realistic view of what Defendant's sentence would be if he were convicted, but they disagree as to what the guideline sentencing range would be. At this point, the undersigned accepts the view of Defendant that his likely guideline range, without any adjustments, would be 97 to 121 months – a significant sentence.

There are additional matters to address. As to the Government's position that Defendant was not candid with pretrial services about his assets, the undersigned declines to make such a finding on this record. There is concern, however, that Defendant did not provide to pretrial services any information about the business entities with which he is associated, other than CWF.

Another matter of concern is Defendant's financial condition. Defendant reported income of about $32,500 a year annually from his business CWF and rental income of about $4,050 monthly. Defendant's total alleged annual income of approximately $81,100 raises questions about other sources of money available to Defendant in light of information contained in the complaint affidavit. On pages 14 and 15 of the affidavit (Doc. No. 1), it is alleged that Defendant was going to pay the CW a total of $1 million: $200,000 initially and then $800,000 at a later time. According to the affidavit, a foreign entity

engaged in the mining industry with which Defendant is associated as a "representative" ("the Entity") was going to be the source of the money. Id. at 3, 10. Nevertheless, Defendant apparently had access to that amount of money in a relatively short period of time. Defendant has a wealth of assets, inconsistent with someone who earns about $81,100 per year. Defendant allegedly had $20,000 with him at his last meeting with the CW. He co-owns seven properties in South Florida valued at approximately $3.6 million. He owns a residence in France. And there has been information proffered that Defendant is associated with the Entity that is believed to be involved in mining contracts valued at $12 billion.

Taking all of the factors under 18 U.S.C. § 3142(g) into consideration, the undersigned finds the Government has proved by a preponderance of the evidence that Defendant is a flight risk.

The more difficult question here is whether there are conditions of release or a combination of conditions of release that will reasonably assure the Defendant's appearance as required.

Defendant has suggested a fairly extensive and comprehensive list of conditions, starting with the use of an electronic monitor and the posting of $3.6 million in property. Defendant has offered to pay for or have family and friends pay for 24-hour security. In conjunction with the electronic monitoring, Defendant would be under house arrest at his South Florida residence, and he would only be allowed to travel to the Southern District of New York for court appearances and to meet with his attorney. As previously stated, Defendant's wife is willing to serve as a third-party custodian, although she would have to travel back and forth some to France.

The Court also could impose additional conditions, some that are standard and others that are not: (1) Defendant must have regular contact with pretrial services; (2) Defendant must have daily telephonic contact with pretrial services; (3) Defendant must consent in writing to the use of armed security guards, of temporary preventive detention, and to the use of reasonable force to thwart any attempt to flee; (4) contemporaneous with Defendant's return to his residence, law enforcement officers, with Defendant's consent and assistance, remove from the premises any and all computers, cell phones, modems, and any other means by which Defendant could communicate electronically except by landline telephone, as well as anything that might serve as a weapon; and (5) Defendant shall not have any visitors without prior permission from the pretrial services officer, only after the pretrial services officer consults with the U.S. Attorney's Office.

Despite the wide range of available conditions of release, the undersigned finds there is no combination of such conditions that would reasonably assure Defendant's presence as required.

Electronic monitoring does not necessarily prevent someone from fleeing, although it allows early notice that someone may have possibly fled. The Government's presentation at the hearing and its post-hearing filing (Doc. No. 19) support this notion.

There are two concerns about the property Defendant seeks to post. First, various mistakes related to the posting of the property detract from the confidence the Court has in the property providing a deterrent to flight. Most importantly, it was initially represented that Defendant owns the seven properties outright. Thereafter, was represented that Defendant owns the properties with two other individuals. Notably, the Government alleges that these two individuals are in one way or another related to the alleged conduct

underlying the obstruction of justice charges, and they may be under investigation themselves.

Second, while $3.6 million is certainly a significant amount of money, given the allegations about various activities that Defendant has been involved in (both in the criminal complaint and in the indictment), $3.6 million is not significant enough to deter flight. It has been proffered that the mining contract at issue in the underlying criminal investigation is conservatively worth about $12 billion.

The proposed condition of 24-hour security has the potential to reasonably assure Defendant's appearance as required. This condition is clouded, however, because (as discussed previously) Defendant's financial resources remain a mystery, and because Defendant is alleged to have offered to pay the CW $1 million for the result he wanted. For these reasons, the undersigned is not confident in the effectiveness of any private security.

Defendant's lack of ties to the Southern District of New York specifically, and lack of ties to the United States generally, distinguish Defendant's case from cases cited by Defendant.

In Khashoggi, 717 F. Supp. at 1049, the defendant was arrested in Switzerland and waived his appellate rights in Switzerland relating to extradition to the charging district of the Southern District of New York. The defendant then traveled to New York for arraignment on the criminal charges. Id. He was a citizen of Saudi Arabia, and there was no extradition agreement between Saudi Arabia and the United States. Id. at 1052. The court there found that the defendant did not pose a substantial risk of flight. Id. at 1052-53. It was important to the court that the defendant's business affairs depended upon his ability to deal with high government and private business officials in the United States. Id. at

1052. According to the court, his flight from the United States "would have a ruinous impact upon his ability to conduct business in the manner with which he is accustomed." Id. In comparison, Defendant's business contacts here are minimal and nothing suggests his business CWF relies on contracts in the United States.

It was also noted in Khashoggi that the royal consulate general of Saudi Arabia had guaranteed that the defendant's homeland would ensure the defendant's appearance at trial, even though there was no extradition treaty. Id. Here, there is no such guarantee.

Defendant also relies upon United States v. Bernard L. Madoff, Nos. 08 Mag. 2735, 1:09-cr-213-DC (S.D.N.Y.) and United States v. Wesley Trent Snipes, No. 5:06-cr-22(S1)-Oc-10GRJ (M.D.F.L.). In the Madoff case, of course, the defendant was a United States citizen who had very close ties to the Southern District of New York. Neither of those factors is present here. The Snipes case differs from this case in that Mr. Snipes had numerous ties - family, business, and financial - to the United States. There are admittedly some similarities between Defendant here and the defendants in the Madoff and Snipes cases. But, they are limited. Here, Defendant has extensive business ties to different parts of the world: Europe; Africa; possibly Israel; and the United States. Defendant does not have any ties to the United States other than the business holdings he has with two persons who are deemed to be under investigation by the United States related to the crimes with which Defendant has been charged.

Based on a consideration of the proffers and all the evidence submitted and in consideration of the various authorities that were provided, the Government has proved by a preponderance of the evidence that there are no conditions or combination of conditions that will reasonably assure Defendant's appearance as required.