1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
2                JACKSONVILLE DIVISION

3   UNITED STATES OF AMERICA,      Jacksonville, Florida

4              Plaintiff,     Case No. 3:13-mj-1087-JRK

5   -vs-                           Thursday, April 18, 2012

6   FREDERIC CILINS,               11:02 a.m.

7              Defendant.     Courtroom 5D

8   _____

9

              **DIGITALLY RECORDED DETENTION HEARING**
10         **BEFORE THE HONORABLE JAMES R. KLINDT**
               **UNITED STATES MAGISTRATE JUDGE**
11

12

13  GOVERNMENT COUNSEL:

14          **Kelly Karase, Esquire**
            U.S. Attorney's Office
15          300 North Hogan Street, Suite 700
            Jacksonville, FL  32202
16

17  DEFENSE COUNSEL:

18          **Michelle Smith, Esquire**
            Law Office of Michelle P. Smith
19          P.O. Box 1788
            Orlando, FL  32802-1788
20

21  COURT REPORTER:

22          Shelli Kozachenko
            221 North Hogan Street, #185
23          Jacksonville, FL  32202
            Telephone:  (904) 301-6842
24          Fax:  (904) 301-6846

25          (Proceedings recorded by electronic sound recording;
    transcript produced by computer.)

1                    P R O C E E D I N G S

2     Thursday, April 18, 2012                    11:02 a.m.

3                         -  -  -

4          COURT SECURITY OFFICER:  All rise.  United States

5     District Court in and for the Middle District of Florida is

6     now in session, the Honorable James R. Klindt presiding.

7          Please be seated.

8          THE COURT:  This is the case of United States of

9     America against Frederic Cilins, Case No. 3:13-mj-1087-JRK.

10    Kelly Karase represents the United States and Michelle Smith

11    is here on behalf of Mr. Cilins.

12          Is that correct?

13          MS. SMITH:  That's correct, Your Honor.

14          THE COURT:  All right.  Good morning.

15          MS. SMITH:  Good morning, Your Honor.

16          THE COURT:  Mr. Cilins is in the courtroom, and

17    Ernst -- is it Thervil, sir?

18          THE INTERPRETER:  Yes, sir.

19          THE COURT:  Is here as the interpreter.

20          Let me go ahead and swear you, Mr. Thervil, please.

21    If you would stand and raise your right hand.

22          Do you solemnly swear that you will translate this

23    case from English to French and French to English to the best

24    of your ability?

25          THE INTERPRETER:  Yes, I do.

1          THE COURT:  All right.  Thank you.

2          And would you please state your full name?

3          THE WITNESS:  Ernst Thervil.

4          THE COURT:  All right.  Thank you, sir.

5          Mr. Cilins was arrested on April 14th, 2013, and he

6    had made his initial appearance on April 15th, 2013, on a --

7    he made his appearance on a criminal complaint filed in the

8    Southern District of New York.

9          When he made his appearance he asked for some time

10   to try to contact an attorney and hire counsel, and also the

11   government moved for his detention, so I set the case over to

12   today first to inquire regarding status of counsel, but it

13   looks like that's taken care of, and so we're set for the

14   detention hearing.

15         And, Ms. Smith, are you ready to proceed today?

16         MS. SMITH:  Yes, Your Honor, we are ready to

17   proceed.

18         THE COURT:  All right.  Thank you.

19         Let me just ask you, Ms. Smith, with regard to the

20   interpreter, the other day we had a little bit of a problem

21   because Mr. Cilins apparently speaks and understands English

22   fairly well, but he was not comfortable proceeding without an

23   interpreter.  But when he was answering a number of

24   questions, he was answering before the question could be

25   fully interpreted because he seemed to understand very

 1  well --

 2          MS. SMITH:  Your Honor --

 3          THE COURT:  -- so --

 4          MS. SMITH:  -- may I -- forgive me for interrupting

 5  you.

 6          THE COURT:  Yes.

 7          MS. SMITH:  The interpreter is actually not

 8  interpreting now, so if we could instruct the interpreter

 9  that he has to interpret word for word what you're saying.

10          THE COURT:  Yes.  Well, and that's my -- and that's

11  my question.  Is Mr. Cilins -- is his desire to have a

12  simultaneous translation, or is he -- is he comfortable

13  proceeding in English and having the interpreter interpret

14  phrases or words that he might not understand?

15          MS. SMITH:  I think -- if I can have just one

16  moment.  I spoke with him at Folkston two days ago, but if I

17  could have just a moment?

18          THE COURT:  Yes.  Yes, yes.  Take your time.

19          MS. SMITH:  Your Honor, he's indicating now -- and

20  he has the same problem I do.  I understand some French so I

21  hear the French, I hear you, and it's hard to concentrate.  I

22  speak a couple of languages.

23          We spoke the other day, and he indicated to me,

24  much like I would be if I went to Spain or went to Brazil --

25  I speak both languages fluently, but I would want an

interpreter in legal proceedings or medical matters and
things that are very important.  That is what he has
indicated to me.

    The problem he's having right now, he's hearing you
and listening to you and he's also hearing the interpreter.
I don't know if we can maybe try the headphones and see if
that works any better.

    THE COURT:  We can try to see whatever works,
because I want whatever's working to work well, and I
understand that -- let me just ask, Mr. Thervil, are you able
to do a simultaneous translation?

    THE INTERPRETER:  Yes, Your Honor.

    THE COURT:  All right.  Well, let's see what we can
do then.

    MS. SMITH:  And, Your Honor, I'm sorry but -- he
does speak English but, again, I think the problem is this is
an important proceeding, and he needs to understand
exactly --

    THE COURT:  Yes.  And I don't mind that at all, but
the problem we had the other day is while he wanted to do
that, he kept answering questions before they could even be
interpreted, so it almost seemed like a waste of time, and it
confused the proceedings.

    I want to do it however he wants it and whatever's
best for him.

1          MS. SMITH:  Well, one way or the other --

2          THE COURT:  Yeah.  We need to do it one way or the

3     other, that's for sure.

4          (Ms. Smith conferring with defendant.)

5          THE COURT:  I doubt if I'll be asking him any

6     questions, but . . .

7          MS. SMITH:  (Unintelligible.)

8          THE COURT:  All right.  Is that working now,

9     Mr. Thervil?

10          THE INTERPRETER:  Yes, Your Honor.

11          THE COURT:  All right.  So if you will, then, make

12     a simultaneous translation of what is said in the courtroom,

13     all right?

14          All right.  So the government has moved to detain

15     Mr. Cilins based on its view that he is a flight risk.

16          And, Ms. Karase, are you ready to proceed?

17          MS. KARASE:  Yes, Your Honor.

18          THE COURT:  All right.  You may proceed.

19          MS. KARASE:  As Your Honor has stated, the

20     government seeks detention of this defendant based on the

21     fact that he's a risk of flight.  Now, I'm not going to

22     restate every fact that's contained in the very lengthy

23     complaint because I believe it sets forth an adequate

24     description of the investigation and the defendant's actions

25     in this particular instance.

1      MS. SMITH:  Your Honor, forgive me.  If Ms. Karase

2 could slow down, the interpreter is -- I speak French.  He's

3 way behind and (unintelligible).  I hate to be a pain.  I

4 really --

5      THE COURT:  No.  No.  That's fine.

6      MS. SMITH:  Just slow down a little bit.

7      THE INTERPRETER:  He's also saying --

8      MS. SMITH:  The echo.

9      THE INTERPRETER:  -- there is an echo and there's

10 a -- the sentence -- when I'm speaking he could hear

11 something, could not hear everything, so it just --

12      THE COURT:  Here's what I'm going to do.  I'm going

13 to take a recess and you all try to get this straightened

14 out.  You may be sitting too close to him using the

15 microphone too.  That could be a problem.

16      But let's take our time and get this worked out,

17 and we'll get the people down here if we need to from the

18 audio technical department and get this worked out.

19      So take whatever time you need to work it out.  I'm

20 not in any hurry at all, but I want to keep some semblance of

21 order to this proceeding because there's no reason for it not

22 to be orderly.

23      So, Ms. Karase, you and I will both do what we can

24 to talk slowly.  The problem we had the other day, you could

25 only say a phrase and then you had to wait until the entire

phrase was stated and then you had to wait again and there
was no simultaneous aspect to it.

　　　　If it can't be done simultaneous, I need to know
that and so does Ms. Karase and everyone who speaks in the
courtroom.  So if it can't be done simultaneously, I just
need to know that, and if that's the case, we may have to
reschedule because it will probably take us about five or six
hours to do this, which is fine.  I have all day tomorrow if
we need to because I think the Federal Public Defender's on
furlough and so we can't do anything in their cases.

　　　　So if we have to reset it for tomorrow where we
take our time, that's fine, because I really -- the most
important thing, and it's not even happening now, is that
Mr. Cilins knows exactly what's going on in the courtroom.
So we'll be in recess.

　　　　(Recess from 11:11 a.m. until 11:19 a.m.; all
parties present.)

　　　　COURT SECURITY OFFICER:  All rise.  This Honorable
Court is now in session.

　　　　Please be seated.

　　　　THE COURT:  All right.  Ms. Chaddock tells me that
we're set to go now, and Mr. Thervil is able to make a
simultaneous translation, and Mr. Cilins is able to hear him.

　　　　Mr. Cilins, if you can't or don't understand
something at any point or you're losing the audio, just raise

your hand and we'll stop and try to deal with that, all
right?

He's shaking his head yes which indicates to me
he's hearing.

THE DEFENDANT:  (In English:)  I understand.

MS. SMITH:  And, Judge, the parties have just sort
of come and agreed that if there is a problem he's going to
raise his hand, so if he loses -- in case I miss it or
something, he'll raise his hand so somebody in the courtroom
should notice.

THE COURT:  Right.  Thank you.

All right.  Ms. Karase, let's start from the
beginning, then, if you would, please.

MS. KARASE:  Yes, Your Honor.  As I stated, the
United States is seeking detention based on risk of flight.
I'm not going to go through every fact that's contained
within the detailed and lengthy criminal complaint, but I do
wish to highlight a few facts for the Court that I think are
important.

Of course, there was an existing federal grand jury
investigation into violations of the Foreign Corrupt
Practices Act.  This was an investigation into a scheme to
obtain valuable mining concessions in the country of Guinea.
It's important to note that these mining concessions have a
value of approximately $2.5 billion.

1          The investigation involves whether or not a foreign

2     company bribed officials of the former government of Guinea

3     to obtain these mining rights in 2008.  The allegations at

4     the heart of that investigation regard whether or not the

5     company defined as the Entity in the body of the criminal

6     complaint paid high ranking government officials in Guinea

7     approximately $12 million for these mining concessions.

8          Now, of course, a big section of the criminal

9     complaint deals with a confidential witness who has firsthand

10    knowledge about unlawful payments made to obtain these mining

11    concessions.  This witness was served with a federal grand

12    jury subpoena on February 2nd, 2013.  It required this

13    witness's testimony and also the production of documents

14    relating to these mining concessions and payments made in

15    exchange thereof.  This defendant was negotiating with these

16    officials and their representatives on behalf of the company,

17    or the Entity, as referred to in the complaint.

18          In early March 2013, the defendant contacted the

19    confidential witness by telephone to offer money in exchange

20    for the production of the originals of contracts and other

21    documents subpoenaed by the federal grand jury, and in

22    recorded telephone calls this defendant offered that

23    confidential witness money for false testimony denying the

24    existence of any prior contracts.

25          This defendant had a face-to-face meeting with the

confidential witness that was surveilled by law enforcement
and recorded.  The defendant offered the confidential witness
$300,000 for the witness's production of the originals of the
documents and for the witness to execute a contract in which
the witness agreed to deny the existence of any prior
contracts or prior receipt of money in connection with mining
concessions.

In a later recorded and surveilled face-to-face
meeting --

THE COURT:  When was the first recording that you
referenced?

MS. KARASE:  The first face-to-face meeting, Your
Honor?

THE COURT:  Yes.

MS. KARASE:  March 25th.

THE COURT:  All right.

MS. KARASE:  There was a second face-to-face
meeting on April 11th in which this defendant advised that
same confidential witness that the witness would be paid a
total of $1 million for compliance with the terms that
Mr. Cilins had dictated.

He specified that $200,000 would be paid up front.
An additional $800,000 would be paid at a later date.  He
provided the confidential witness with a written document
called an attestation in which he required -- in which the

1 document required the witness deny any contracts for mining

2 concessions and deny ever receiving any money.

3         Paragraph 21 of the criminal complaint sets forth

4 the specifics -- some of the specifics of the attestation.

5         THE COURT:  What page is that?

6         MS. KARASE:  It's on page 15, Your Honor, and

7 carries over to 16.

8         The confidential witness provided a copy of this

9 document to law enforcement after the end of the meeting.

10 There were a lot of specifics mentioned during that meeting

11 as well, including this defendant's agreement to get the

12 confidential witness some immediate cash.

13         They agreed to meet again, and a meeting was

14 arranged on April 14th, 2013, which is the day that the

15 defendant was taken into custody.  The defendant arrived at

16 the meeting and had in his possession approximately $20,000

17 in United States currency.

18         According to the report that this defendant

19 provided to pretrial services, $20,000 in U.S. currency is

20 more than half of his annual income.  He provided no other

21 source for annual income that he had.  Further, he identified

22 with great specificity five properties that he owns in

23 Florida.  This included approximate market value, rental

24 income, approximate location, and the current status, be it

25 occupied or unoccupied.

1      The total value of the five properties he told us

2   about was $779,000.  The government has reasons to believe,

3   specifically based on my own conversations with the

4   defendant's attorney, Ms. Smith, that the defendant actually

5   has several million dollars' worth of property in Florida,

6   and this is unencumbered property that he somehow has managed

7   to acquire on his $32,000 salary that he earns in France,

8   and, of course, that's converted to dollars.  It's

9   concerning, Your Honor, that he was dishonest with pretrial

10  services in identifying the assets that he has.

11      Another and probably the most concerning factor

12  about the circumstances of Mr. Cilins' arrest are that in his

13  possession at the time of his arrest was a French passport.

14  When the agents with the FBI contacted the French consulate

15  to notify the consulate of Mr. Cilins' arrest, they provided

16  the passport number from that French passport.  Now, this is

17  the French passport that Mr. Cilins used to enter the United

18  States, and it bore the entry stamp from when he arrived and

19  several other entry stamps.

20      The French consulate, when -- having run that

21  number, reported that it was not a valid passport, that it

22  appeared to be a fraudulent passport, and that number did not

23  come back to any existing French passport.

24      The agents, being diligent as they are, located a

25  photocopy of a passport in Mr. Cilins' property at the time

1   of his arrest.  Although this photocopy bore a photograph of

2   the defendant and his address, the same address that was on

3   the physical passport, it had a different issue date and a

4   different passport number.

5        The agents provided the passport number from the

6   photocopy to the French consulate and confirmed that this

7   was, in fact, a validly issued passport.  Your Honor, we

8   don't know where that physical passport is.  All we know is

9   that there's a photocopy and that at some point it was in

10  existence.

11       Mr. Cilins is not a United States citizen or a

12  legal permanent resident.  In fact, as I've just proffered,

13  he was traveling on a fraudulent French passport at the time

14  that he was arrested.  There's currently an immigration

15  detainer in place because he was here under the visa waiver

16  program.

17       When looking at the factors under 3142(g) of Title

18  18, we examine the nature and circumstances of the offense

19  charged.  This offense was particularly egregious, Your

20  Honor.  This was the interference, continuously and

21  repeatedly, with a pending federal grand jury investigation.

22       As the complaint explains, although he may not be a

23  citizen of this country, Mr. Cilins was made aware of what a

24  federal grand jury is and what its significance is.  He

25  repeatedly instructed the confidential witness to destroy

1   documents requested as part of that investigation.  He

2   repeatedly instructed the witness to lie as part of that

3   federal grand jury investigation.  He went so far as to

4   outline the terms in a document that he provided to the

5   confidential witness, which gets to the next factor as to the

6   weight of the evidence against Mr. Cilins, which is factor

7   No. 2 under 3142(g).

8           The weight of the evidence against Mr. Cilins is

9   very strong.  There are multiple recorded calls and

10  face-to-face recorded meetings that were also surveilled by

11  law enforcement.

12          With regard to the penalties that Mr. Cilins is

13  facing as a result of this offense, we've covered the maximum

14  term of imprisonment, which Count One is 20 years under the

15  statute.  The guideline range, Your Honor, surpasses the

16  statutory maximum.

17          The applicable guideline range for this offense is

18  approximately 262 months imprisonment to 327 months

19  imprisonment.  This is because we look at the underlying

20  offense in which this witness -- this defendant was

21  obstructing the investigation of, and that offense is the

22  Foreign Corrupt Practices Act.

23          The amount of the benefit received in return for

24  the bribes under the Foreign Corrupt Practices Act was over

25  $2 billion, which is off the chart in terms of the fraud

1  calculations guidelines.

2          We look at the history and characteristics of the
3  person, and included therein, we look at the person's
4  character.  Well, we know that he was less than truthful with
5  pretrial services in summarizing the assets that he has.  The
6  fact that he showed up to a meeting with the confidential
7  witness with $20,000 in cash but reports an annual income of
8  less than twice that is indicative of someone being
9  untruthful.

10          We also look at the property that he denied --
11  well, the property that he claimed to own when meeting with
12  pretrial services and the property that was later disclosed
13  that he actually has access to and owns through his attorney.
14  And just so we're clear, I've had conversations with Officer
15  Watson about whether there was any confusion when she was
16  interviewing the defendant.  She's confident that he
17  understood, they were able to communicate well, and the only
18  properties he listed are those that are included in the
19  report.

20          We look at the defendant's family ties.  He has
21  none to the United States.  We look at the financial
22  resources of the defendant.  He has significant financial
23  resources, which of course indicates the motive and ability
24  to flee.

25          The amount of cash that he's offering, paying to

1  the confidential witness, a total of $1 million at the April

2  11th meeting, and the fact that the original bribes in which

3  this defendant was involved in 2008 amounted to $12 million

4  are indicative of just how significant this defendant's

5  financial resources are.

6        He doesn't have any ties to this community other

7  than this property that he may have a financial interest in.

8  He travels back and forth frequently, and we know that he was

9  traveling on this occasion on a false passport and have no

10 information as to where his real passport is.

11       Your Honor, if this defendant were released and he

12 somehow made his way back to France, in violation of any bond

13 conditions this Court would set, the United States would not

14 be able to extradite him from France.  France will not

15 extradite its own citizens.

16       Your Honor, for these reasons, the penalty that

17 this defendant is facing, his lack of ties and status in the

18 United States, the falsehoods that he's put before this Court

19 and this government in traveling on his false passport all

20 support a finding of detention based on risk of flight.

21       THE COURT:  All right.  Ms. Smith, do you have

22 questions for Ms. Karase on her proffer?

23       MS. SMITH:  Your Honor, I was hoping we would

24 actually hear from an agent today.  I assumed that they would

25 bring an agent in, so I do have some questions on the

1 proffer.

2        THE COURT:  All right.  Well, the practice in this

3 division is one that isn't seen in many places, but it's been

4 in place since about 1987, and that is that defense counsel

5 is given the opportunity to examine counsel, and we go from

6 there.  If it becomes apparent that the relevant information

7 is in the possession of an agent, then the Court does

8 consider whether it would be appropriate to allow the

9 defense -- or defense counsel to call an agent.

10        So it's not necessarily precluded, and I don't

11 know -- Ms. Karase, is the agent present with you a local

12 agent or someone from New York who would have more knowledge

13 of the case?

14        MS. KARASE:  The agent present is a local agent,

15 Your Honor.  She has been involved in some local aspects of

16 the investigation, but she certainly is not the case agent.

17        THE COURT:  All right.  Well, we'll proceed and see

18 how we do, and we'll go from there.

19        Ms. Karase, if you don't mind moving over to this

20 podium, and, Ms. Smith, if you could use this one so I can

21 make sure that we're getting everything recorded properly.

22        MS. SMITH:  Thank you, Your Honor.

23        THE COURT:  And if this being -- if this is your

24 first experience in our division, basically cross-examining

25 an assistant United States attorney, it's -- I find that

1    those who haven't practiced the way we do it here tend to not

2    be as comfortable with the situation, so we'll just take it

3    slow and you can just make sure that you allow Ms. Karase to

4    answer your questions and I'll make sure she allows you to

5    ask them.

6            And then if she objects to a question, then she

7    gets to object and we'll go from there.

8            So you may proceed.

9            MS. SMITH:  Your Honor, if I can make a joke, this

10   should be a lot of fun.

11           THE COURT:  Well, sometimes it is --

12           MS. SMITH:  I'm making a joke, Your Honor.

13           THE COURT:  I know.  I know.  Yes, you may --

14           MS. SMITH:  A little levity this morning.

15           THE COURT:  One minute.

16           THE INTERPRETER:  He has told the interpreter to

17   get with the mike closer to the interpreter's mouth.

18           THE COURT:  Okay.  Let me -- let's just

19   double-check now.

20           Mr. Cilins, are you following everything, sir?

21           THE DEFENDANT:  Yes.

22           THE COURT:  All right.  Ms. Smith, you may proceed.

23           MS. SMITH:  Thank you, Your Honor.  Please the

24   Court?

25           THE COURT:  Yes.

1          MS. SMITH:  Ms. Karase, what information do you

2     have to show that Mr. Cilins was actually involved with BSGR,

3     the Entity mining company named in the criminal complaint in

4     2008?

5          MS. KARASE:  He was present at several meetings

6     that were held and acted on behalf of the entity in

7     negotiating those $12 million contracts, the contracts that

8     totaled in value $12 million.

9          MS. SMITH:  What was the exact date of those

10    contracts?

11         MS. KARASE:  Ms. Smith, other than what's contained

12    in the criminal complaint, I'm not positive of the dates.

13         MS. SMITH:  Isn't it a fact those were actually

14    negotiated after Mr. Cilins terminated any relationship

15    whatsoever with BSGR?

16         THE INTERPRETER:  The interpreter --

17         MS. KARASE:  Ms. --

18         THE COURT:  Whoa, whoa, whoa.

19         THE INTERPRETER:  Ms. Smith needs to slow down a

20    little bit.

21         MS. SMITH:  I'm sorry.

22         THE INTERPRETER:  Can you repeat the question for

23    the interpreter, please?

24         MS. SMITH:  Thank you.

25         Isn't it a fact that Mr. Cilins terminated any and

1  all ties with BSGR, the Entity, in 2007?

2          MS. KARASE:  Mr. Cilins indicated that he was still

3  acting on behalf of the Entity's president in a recorded

4  conversation with the confidential witness in -- as recently

5  as the last month.

6          MS. SMITH:  That wasn't my question.

7          In 2008 he was not actively employed, working for,

8  or in any other capacity connected with BSGR.

9          MS. KARASE:  It's my understanding --

10          THE COURT:  Slow down.  Let him finish.

11          Okay.

12          MS. KARASE:  It's my understanding that he was

13  still acting on behalf of the Entity.  I do not know whether

14  or not he was formally employed in terms of receiving a

15  paycheck or under some employment agreement, but it's my

16  understanding he was still acting in furtherance of the

17  Entity and representing the Entity through his presence at

18  meetings and his negotiations of those contracts.

19          MS. SMITH:  You have reviewed both his current

20  passport and his previous passport for his entry and exit

21  stamps to Guinea?

22          MS. KARASE:  Ms. Smith, his current and valid

23  passport has not been located.  We just have a photocopy of

24  that.

25          MS. SMITH:  Well, let's move to that and then we'll

1    come back to this line of questioning.

2            Do you have both the passport that you retrieved,

3    that your agents retrieved, from Mr. Cilins as well as the

4    photocopy with you?

5            MS. KARASE:  No.  The fraudulent passport, we do

6    not have the physical copy.  I have a photocopy of the

7    passport, just the one page, and then the photocopy that was

8    actually seized -- well, a photocopy of a copy that was

9    seized from Mr. Cilins.

10           MS. SMITH:  Wasn't the passport actually seized,

11   the one that you're alleging is a fraud?

12           MS. KARASE:  Yes, it was.

13           MS. SMITH:  Okay.  And your agent does not have

14   that?

15           MS. KARASE:  She does not have that in the

16   courtroom with her at the time, no.

17           MS. SMITH:  Where is that located right now?

18           MS. KARASE:  It's in evidence.

19           MS. SMITH:  And who exactly did you speak with at

20   the consulate?

21           MS. KARASE:  I did not speak with anyone at the

22   consulate.

23           MS. SMITH:  So you have no firsthand knowledge that

24   the passport is actually a fraud.

25           MS. KARASE:  I will proffer that the FBI has spoken

1 with the consulate and was told that the passport was a

2 fraud.

3       MS. SMITH:  Who did they speak with at the

4 consulate?

5       MS. KARASE:  A female by the name of Pasqual

6 Garcia.

7       And let me be clear.  The passport number was not a

8 registered number.

9       MS. SMITH:  And did you actually speak -- what is

10 Ms. Pasqual Garcia's capacity at the consulate?

11      MS. KARASE:  She was the contact who received

12 notification of the arrest and to whom the notice was

13 directed when the agents called and advised the nature of the

14 report they had to make.

15      MS. SMITH:  Did she -- which consular office is she

16 located in?

17      MS. KARASE:  Miami.

18      MS. SMITH:  Did anyone attempt to speak with the

19 consul general or his -- the honorary consul general in

20 Orlando?

21      MS. KARASE:  No.

22      MS. SMITH:  So other than a deputy clerk who said

23 the passport was fraudulent or not registered -- actually

24 they said it wasn't registered, not that it was fraudulent --

25 that is the only information you have.

1          MS. KARASE:  Correct, and the photocopy of the

2     missing passport.

3          MS. SMITH:  What was the issue date on the passport

4     you obtained from Mr. Cilins?

5          Your Honor, for the record, I would like to see

6     both of those passports at this -- they've made a very

7     serious allegation here that we have a fraudulent passport,

8     and I don't believe that --

9          MS. KARASE:  The issue date of the actual passport

10    that was recovered was October 21st, 2008.  The photocopy of

11    the valid passport bears an issue date of March 19th, 2007.

12         MS. SMITH:  Have you verified with France if a

13    person may have more than one passport?

14         MS. KARASE:  No.

15         MS. SMITH:  So you've not -- you've not made any

16    attempts to verify if France is like England or some of the

17    other EC countries that allow duplicate passports to be

18    issued.

19         MS. KARASE:  I'm not aware of that, but no, that

20    inquiry has not been made.  The passport bearing the issue

21    date of March 19th, 2007, has not been located though.

22         MS. SMITH:  May I see the copies that you're

23    relying on?

24         Your Honor, may I have just a moment, please?

25         THE COURT:  Yes.

1          THE DEFENDANT:  (In English:)  Can I say anything

2   to my attorney?

3          MS. SMITH:  No.  I don't think you're going to need

4   to.  I can read the French, if I can read it.

5          You're aware that the passport -- the two -- Your

6   Honor, may I have just a moment?

7          THE COURT:  Yes, ma'am.

8          Let me just say, what is it that you've been

9   handed?  I know there was a copy of, I thought, the first

10  passport that was referenced, the one that was actually

11  seized.  Do we know which -- what copies you have?

12         MS. SMITH:  Your Honor, I'll read what's on there

13  so we can sort of distinguish between the two copies, and

14  then the government may be able to tell you which one's

15  which.

16         THE COURT:  Slow down just a little.

17         MS. SMITH:  The first passport was issued, as the

18  government said, in March 19th of 2007, has an expiration of

19  March 18th, 2017.  The passport number -- there are two of

20  them.  One is difficult to read.  It appears to be 07 and

21  then I can't read two letters.  What it appears to end in is

22  a 96 or a 94.  The actual stamped -- and that was on the

23  stamped page portion of the passport.  The numbers on the

24  passport initial photo page indicate the passport number is

25  07A as in apple, K as in kilo, 26794.

1          The other passport photograph, and we only have the

2     front -- again, the face pages of both of them --

3     indicates -- the stamped pages are, again, very difficult to

4     read, but appear to say 07CT94, an unintelligible number,

5     followed by 52.  And the stamped portion of the passport

6     that's actually written with a typewriter or computer appears

7     to say 08CT94852.

8          They both are issued to Frederic Cilins.  They both

9     describe his height at 1.82 meters, his eyes as *marron*, which

10    is brown, and his nationality as French.

11         The second passport was issued apparently

12    10/21/2008 and would expire 10/20/2018.

13         THE COURT:  All right.  Thank you.

14         MS. SMITH:  Your Honor, I'm tendering those back to

15    the government so she can tell me which one -- I believe the

16    one that she claimed was legitimate was the 2007 issue date.

17         MS. KARASE:  That's correct.

18         And, Your Honor, I'll mark these photocopies as

19    exhibits and make them part of the record since we've made

20    several references to them now.

21         THE COURT:  All right.  Thank you.

22         MS. KARASE:  And just for clarification, I'll mark

23    the one with the issue date of 2007 as Government's Exhibit 1

24    and the one with the issue date of 2008 as Government's

25    Exhibit 2.

1          THE COURT:  All right.

2          MS. SMITH:  I believe I asked you -- and then we

3     sort of got sidetracked -- whether you verified if France

4     allowed the issuance of two passports under certain

5     circumstances.

6          MS. KARASE:  No.

7          MS. SMITH:  So for all you know, these are two

8     legitimate passports, one with a number that you claim is

9     registered and one with a number that you claim is not

10    registered.

11         MS. KARASE:  It's not my claim; it's the claim made

12    by the French consulate, but yes, that is the information

13    that we received.

14         MS. SMITH:  Did you look at the passport that was

15    taken, the actual passport, which would have been Exhibit

16    No. 2, and did you verify the entry visa and the entry stamps

17    by U.S. Customs on there?

18         MS. KARASE:  The passport that was retrieved, the

19    physical passport, had several entry and exit stamps, but the

20    particulars of those stamps were not verified.

21         MS. SMITH:  And you're aware that Immigration and

22    Customs Enforcement, and specifically CBP, which is Customs

23    and Border Protection, actually scan the passport through a

24    machine which runs it back into France to verify -- they link

25    it to the consuls to verify the passports.

1          MS. KARASE:  That has been my own personal
2     experience.  I don't know whether that was done so in this
3     case or under what circumstances this defendant entered the
4     country.

5          MS. SMITH:  So it's your -- I'm sorry.

6          So it's your contention that at least on three or
7     four, five, six occasions that Mr. Cilins has entered on the
8     2008 -- the one that you're claiming is a fraudulent
9     passport, that CPB did not at any time do their job and
10    verify that passport.

11         MS. KARASE:  Ms. Smith, I certainly wasn't present
12    when he entered, and I haven't reviewed the passport itself,
13    nor has the agent, particularly to note the entry and exit
14    stamps other than to notice that it did bear several entry
15    and exit stamps.

16         MS. SMITH:  For the United States.

17         MS. KARASE:  I don't think that we can even say for
18    the United States.  Just that it had entry and exit stamps.

19         MS. SMITH:  Your Honor, I would request production
20    and an actual review of the passport, and I'd like to be able
21    to contact -- before Your Honor makes a decision, obviously,
22    unless you're going to release him -- that I be allowed to
23    review the passport and contact the consul myself.

24         THE COURT:  Well, we'll make -- we'll discuss that
25    when --

1          MS. SMITH:  When the time comes.

2          THE COURT:  -- when the time comes.

3          MS. SMITH:  Ms. Karase, if we can move back to

4    Guinea and the allegations in the complaint.

5          Have you been in contact with the Guinean

6    government?

7          MS. KARASE:  No, I have not.

8          MS. SMITH:  So you're aware that the actual

9    contracts between BSGR were actually initiated in 2002, 2005,

10   and 2006, the initial contracts.

11         MS. KARASE:  All I can tell you about that -- I

12   can't speak on behalf of the Guinean government, other than

13   to say that there is an open investigation in the Republic of

14   Guinea.

15         MS. SMITH:  And that open investigation revealed

16   that parliament, three separate governments inside Guinea,

17   both the old government, the secondary government after

18   President Conte died, and then the next government, all

19   approved all of the BSGR contracts.

20         MS. KARASE:  Your --

21         MS. SMITH:  Parliament and the government

22   themselves, the president and the government.

23         MS. KARASE:  Your Honor, I'm going to object to

24   this line of questioning as being outside the scope of the

25   offenses with which the defendant is charged in the

complaint, which regard the obstruction of justice, the
tampering with a witness, and the destruction of records.

THE COURT: Well, I'll allow a few more questions
in this area, and if you don't know, then you don't know.
And I'm guessing Ms. Smith plans to proffer various
information about this, so you did touch on the contracts to
at least a sufficient degree to allow some questioning about
it.

But I recognize that those aren't the charges, but
I think you were providing certain information by way of
background, and I'm thinking she's doing the same or will do
the same.  But if you -- and if you don't know, just say so
and she can ask her next question.

MS. KARASE:  Ms. Smith, I'm not certain of the
dates that you referenced.

MS. SMITH:  Okay.  In the investigation none of
your FBI agents has actually spoken with the Guinean
government to obtain the originals of those contracts, have
they?

MS. KARASE:  Can you define "your FBI agents"?

MS. SMITH:  The government's FBI agents.

MS. KARASE:  I can't speak on behalf of every
single FBI agent that's employed by the FBI, Your Honor --
Ms. Smith.

MS. SMITH:  The ones that are involved in this

1    investigation.

2         MS. KARASE:  I'm not aware of what context they may

3    or may not have had with the government of Guinea.

4         MS. SMITH:  Isn't it true that they are relying on

5    solely the testimony of Mamadie Toure, a former consort of

6    the president who died in December of 2008, president of

7    Guinea?

8         MS. KARASE:  No.

9         MS. SMITH:  What other information besides the

10   recorded telephone conversations do you have other than the

11   testimony of Mamadie Toure?

12        MS. KARASE:  Well, you've touched on it in your

13   questioning.  There were recorded telephone conversations.

14   There were recorded meetings.  There was your client's own

15   words.  There were documents provided by your client, cash

16   provided by your client, travel records of your client.

17        MS. SMITH:  Well --

18        MS. KARASE:  There was substantially more than the

19   word of someone that was uncorroborated.

20        MS. SMITH:  Let's talk about those travel records.

21        Can you tell us exactly what travel records you're

22   discussing?

23        MS. KARASE:  Well, I can tell you -- I can tell you

24   that the defendant met with the confidential witness on

25   multiple occasions, and he claims to have been residing in

1  France at all times, and I can tell you that those meetings,

2  at least three, were surveilled and recorded.

3         MS. SMITH:  What other -- what other travel

4  documents, records are you relying on in your criminal

5  complaint or to show that he is a risk of flight?

6         MS. KARASE:  Other travel documents include the

7  existence of an otherwise valid passport that we've been

8  through that we do not know the whereabouts of, and although

9  I do not have them, I'm confident that travel records exist

10  to confirm his presence in Jacksonville.

11         I know that he flew in from -- that he flew in and

12  the meetings took place at the airport, and so I'm confident

13  that there are records of those travels as well in order to

14  have those meetings with the confidential witness.

15         MS. SMITH:  And that is the three meetings in -- or

16  the four meetings that happened between March and April.

17         MS. KARASE:  That's correct.

18         THE COURT:  Can you -- when you say -- may I ask a

19  question?

20         MS. SMITH:  Certainly.

21         THE COURT:  When you say that they took place at

22  the airport, are you talking about the Jacksonville airport,

23  and is that where all three meetings took place?

24         MS. KARASE:  At the Jacksonville airport, yes.

25         THE COURT:  All three meetings?

1          MS. KARASE:  Yes, Your Honor.

2          THE COURT:  All right.  Thank you.

3          MS. SMITH:  Did you verify that in fact Mamadie

4    Toure and Mr. Cilins have met and/or spoken frequently since

5    2005/2006?

6          MS. KARASE:  I don't have information about that.

7          THE COURT:  Is the person you're referencing by

8    name the person who you think is referred to as the CW in the

9    complaint?

10         MS. SMITH:  It is indeed, Your Honor.  She's the

11   one who's also an alleged conspirator in the underlying

12   Foreign Corrupt Practices Act.  She is the alleged recipient

13   of the millions of wrongfully paid -- allegedly wrongfully

14   paid dollars.  She's allegedly the recipient, so therefore

15   she is an accomplice in the underlying Federal Corrupt

16   Practices Act case, should the government ever be able to

17   prove that case.

18         THE COURT:  All right.

19         MS. SMITH:  You're aware that Ms. Toure and persons

20   on behalf of Ms. Toure have circulated fraudulent documents

21   since as early as 2008 and 2007 in an attempt to blackmail

22   BSGR, Mr. Cilins, and other persons and other business

23   entities doing business in Guinea.

24         MS. KARASE:  No, I'm not aware of that.

25         MS. SMITH:  You're aware that all of the documents

that Ms. Toure has in her possession are actual fraudulent

documents.  None of them are original documents.

MS. KARASE:  I am not aware of that, and certainly

your client's valuation of those documents suggest otherwise.

MS. SMITH:  Ms. Karase -- Karase, I'm sorry.

Ms. Karase, you're aware that persons in South

Africa have been blackmailed or extorted either through, by,

or on the behalf of Mamadie Toure.

MS. KARASE:  I'm not aware of that.

MS. SMITH:  You're aware that Mamadie Toure was

actually not the wife of the former president, although you

have listed her as the wife of the former president.

MS. KARASE:  I'm not aware of that.

MS. SMITH:  Isn't it a fact that she actually was a

consort?  She was the fourth in a line of three actual wives

and a fourth mistress.

MS. KARASE:  I'm not aware of that.

MS. SMITH:  You're aware that the contracts for the

Simandou complex, which is the BSGR complex -- I think it's

Simandou, and I may be mispronouncing that -- that that

mining site were actually the original leases or exploration

agreements were signed as early as 2002 and 2005.

MS. KARASE:  Your Honor, at this time I object

again as --

THE COURT:  Do you know?  I mean, do you know?

1          MS. KARASE:  I do not.

2          THE COURT:  Just say you don't know.  That's fine.

3          MS. SMITH:  You're aware that after President

4   Conte -- I may be pronouncing his name wrong -- died in

5   December of 2008, additional contracts with BSGR were

6   negotiated, directed by BSGR, without Mr. Cilins or any of

7   the former persons who had negotiated on behalf of BSGR.

8          MS. KARASE:  I'm not aware of that.

9          MS. SMITH:  Have you viewed those contracts that

10  were negotiated in 2008 and 2009?

11          MS. KARASE:  No.  Ms. Smith, I just advised I'm not

12  aware of the existence of those contracts.

13          MS. SMITH:  Are you aware that the Guinean

14  government, the new Guinean government that came in following

15  the president's death in December of 2008, actually --

16  Ms. Mamadie Toure fled from that government because she was

17  being investigated?

18          MS. KARASE:  I'm not aware of that.

19          THE COURT:  Ms. Smith, this -- maybe because this

20  could take twice as long as it needs to, if you're going to

21  proffer all of this --

22          MS. SMITH:  I am, Your Honor.

23          THE COURT:  -- which I'll allow you to do, I think

24  that in terms of the specifics of the underlying

25  investigation, if Ms. Karase doesn't object to it, we can

1   assume that she doesn't know those facts, given that she's

2   not handling the case, and I'll be glad to hear whatever

3   proffer you have at the appropriate time.

4       But I think I'm going to hear all of this twice,

5   the first time when you ask the question and Ms. Karase

6   states that she doesn't know, and then when you proffer it.

7       MS. SMITH:  Fair enough, Judge.

8       THE COURT:  I think -- I think we've established

9   that -- and it's clear that Ms. Karase -- her information is

10  based on what's in the criminal complaint and to whomever

11  else she's attributed it at this point.

12      Is that fair to say, Ms. Karase?

13      MS. KARASE:  That is fair, and I do not object to

14  proceeding in the manner that Your Honor has suggested.

15      THE COURT:  But go ahead and ask questions in other

16  areas about the proffer.  Please proceed.

17      But you know what I'm going to do is I'm going to

18  take a brief recess because I know that our interpreter needs

19  some periodic breaks because it's very strenuous, both

20  mentally and physically, in terms of what he's doing, and I

21  think that your client might also need a break.

22      So why don't we take about ten minutes, but we're

23  going to have to think about lunch at some point too because

24  I have the court personnel and the United States marshals and

25  everyone else to consider, in addition to ourselves, so --

1      MS. SMITH:  Your Honor, would you like to take a

2  lunch break to let your staff have a break now?  I mean, I

3  can be here all afternoon if need be.  I don't know what

4  Ms. Karase has on her agenda, but -- I don't want to belabor

5  the point, but I also know, working for Judge Presnell and

6  members of the Court, I also know how staff are.  They need a

7  break.

8      THE COURT:  Yes.  Well, let's see.  Let's just see.

9      Well, why don't -- I know you're with me this

10  afternoon at 2:00 for two hearings.

11      MS. KARASE:  And, Your Honor, I do anticipate those

12  will both be very short in light of new information.

13      THE COURT:  Well, am I to understand that in those

14  two cases the government will be withdrawing their detention

15  motions?

16      MS. KARASE:  That's correct, Your Honor.

17      THE COURT:  Well, if we're going to set conditions

18  of release, that could take a while given that those will be

19  done with a translator or an interpreter also.

20      MS. KARASE:  And I should say it's dependent upon

21  suitable third-party custodians appearing.

22      THE COURT:  All right.  Well, that could take --

23  that could take quite a while.

24      Let's do this.  Why don't we -- why don't we -- why

25  don't we recess till 12:30.  That's a little more than 20

1  minutes, and we'll try to get everybody in good enough shape

2  to proceed from 12:30 until 1:30, and then I have a very

3  short matter that I have to attend to, and then we could

4  start again and go until 2:00.

5       I am thinking, though, that you're going to want

6  additional -- at least a copy of the passport.

7       Do you have any objection to that?

8       MS. KARASE:  I don't have an objection with

9  permitting Ms. Smith to view that.  No.  I certainly, of

10 course, don't want to turn it over to her, but I don't have a

11 problem with -- and assuming that we can obtain it.  I don't

12 know how quickly that can happen.

13      MS. SMITH:  Your Honor, I would actually like to

14 have it scanned and e-mail it to the consul general, the

15 actual consul general in Miami, to determine the validity of

16 the passport.

17      THE COURT:  Well, and I want to give you whatever

18 opportunity that you want to do whatever you need to do, but

19 I don't know if we're going to accomplish that today.  And so

20 that's what I'm -- I guess I'm thinking that we can see how

21 much we can do today.

22      I know you said you were free all afternoon, but

23 how free are you tomorrow?

24      MS. SMITH:  I believe I'm okay tomorrow.  My phone

25 is downstairs with my calendar, but I believe I'm fine.  I

1 can get somebody to cover one hearing I have in the morning,

2 and I can either drive back or I can stay up here tonight if

3 that pleases the Court.  I can make arrangements if need be.

4          We may finish today.  If I can at least maybe

5 get -- take these copies and at least take the rest of the

6 information, I will get my staff contacting -- the consul

7 general closes between 12:00 and 2:00 every day though.  They

8 take a nice long lunch.

9          THE COURT:  So we're taking 20 minutes and they're

10 taking two hours.

11          MS. SMITH:  Yes, sir.  I think we have something

12 wrong in this picture.

13          THE COURT:  All right.  Well, and I don't -- I'm

14 not sure -- you all have to determine the status of whatever

15 it is Ms. Smith wants to see.  And I think it's an important

16 issue as we're looking at all of this, so I think we should

17 take whatever time we can to make sure that it's resolved.

18          MS. KARASE:  But -- and if I may interrupt, more

19 importantly, the location, Your Honor, of the physical

20 passport, it may actually be on its way to New York.  Agent

21 Stelly would need to check that, and we certainly will do

22 that over the break.

23          THE COURT:  Well, let's check and see.

24          So why don't we -- why don't we get back together

25 in 20 minutes, and then we'll see if really we would be

better off having you finish your questioning today.  And

then you could do your proffer tomorrow, and in the meantime

we could try to see whatever it is we can do about this other

issue.

           And then if we have to leave that issue until

Monday, then we do.  I mean, this is an important hearing for

your client, as -- I'm stating the obvious, so I think

whatever time we need to take to resolve it, we'll take, all

right?

           So let's be in recess for 20 minutes and then see

where we go from there.

           (Recess from 12:13 p.m. until 12:39 p.m.; all

parties present.)

           COURT SECURITY OFFICER:  All rise.  This Honorable

Court is now in session.

           Please be seated.

           THE COURT:  All right.  Everybody's back in the

courtroom, and Mr. Cilins -- am I saying it right, Cilins?

           MS. SMITH:  It's Cilins.  Cilins.

           THE COURT:  Cilins, Cilins.

           MS. SMITH:  Cilins?

           THE DEFENDANT:  Cilins.

           THE COURT:  Cilins.  I'll try to pronounce that

correctly.

           And Mr. Thervil is back as the interpreter.  And if

1  you would continue, please, to make a simultaneous

2  translation of what is said in the courtroom.

3          I see we're missing the FBI agent, so I don't know

4  if that's a good thing or a bad thing.

5          MS. KARASE:  Your Honor, she spent the break trying

6  to get the passport here so as to not further delay things,

7  so she's actually just making a quick visit to the restroom

8  and she'll be back momentarily, if we could proceed without

9  her.

10          THE COURT:  All right.  Now, did you have

11  additional questions for Ms. Karase, Ms. Smith?

12          MS. SMITH:  I do have a couple, not very many.

13          THE COURT:  All right.  Well, why don't you all

14  come to the podiums again.

15          Ms. Karase knows this well, but our microphone

16  system is not good, and if you're not right in front of it,

17  we're not picking it up.

18          MS. SMITH:  Thank you.

19          Ms. Karase -- and I know that we're going to go

20  through a proffer in a few minutes, but I do want to ask you

21  one or two other questions about Mamadie Toure.

22          Were you aware that she signed an attestation that

23  is almost identical in form and substance to the attestation

24  she signed in 2013, that she actually signed one earlier in

25  2007 or '8?

1          MS. KARASE:  I'm not aware of that.

2          MS. SMITH:  Did she provide the agent with copies

3   of that attestation that she previously signed?

4          MS. KARASE:  I'm not aware of that.

5          MS. SMITH:  Were you aware that she attempted to

6   sell fraudulent or invalid mining leases herself to persons

7   as late as 2009, '10, '11, or '12?  Are you aware of that?

8          MS. KARASE:  No, I'm not.

9          MS. SMITH:  What evidence do you show that she had

10  any ability in 2008 to conduct or to facilitate the obtaining

11  of the BSGR leases for the Simandou complex?

12         MS. KARASE:  Just the references that are included

13  within the complaint is all the evidence that I have.

14         MS. SMITH:  Okay.  You do not have any documents?

15         MS. KARASE:  I do not, no.

16         MS. SMITH:  Okay.  Do you know if your agents have

17  any documents?

18         MS. KARASE:  I don't know.

19         MS. SMITH:  Isn't it true that the first time

20  Ms. Toure mentioned the grand jury to Mr. Cilins was on the

21  April 11th, 2013, meeting, not previous?

22         MS. KARASE:  I don't know when she first mentioned

23  the grand jury.

24         MS. SMITH:  Okay.  I direct you to paragraph 20 of

25  your complaint at page 12:  "Was there any other meeting

1 besides this one where the grand jury issue was discussed or

2 explained to Mr. Cilins?"

3          MS. KARASE:  Ms. Smith, there were -- there was

4 other contact between your client and a confidential witness

5 other than that referenced in paragraph 20, and I don't know

6 every detail about every prior contact.

7          MS. SMITH:  Were these conversations held in

8 French, in the Guinean dialect, or in English between the --

9 Mamadie Toure and Mr. Cilins?

10          MS. KARASE:  The conversations that are referenced

11 in the complaint, as is stated in the complaint, were

12 conducted in French.

13          MS. SMITH:  And have you submitted those to a

14 certified French interpreter?

15          MS. KARASE:  I have not.

16          MS. SMITH:  Have you seen any certified

17 interpretation?

18          MS. KARASE:  No, I have not.

19          MS. SMITH:  The only thing, in fact, that you are

20 relying on is the English drafts provided to you by the

21 agents, which are summaries; is that correct?

22          MS. KARASE:  The agent has reviewed English draft

23 summaries, and that is what he relied on in the complaint.

24          MS. SMITH:  So, in fact, the answer to my question

25 would be yes, that that is what is relied upon, English draft

1 summaries, not a word-for-word translation.

2      MS. KARASE:  That's what's referenced in the

3 complaint.

4      MS. SMITH:  Were you -- you said you spoke with

5 pretrial services, and forgive me, I don't remember

6 pretrial -- the name of the pretrial services officer, and

7 that she indicated that she could correspond -- or

8 communicate with Mr. Cilins.  Is that fair, what she said?

9      MS. KARASE:  That's correct.  And the officer is

10 Officer Watson.

11      MS. SMITH:  Thank you.

12      And did Officer Watson indicate that she speaks

13 French or he speaks French?

14      MS. KARASE:  I didn't inquire, though she indicated

15 that she proceeded in English and spoke slowly, and

16 Mr. Cilins appeared to understand everything that was said

17 and communicated appropriately in response.

18      MS. SMITH:  Okay.  Do you know if she offered

19 Mr. Cilins to have counsel present during that pretrial

20 services interview?

21      MS. KARASE:  I do not know.

22      MS. SMITH:  Do you know if he requested counsel to

23 be present?

24      MS. KARASE:  I do not know.

25      MS. SMITH:  Do you know if there -- if he requested

1  an interpreter to be present?

2          MS. KARASE:  I do not know.

3          MS. SMITH:  And do you know if Ms. -- obviously

4  Ms. Watson indicated she did not use an interpreter.

5          MS. KARASE:  That's correct.  She spoke to him in

6  English, I believe.

7          MS. SMITH:  And this was shortly after his arrest?

8          MS. KARASE:  That's correct.

9          MS. SMITH:  Now, let's discuss the last meeting,

10 which happened on April 14th; is that correct?

11         MS. KARASE:  Yes --

12         MS. SMITH:  Okay.

13         MS. KARASE:  -- the day of his arrest.

14         MS. SMITH:  Okay.  And at that meeting, what

15 purportedly was supposed to happen was he was supposed to

16 give money to Mamadie Toure, and Mr. Cilins -- the talk was

17 that he would receive documents or she would destroy

18 documents; is that correct?

19         MS. KARASE:  That's correct.

20         MS. SMITH:  And at that meeting where your agents

21 watched him, he actually left that meeting without paying any

22 money to Mamadie Toure.  Isn't that correct?

23         MS. KARASE:  I don't know whether he paid any money

24 to the person with whom he met on April 14, but I do know

25 that when he left, he was in possession of $20,000 cash.

1          MS. SMITH:  Have you asked -- have you asked your

2     agents if any money exchanged hands?

3          MS. KARASE:  No, I have not.

4          MS. SMITH:  Have you spoken with your confidential

5     witness to see if any money changed hands that day?

6          MS. KARASE:  No, I have not.

7          MS. SMITH:  Did you speak with your witness, or did

8     the agents speak with your witness, and ask her of all the

9     various times she's received money from Mr. Cilins and other

10    persons for various assorted things?

11         MS. KARASE:  There are references in the complaint

12    to other instances in which she received money, so I --

13    relying on the complaint, yes, there were other instances of

14    that.

15         MS. SMITH:  And what proof did she provide you of

16    those actual transactions?

17         MS. KARASE:  She did not provide me with any proof,

18    but I have not met with the confidential witness.

19         MS. SMITH:  Okay.  And what proof did she provide

20    your agents that those transactions actually occurred?

21         MS. KARASE:  I'm not aware other than what's

22    documented and supported in the complaint.

23         MS. SMITH:  Surely your agents actually pulled her

24    banking records.

25         MS. KARASE:  I'm not aware one way or the other.

1          MS. SMITH:  Did they pull her telephone records?

2          MS. KARASE:  I'm not aware of that one way or the

3  other.

4          MS. SMITH:  Did they pull her travel records?

5          MS. KARASE:  I'm not aware.

6          MS. SMITH:  Okay.  Did they pull any banking

7  records involving any of her companies, specifically Matinde

8  and Company, or any other companies that she owns?

9          MS. KARASE:  I'm not aware of what documents they

10  may or may not have pulled.

11         MS. SMITH:  Isn't it true that they have not pulled

12  any documents or obtained any documentary evidence of actual

13  payments to or on behalf of Mamadie Toure?

14         MS. KARASE:  I cannot comment on that.  I don't

15  know.

16         MS. SMITH:  Now, the government has done an

17  independent investigation into Mr. Cilins and his financial

18  assets?

19         MS. KARASE:  I believe so, yes.

20         MS. SMITH:  Can you tell the Court what assets that

21  the government has located belonging to Mr. Cilins?

22         MS. KARASE:  I cannot.

23         MS. SMITH:  How do you know that it was done then?

24         MS. KARASE:  Because when I inquired about other

25  real estate that he owned, I was told that agents in New York

1    had information connecting him to other properties.

2            MS. SMITH:  Was that following my telephone

3    conversation with you with Michael Spiegelhalter from DOJ and

4    with Elisha Corbe, I believe is his name, from New York?

5            MS. KARASE:  Kobre, and it's actually Stephen

6    Spiegelhalter.

7            MS. SMITH:  Thank you.

8            Was that after my conversation with them?

9            MS. KARASE:  Yes, it was.

10           MS. SMITH:  After I proffered to you that we would

11   be willing to put up about $3 million in unencumbered assets?

12           MS. KARASE:  Correct.

13           MS. SMITH:  Okay.  But no prior investigation was

14   done into his finances.

15           MS. KARASE:  Oh, I don't know one way or the other

16   when the New York agents or other FBI agents conducted their

17   investigation.  I just learned of it after you and I spoke.

18           MS. SMITH:  Isn't it -- isn't it true that no one

19   looked into his properties that he owns in France?

20           MS. KARASE:  I'm not aware.

21           MS. SMITH:  Or that -- or his family --

22           THE INTERPRETER:  Ms. Smith, can you repeat that

23   last question for the interpreter?

24           MS. SMITH:  Isn't it true that none of your agents

25   have looked into any properties that he owns in France?

1          MS. KARASE:  I don't know whether they have or have

2    not.

3          MS. SMITH:  Have you spoken with French authorities

4    to determine his family background, his -- whether he came

5    from wealth or from poverty or any of those such items?

6          MS. KARASE:  No, I have not, and I'm not aware of

7    any agents' conversations.

8          MS. SMITH:  Have you attempted to verify that he is

9    indeed a very well respected businessman, both in South

10   Florida, in many countries in Africa, and in France?

11         MS. KARASE:  No, I have not.

12         MS. SMITH:  Have you attempted to verify any of the

13   assets that he has -- he has accumulated over the last 20, 22

14   years of working?

15         MS. KARASE:  No, I have not.

16         MS. SMITH:  Have you attempted to contact the

17   manager of his properties in South Florida to verify that he

18   is indeed receiving a minimum of $4,000 per month in rental

19   income?

20         MS. KARASE:  No, I have not done that.

21         MS. SMITH:  Have you spoken with his wife or any of

22   his family members to determine their financial background?

23         MS. KARASE:  No.  Ms. Smith, I have not conducted

24   any kind of a financial investigation personally.  I'm

25   relying on the documents that -- the information provided in

1  preparation of the pretrial services report and the

2  information contained within the complaint.

3       MS. SMITH:  Okay.  And you're not aware if agents

4  have conducted any of this investigation that we've just

5  spent the last five minutes discussing.

6       MS. KARASE:  I am not aware -- I don't have any

7  firsthand knowledge that they've conducted any of that other

8  than to note that I know that they at least have looked into

9  real estate that he owned.

10      MS. SMITH:  If -- nevertheless, you've decided that

11 his current income from a small, relatively new business is

12 not enough to support the properties that he's previously

13 purchased, the lifestyle that he has previously lived.  You

14 didn't do anything to verify or assure yourself of the source

15 of those funds.

16      MS. KARASE:  Other than to look to his statement

17 that said he annually earns $32,000 -- $32,578 and no more,

18 no.

19      MS. SMITH:  Okay.  And that was from one company,

20 CSW.

21      MS. KARASE:  Right, which is the only company he

22 disclosed.

23      MS. SMITH:  And he disclosed his rental income in

24 South Florida.

25      MS. KARASE:  That's correct.

1          MS. SMITH:  Have you verified that he is a member

2     or owner or shareholder of two or three corporations or LLCs

3     in Florida?

4          MS. KARASE:  No.

5          MS. SMITH:  Do you know if anyone from the FBI or

6     anyone other in the government has made that verification?

7          MS. KARASE:  I do not know.

8          MS. SMITH:  Now, it is your position that he is a

9     risk of flight because of his severe -- his extensive

10    financial and significant financial assets, his frequent

11    travel, and his French citizenship, and the nature of the

12    offense; is that correct?

13         MS. KARASE:  Those are some of the reasons, yes.

14         THE COURT:  The passports.

15         MS. SMITH:  Yes.  Thank you, Judge.

16         And the allegedly false passport.

17         MS. KARASE:  And also the false statements, yes.

18         MS. SMITH:  Okay.  And the false statements,

19    however, were provided without counsel and without an

20    interpreter.  Isn't that true?  Those statements you're

21    relying on as false.

22         MS. KARASE:  That's true.

23         MS. SMITH:  And since hiring counsel, since his

24    family has hired me, we have come forward with a more

25    complete list as I disclosed to you and to the DOJ in

1 Washington, Mr. Spiegelhalter and to Mr. Clobray; is that

2 correct?

3          MS. KARASE:  I wouldn't call it a list.  You

4 mentioned generally that he had approximately $3 million in

5 unencumbered real estate in South Florida.  We didn't go into

6 any specifics.

7          MS. SMITH:  Fair enough.

8          Isn't it true that your complaint relies solely

9 upon -- well, let me rephrase that.

10          The charges in your complaint, the obstruction, the

11 tampering, and the alleged destruction of documents as you've

12 charged them, the violations of Section 1510, 1512(c), and

13 1519, you rely on events that happened between March 11th,

14 2013, and April 14th, 2013, or something thereabouts, between

15 March and April of this year.

16          MS. KARASE:  Those are the dates that are listed

17 for the alleged offenses.

18          MS. SMITH:  That's what I'm asking you.

19          Isn't it also true that it is your position that he

20 knew there was a criminal investigation by virtue of the

21 alleged conversations between he and your confidential

22 witness, Ms. Toure?

23          MS. KARASE:  The complaint references the

24 defendant's comments about a pending investigation.

25          MS. SMITH:  And nevertheless, he came back to the

1  United States with the knowledge -- several times with the

2  knowledge that there was, by your allegations, a criminal

3  complaint pending.

4          Isn't that a fact?

5          MS. KARASE:  I don't believe there was a criminal

6  complaint pending.

7          MS. SMITH:  Well, excuse me, a criminal

8  investigation pending.

9          MS. KARASE:  I'm not sure exactly what he knew.

10  There were references to a grand jury investigation.  I don't

11  know what specifically was in his head at the time, but he

12  did make references to a grand jury investigation.

13          MS. SMITH:  Well, let's go through your criminal

14  complaint.

15          The complaint says that on or about March 15th and

16  on or about March 16th, there were discussions about paying

17  money to destroy documents; is that correct?

18          THE COURT:  The --

19          MS. SMITH:  Excuse me, page 9, paragraph 16(a) and

20  (b).

21          MS. KARASE:  Yes.  There were discussions of that

22  nature.

23          MS. SMITH:  And then on paragraph 18(a), 18(b),

24  (c) -- it continues to go on that they have been talking

25  about there being officials, the possibility of

1    investigations, what is she to do if someone talks to her --

2          MS. KARASE:  Ms. Smith, you asked me specifically

3    what your client knew.  I can't answer that, so I --

4          MS. SMITH:  With all due respect, Ms. Karase, I

5    asked you what the government -- the government's allegations

6    are Mr. Cilins knew, in either March or April or all the way

7    through, that there was the possibility or a pending

8    investigation.  That is the basis of your charges.

9          Isn't that correct?

10         MS. KARASE:  There are discussions between

11   Mr. Cilins and a confidential witness about a pending

12   investigation in which he inquires whether there was a

13   pending investigation at the early stages, and then later

14   he's advised exactly what a grand jury is and a grand jury

15   investigation is.

16         MS. SMITH:  And he was advised of that as early as

17   April 11th and maybe possibly as early as March 25th?

18         MS. KARASE:  According to paragraph 19 of the

19   complaint, yes.

20         MS. SMITH:  Okay.  And nevertheless, despite all of

21   these conversations in March and April between Ms. Toure and

22   Mr. Cilins about a pending investigation, about the

23   possibility of an investigation, about talking to agents,

24   about the grand jury, Mr. Cilins made at least two if not

25   three trips from France to the United States.

1          MS. KARASE:  After having conversations with the

2     confidential witness, Mr. Cilins -- about a pending

3     investigation, Mr. Cilins did make trips back and forth to

4     the United States or at least met with a confidential witness

5     in the United States.  I can't say for certain whether he

6     left and came back.

7          MS. SMITH:  Have you contacted Customs and Border

8     Protection to see his exact entry and exit dates as outlined

9     in TECS or the other system that they now have that I can't

10    remember the name of?

11         MS. KARASE:  Well, we've consulted the passport

12    which is on its way here for your review, and it does show an

13    entry date into the United States of April 8th, 2013, and

14    then there are several other entry dates, but it was

15    unable -- we could not decipher from the photocopy.  At least

16    the agent with whom we were speaking on the break could not

17    decipher that.

18         MS. SMITH:  All right.  Have you spoken with CBP,

19    Immigrations and Customs Enforcement, TSA, or any other

20    federal agency charged with entries and exits to the border

21    about Mr. Cilins' entries and exits to the United States?

22         MS. KARASE:  No, I have not.

23         MS. SMITH:  So in fact, you have no evidence to

24    show that he is a risk of flight with regard to his travels

25    because he arrives here in Orlando after knowing there was a

1 criminal investigation.

2          MS. KARASE:  That's inaccurate.

3          THE COURT:  I think that's really kind of argument

4 anyway.

5          MS. SMITH:  Fine, Your Honor.  And, Your Honor, I

6 withdraw that.  I . . .

7          Your Honor, may I have just a moment with my

8 client?

9          THE COURT:  Yes.  Are you --

10          MS. SMITH:  And I can let (unintelligible).

11          THE COURT:  Yes.

12          Why don't we just see if they have any additional

13 questions, Ms. Karase.

14          (Brief pause.)

15          MS. SMITH:  Ms. Karase, on the day of the arrest,

16 agents actually arrested Mr. Cilins after he terminated the

17 meeting with Ms. Toure.  Isn't that true?

18          MS. KARASE:  Yes.  That's what's stated in the

19 complaint.

20          MS. SMITH:  And, again, to your knowledge, you have

21 no knowledge that any moneys were trans- -- were given to

22 Ms. Toure that day.

23          MS. KARASE:  I don't have any evidence of that.

24          MS. SMITH:  And you have no information from your

25 agents.

1          MS. KARASE:  Correct.

2          MS. SMITH:  And you have no -- he was actually

3     getting ready to board the flight back to Miami when he was

4     arrested.  He was checking the gate times when he was

5     arrested.

6          MS. KARASE:  Yes.  That's true.

7          MS. SMITH:  Your Honor, I don't believe I have

8     anything further for Ms. Karase other than maybe when we get

9     the passport, to see what --

10         THE COURT:  All right.  Thank you, Ms. Karase.

11         MS. SMITH:  Your Honor, I do have a proffer.

12    You've heard a large portion of it, and I don't know what

13    other evidence Ms. Karase needs to put on, or if she has any

14    additional proffer, but if I -- since I'm not familiar with

15    Your Honor's procedures.

16         THE COURT:  Well, these are not just mine.  These

17    are the way the Court practices.

18         Is there anything else that you wanted to present

19    at this time, Ms. Karase?

20         MS. KARASE:  No, Your Honor.

21         THE COURT:  All right.  Ms. Smith, let me ask you,

22    before you begin your proffer, if you did get a copy of the

23    pretrial services report that's been referenced.

24         MS. SMITH:  I did, Your Honor, and I have a few

25    additions and corrections to make to that report.

 1          THE COURT:  All right.

 2          MS. SMITH:  Your Honor, as pointed out during the

 3   cross-examination of Ms. Karase, Mr. Cilins did not have an

 4   interpreter with him.  He did not have counsel present with

 5   him.  He does speak some English, but he does have difficulty

 6   with some things, so I'd ask the Court to consider that.

 7          I have -- I would like to proffer some additional

 8   information.  I brought documentation for the Court.

 9          THE COURT:  And during your proffer, will you be

10   referencing anything else you wanted to correct?  I don't

11   want to -- I don't want to lose track of --

12          MS. SMITH:  Thank you.

13          THE COURT:  -- this.

14          And it may be during your proffer you'll be

15   referencing these things and we can take note of them at that

16   time.

17          MS. SMITH:  Your Honor, if I can -- I did not go

18   over it with Mr. Cilins.  If I can just take two brief

19   seconds to just --

20          THE COURT:  I'll tell you -- you know what?

21          MS. SMITH:  Or can we come back to this portion and

22   I'll proffer and --

23          THE COURT:  Yes.

24          MS. SMITH:  -- then we can take a break and I

25   can --

1          THE COURT:  Yes.

2          MS. SMITH:  -- go over it with him.

3          THE COURT:  Yes.  Let's do that.

4          MS. SMITH:  Save the Court some time.

5          THE COURT:  Thank you.

6          MS. SMITH:  Your Honor, one of the corrections that

7     we need to make, that I know that I'd like to go ahead and

8     make, is that he is a managing director, partner,

9     shareholder, whatever the term is in the business world for

10    three companies in South Florida -- two or three.  One of

11    them is Holiday Beachfront Townhomes, LLC.

12         THE COURT:  Could you repeat that, please?

13         MS. SMITH:  Yes, Judge.  Holiday Beachfront

14    Townhomes, LLC.  They are the owners -- the LLC owns several

15    of the rental properties.

16         Pha, P-h-a, Investments, LLC.  They also, I

17    believe, own several of the rental properties.

18         And previously, I believe, he was a -- and I'm not

19    sure.  I've not been able to ascertain whether this is

20    still -- he's still a member of this entity.  I don't believe

21    it.  I believe it's been dissolved, but the previous entity

22    was FMA USA, LLC, also involved in real estate investments in

23    South Florida, specifically in Aventura and Hollywood and

24    Surfside primarily.

25         THE COURT:  On the second one, did you say B as in

1  boy or V as in Victor?

2          MS. SMITH:  Neither.  P as in Peter, Peter Henry

3  alpha, Pha.

4          THE COURT:  I think I'm having just a little bit of

5  trouble hearing because --

6          MS. SMITH:  Get the (unintelligible).

7          THE COURT:  Yes, so thank you.

8          MS. SMITH:  And sometimes I don't enunciate.  My

9  southern gets in the way.

10          So Your Honor, the Hollywood Beach Townhomes,

11  Mr. Cilins -- one of the properties that is owned by

12  Hollywood Beachfront Townhomes, LLC, is a property valued at

13  $1.320 million -- $1,321,000.

14          THE COURT:  Which one is that?

15          MS. SMITH:  The address for the property is 2300 --

16  no.  Excuse me.  The legal description is lot 16, block 11,

17  lots 3 and 4, block 12 of the Hollywood Beach first addition

18  in Broward County.

19          The address, according to the tax collector, the

20  property appraiser's office, looks to be Nevada Street in

21  Hollywood.  There's two separate blocks.  There's two

22  separate lots or properties there.  The value -- total value,

23  according to the property appraiser -- and we use the most

24  conservative since that's been the most conservative

25  estimate -- is $1,320,820, so $1,321,000.

1       It is unencumbered.  He would -- he would -- and he

2   would also -- he would be willing to place that with the

3   Court, mortgage that to the Court.  I've taken the liberty of

4   preparing all of -- having all of the mortgage documents

5   prepared and the transfers prepared in anticipation that the

6   Court might accept that, along with other properties.

7       There is another property owned by the same entity,

8   Hollywood Beachfront Townhomes.  The property is located at

9   the east 3405 feet of lot 1, block 12, Hollywood Beach

10  addition, Broward County, and this is -- the site address for

11  this one is 2325 North Surf Road, No. 1, Hollywood.

12      The value for the two combined -- there's actually

13  three parcels at that address.  The three parcels combined,

14  according to the tax collector's office, the Property

15  Appraiser's Office in Broward County, is $1,627,800, so

16  $1,628,000 to round up the $200.

17      The next property owned by Pha Investments is a

18  condominium in Cedar Glen Condominiums.  It is -- the value

19  of the property, free and clear of all mortgages, is

20  $135,210.  It's located at 671 N.E. 195th Street, Unit 325E

21  as in Edward in Miami.

22      The fourth property -- it is owned by Pha

23  Investments.  It's in Hollywood Station, a condominium.  The

24  address is -- excuse me, Your Honor.  The address is 140

25  South Dixie Highway 925, Hollywood, Florida.  The value

1  unencumbered is $135,210 for that parcel, according to the

2  property appraiser.

3          The next property, again owned by Pha Investments,

4  is -- this is -- it's in the same condominium community, and

5  the address is 140 South Dixie Highway, Unit 729, Hollywood,

6  Florida.  The value, unencumbered, is $130,380, according to

7  the property appraiser.

8          There is also another property owned by Pha

9  Investments.  It is located at 1900 Van Buren Street, 211B as

10  in bravo, in Hollywood.  It is a condominium.  The

11  unencumbered -- and when I'm saying unencumbered, Your Honor,

12  the property appraiser's value is $86,110.  None of these

13  properties has a mortgage on it, so the value is -- the value

14  of all of them is completely unencumbered.

15          Your Honor, again, we have -- we've had them -- the

16  mortgages executed by the manager of the limited liability

17  company.  They've been executed.  Also I have affidavits, if

18  it please the Court, for Mr. Cilins' signature and also other

19  mortgages for his signature, should the Court accept those as

20  security.

21          THE COURT:  Do some of those properties match up

22  with the ones that are in the pretrial services report?

23          MS. SMITH:  They do.  I didn't match them because I

24  didn't have time.

25          THE COURT:  All right.  That's fine.  I just wanted

1  to make sure.

2        MS. SMITH:  But they -- they all -- I think they

3  all match there.  I'm not -- and I'll inquire during the

4  break, Your Honor, and if I need to correct that further,

5  I'll do that so that we don't waste (unintelligible).

6        Your Honor, with regards to Mr. Cilins himself, he

7  is a stable 50-year-old man.  He is 50 or 51.  He has four

8  children and a brand new grandbaby who's now four days old.

9  His current partner, who's now become his wife as of about a

10  year ago, he's been with her for the last 23 years.  He has

11  business interests in Europe.  He has obviously the

12  investment companies in the United States that are

13  significant ties to South Florida.

14        He also is -- he has no criminal history.  There's

15  no drug use, no mental health issues.  His passport -- and

16  I'll address that with him when we get both copies.  He has

17  indicated to me and told me that I can tell the Court that he

18  had two valid passports.

19        France is like England.  They have a provision

20  where you can obtain a passport, and if you're going to

21  travel, you can get a second one, because sometimes you send

22  them off for visas to other countries.  You send them off and

23  you're without your passport to travel to another country.

24  France has the provision, as does the United Kingdom and

25  several other EC countries, to allow a person to have two

1    valid passports.

2          He was arrested peacefully, Your Honor.  He did not

3    resist.  He was actually leaving.  There was no -- and as

4    part of a proffer with regards to the criminal complaint and

5    with regards to the underlying charges, he was actually

6    leaving with -- there was no transfer of payment to

7    Ms. Toure, the government witness in this case.  There had

8    been no transfer of documents or anything at that point in

9    time.

10         He had visited Orlando on at least two if not -- or

11   not Orlando, excuse me, Jacksonville on at least two or three

12   occasions after this investigation began and he started

13   speaking with Ms. Toure about the investigation in March.

14   The criminal complaint is rife with problems.

15         The first problem, and -- Your Honor, is that --

16   well, this is part argument.  The proffer I'll give --

17   forgive me, Your Honor.

18         Ms. Mamadie Toure signed documents several years

19   ago, these attestations.  She has signed numerous

20   attestations that are -- that are similar in appearance and

21   form.  Many of these she prepared herself.  She and/or other

22   persons acting on her behalf or at her request have been

23   blackmailing Mr. Cilins, BSGR, and various other entities

24   since they were expelled -- not BSGR but since she was

25   expelled from the country.

1         When President Conte died in December 2008, if she

2    had any ability to obtain any influence over an -- over an

3    official, that influence died with the president.

4         THE COURT:  When was that?  I'm sorry?

5         MS. SMITH:  December of 2008.

6         If the government had the documents that I

7    referenced during the cross-examination of Ms. Karase, they

8    would know that the Simandou lease, the initial lease or the

9    initial -- I'm not good with mining rights, Your Honor, but

10   the initial contract on the Simandou block or parcels was

11   executed -- negotiations began in early 2002 or 2003.  There

12   was an initial preliminary contract and some protocols and

13   some things done as far back as 2002 or 2003.

14        Contracts were signed in 2005 and 2006.  The press

15   releases from the country show the date of the release.  I've

16   attempted to get the press from Ghana [sic], the actual press

17   releases from Ghana.  It was a big affair with BSGR signing

18   these contracts in 2005, 2006, and 2007.  They were signed

19   with the full regalia, knowledge, understanding of both

20   parliament, the president, and the minister of mining.

21        Other mining companies also had leases to Simandou,

22   and I don't know if I'm pronouncing that correctly, but the

23   Simandou parcel is the parcel at issue underlining the

24   Foreign Corrupt Practices Act claim.

25        Mr. Cilins left any -- any arrangement, any

affiliation with BSGR in 2007.  BSGR changed its entire

personnel staff in Guinea and their people dealing with

personnel in Guinea in 2007.  BSGR continued to negotiate

contracts on its own through new staff in 2008 and with the

new government in 2009.  There were two -- there was an

interim government after the president died, and then there

was a second government that came in in 2009.

The interim government approved the old leases and

the old contracts.  The new government approved the old

contracts and then entered into brand new contracts with

BSGR.  Mr. Cilins nor the government's prime witness was any

way involved.  She was literally ran out of the country on a

rail, to quote a southern colloquialism, in early 2000 --

January of 2009.

She is not the legal wife or -- nor was she ever

the legal wife of the deceased president, as she claims and

the government claims in their complaint.  She was a

mistress.  He had three other legal wives.  She was not one.

She was the youngest.  She was about 20, 21, 22 when he

started the affair with her.

She has been seeking to live here in the United

States because of fear of going back to Guinea.  They have

falsified documents.  She has contacted persons in other

countries in an attempt to manufacture or obtain some manner

or way to stay here instead of going back to Guinea to deal

1    with whatever issue she has there.

2         Your Honor, I believe I proffered that he was

3    leaving on a flight.  There were numerous telephone calls --

4         THE COURT:  He was leaving on a flight --

5         MS. SMITH:  He was leaving on a flight -- on the

6    last meeting on April 14th when he was actually arrested,

7    there had been no exchange.  He was actually leaving without

8    documents.  No money, no money had been transferred.  He was

9    going back to Miami to await his flight to go back home to

10   France, where he lives with his wife and his children.  That

11   was when he was arrested.

12        Your Honor heard the agent admit that he was

13   arrested at the gate or looking at the board where you're

14   checking your flights.

15        BSGR has been contacted by persons from Mali

16   claiming affiliation with Mamadie Toure, with persons from

17   South Africa, with persons from Guinea, and I believe Sierra

18   Leone, although I'm not 100 percent positive of that; various

19   companies, various businesses, and BSGR, all attempting to

20   present documents that claim some sort of wrongdoing in

21   order -- and asking for money in exchange.  She has done this

22   repeatedly over the years, both to BSGR, other companies, and

23   Mr. Cilins.

24        At one point in time she offered to another

25   company, another mining company, the ability to get mining

1  rights in Guinea for a property she purportedly owned.  Only

2  upon the company checking that out did they learn that she

3  did not own the property and had no rights to transfer any

4  mining rights in the property.

5       Your Honor, there are no records of any transfers

6  to -- that the government -- well, this is argument, so I'll

7  leave that.  I'm sort of transitioning.

8       If I can have just a moment with my client.  I

9  don't know when you are going to want to take a break.  I'm

10 assuming very soon for your next hearing, so --

11      THE COURT:  Yes, Ms. Karase?

12      MS. KARASE:  Your Honor, if I may just add, I will

13 have some rebuttal facts in response to the proffer that

14 Ms. Smith has made.  Very brief, but I do have a

15 (unintelligible) presentation.

16      THE COURT:  Well, I was thinking you might have

17 some questions of her proffer --

18      MS. KARASE:  That's -- I --

19      THE COURT:  -- and I have a 1:30 and then I have a

20 2:00.

21      Why don't we do this?  The 1:30's just going to

22 take a few minutes.  It's a telephonic attorney admissions,

23 and it gets a little crazy, so I'll probably just, say, clear

24 the courtroom.  It's just -- it just is distracting for

25 everybody who's in the courtroom and for everybody else if

1 there are people here.  I'm not necessarily going to close

2 it.

3          But I'm thinking that what we should probably do is

4 just recess now until 1:45, and then we'll come back, and

5 then between 1:45 and 2:00, let's try to come up with a game

6 plan of how we proceed today, and if necessary, tomorrow,

7 because I don't think there's any way, given the documents

8 that you would want me to review and the cross-examination of

9 your proffer, additional proffer, cross-examination of that

10 proffer, and then maybe any other evidence and argument,

11 we're going to get done today.

12          So if you all can talk about it a little bit and

13 see what your schedule is tomorrow.

14          Did we say I had nothing tomorrow?

15          I have some things starting at 3:00 tomorrow.  It's

16 a law school project that I'm helping with, but if necessary,

17 I can rearrange that.  But I could start whenever you wanted

18 and hopefully we'd be done by 3:00.

19          But why don't you all talk about it and if you

20 want -- we could still do some things between 3:00 and

21 probably -- oh, they start at 1:00?  Okay.  Well, we'll work

22 around all that, but we can start as early as we need to in

23 the morning.

24          But why don't you talk about it.  We can still do

25 another 45 minutes or so from 3:00 to 3:45 this afternoon, if

1  that moves us along, so you all talk about it and see what

2  you think and then we'll just -- we'll reconvene at 1:45,

3  okay?

4          MS. SMITH:  Your Honor, if I may ask for leave of

5  the Court.  In Orlando I could go back and actually speak

6  with my client.  Can I and the interpreter go back with the

7  U.S. Marshals and be allowed to speak with him during the

8  break to sort of facilitate moving this along?

9          THE COURT:  Well, I'm just thinking if they take

10  him back downstairs you could.  I don't think there's -- the

11  way it's set up right here, it wouldn't work, but they'll

12  take him downstairs and you can meet with him.

13          And then if it's running a little late, don't panic

14  in terms of getting back up here.  We'll do everything we can

15  to get back up here at 1:45, but if we're running a little

16  late, we'll deal with that.

17          And I appreciate the marshals working with everyone

18  on that.

19          We'll be in recess.

20          MS. SMITH:  Thank you, Judge.

21          (Recess from 1:24 p.m. until 1:56 p.m.; all parties

22  present.)

23          COURT SECURITY OFFICER:  All rise.  This Honorable

24  Court is now in session.

25          Please be seated.

THE COURT:  Well, I hope no one spent too long
discussing what our schedule would be tomorrow because as you
may or may not know, Judge Conway entered an order just
probably about, I don't know, less than two hours ago which
states that due to the most recent budget cuts imposed by the
U.S. District Court for the Middle District of Florida and
the federal agencies supporting the Court and on the
government attorneys who appear before the Court, it is
ordered that until further notice, it is the policy of this
Court not to conduct criminal proceedings on Fridays except
in the case of emergencies and other exigent circumstances.
However, all federal courts in the Middle District of Florida
will remain open five days a week.

So I brought copies of the orders for you that you
can look at yourself, so the best-laid plans.

What were you thinking about this afternoon,
Ms. Smith?  Why don't I start with you?

MS. SMITH:  We were just thinking when Your Honor
came in -- Ms. Karase -- I'm going to -- Ms. Karase, isn't
it?

THE COURT:  Yes.

MS. SMITH:  I've botched it a hundred times today.
I'm sorry.

She said she had a few questions for me this
afternoon.  I don't know the kind of time she's talking

1 about.

2      The only issue I think that's outstanding that
3 we're going to need documents on is France, the passport.  My
4 staff contacted the consul -- let me get up --

5      THE COURT:  Yes.

6      MS. SMITH:  My staff contacted the consul in Miami.
7 The consul told them there was no way anybody in Miami, D.C.,
8 New York, any of the U.S. consuls could verify the validity
9 of the passports because they were not the issuing office.

10      We have contacted Paris, but they are closed.  They
11 shut down for the day in Paris.  We've contacted the family
12 attorney, and I instructed my staff to do that, to contact
13 the family attorney in Paris so that they can begin working
14 on that.  I have her after-hours number, so they can begin as
15 soon as it opens in the morning.

16      They will go to the office there where he actually
17 obtained both passports to verify and get some sort of
18 documentation from the French consul there that -- or it's
19 not a consul there -- that they're valid.

20      The other issue is we know where the other passport
21 is.  It is in the safe in his -- he and his wife's home in
22 Paris.  I can get it in two days.  DHL or Federal Express can
23 get it here in two days.  That's the soonest I can get it
24 here is two days from now, if that is something that -- if
25 Your Honor's thinking about giving bond, I can get that other

1   passport to you.

2        THE COURT:  Well, it sounds like no matter what

3   happens, we're -- we wouldn't be able to proceed until at

4   least Monday.

5        MS. SMITH:  As much as I hate for him to sit, I

6   kind of think -- I could check -- I took the liberty of

7   checking my entire week's schedule, not just

8   (unintelligible).  I've got some appointments Monday, but

9   all -- with the exception of a court hearing -- and I'll

10  contact Judge Whitehead in state court and see if I can move

11  the Monday hearing.  Tuesday I'm completely free.  Wednesday

12  I'm not.  Thursday I have CJA training, but I can obviously

13  get out of that.  And Friday I can move what I have then.

14       So I'm fairly available to work with Paris and the

15  Court's schedule next week, with the exception if I can just

16  maybe let the Court know later this afternoon if Judge

17  Whitehead will move that hearing Monday morning or I can get

18  coverage for it.  It's not something that -- I don't think it

19  would be a problem if we choose to do it Monday.

20       THE COURT:  Well, actually Tuesday looks a lot

21  better for me at this point.

22       Ms. Karase, how does that look for you?

23       MS. KARASE:  Your Honor, I have a sentencing

24  scheduled for 10 a.m. on Tuesday that would be quite lengthy,

25  but I should be free by 1 p.m., and I'm free the remainder of

1   the afternoon.

2           THE COURT:  Well, could we do it at 1:00 on

3   Tuesday?

4           MS. SMITH:  I don't see why not, depending on how

5   far we get this afternoon.  I know you have -- I just spoke

6   with Sylvia.  I know you have a 2 o'clock, and I don't think

7   that's going to take too terribly long.  I don't know how

8   long you want to go today.

9           THE COURT:  Well, I have a 2:00.

10          What is the status of that?  Are there going to be

11  two third-party custodians presented?

12          MS. KARASE:  Ms. Irvin advised that both proposed

13  third-party custodians are present.

14          THE COURT:  All right.

15          MS. KARASE:  And frankly, I don't anticipate a

16  problem with either of them, but I would like to hear from

17  them.

18          THE COURT:  All right.  Well, let's see.  If we

19  start that in just a few minutes, that could still take us --

20  that could still take us, I don't know, 40 minutes, at least

21  20 minutes for each, because I have to go through the

22  conditions of release and all of that, and we do that -- we

23  do that differently too.  And it's Spanish, so we'll have an

24  interpreter.

25          I think the best bet would be if we started at

1   3:00, and I could go until 3:45, for 45 minutes.  I have a

2   4 o'clock, but I have to stop at a quarter till to meet with

3   the probation officer.  It's reentry court, and --

4           MS. KARASE:  And I'll be here with you.

5           THE COURT:  Yes.  You'll be here with me for that

6   too.

7           But if the 45 minutes really isn't going to help

8   this afternoon and we can get it all done tomorrow, there's

9   no reason, Ms. Smith, for you to stay around an hour.  You

10  could almost be halfway to Orlando.

11          MS. SMITH:  Hypothetically speaking, if I followed

12  the speed limit.

13          THE COURT:  Yes.  Yes.  And if not -- well, we

14  know.

15          So if you would rather do that, we could just get

16  started at 1:00.  I would think we wouldn't take more than

17  four hours on Monday.

18          MS. KARASE:  Your Honor, the government has very

19  little left in terms of questioning and further arguments,

20  so --

21          THE COURT:  Okay.

22          MS. KARASE:  -- I don't -- I really think that we

23  can wrap up today.

24          THE COURT:  I meant Tuesday.

25          Well, I don't know about today.  You're awfully

1    ambitious.  I'm worried that we'll even get started at 3:00

2    because of the -- you know, of having to -- well, we're going

3    to be holding two separate hearings and going through two

4    separate things.  It takes longer sometimes to do that.

5          And then without having this information on the

6    passport, we can't finish up today.

7          MS. KARASE:  Well, to comment on that, Your Honor,

8    I do have -- I've provided Ms. Smith with a photocopy of the

9    passport that Mr. Cilins had in his possession at the time of

10   his arrest, and obviously, you know, with regard to the

11   production of the other passport, yes, yes, we would want

12   that.

13         I don't know if there are only two that are out

14   there now, given that France apparently issues more than one

15   at a time.  I think the important consideration, though -- I

16   think Your Honor can still draw from the fact that he has

17   extensive travel, and I think that all of the other arguments

18   still support, by far more than a preponderance of the

19   evidence, that he's a risk of flight.

20         THE COURT:  Well, then you're -- are you going to

21   withdraw your -- because it's not only just what I find but

22   Ms. Smith or you, either one, can appeal this to the district

23   judge in the Southern District of New York.

24         And so at this time you're willing to concede that

25   that's not a -- the passport that you think is not

registered, you're willing to concede that that's not

fraudulent -- I think you referred to it as fraudulent -- and

that both of the passports are valid?

        If you want to concede that, without there being

any proof of it, then I'll -- you can concede that and we can

get as far as you want today.

        MS. KARASE:  Your Honor, perhaps we can reach an

agreement that the information that I have, the evidence that

I have, is that one is registered and one is not.

        THE COURT:  Well, that's -- that's -- well, I think

that's -- there's an issue with that.  I don't think -- I

don't think Ms. Smith's going to concede that it's not

registered.

        Are you?

        MS. SMITH:  No, sir.  And I don't believe that

registered is the appropriate term.  My guess is the clerk

that she spoke with in Miami -- my ex-husband was French.

I've been to that consulate many times -- is a typical

entry-line clerk in an office that looked at something and

that was the end of it.

        It's our indication that both of these, at the time

of issuance, were valid passports.  One may not be valid now.

That does not mean that it wasn't canceled because of an

additional one, because if it was a -- that I'm not --

because that may be in fact the truth and there's no fraud in

1  that.

2       But it's our contention that at the time of

3  issuance that they're both valid passports.  He's obviously

4  traveled, according to the documents, six or eight, maybe ten

5  times into the United States on this purportedly valid

6  passport.  It's hard for me to believe that CBP or TSA,

7  immigration, somebody didn't catch a fraudulent or

8  unregistered passport -- whatever word you want to put in

9  there -- so I'm not willing to concede that at this -- she's

10 made -- Ms. Karase has made a big deal about it.  I think --

11 I think it's in my client's best interest to answer that

12 question --

13      THE COURT:  Okay.

14      MS. SMITH:  -- as much as I'd like to finish today

15 and try to get him out.

16      THE COURT:  Yes.  Well, I think -- I mean, and I

17 think once we -- once you all start making argument and all

18 of that, I just can't imagine we're going to get it done in

19 45 minutes today, so -- and I want to review the documents,

20 the --

21      MS. SMITH:  I'll tender those to the Court.

22      THE COURT:  Right.  And I'm guessing you're going

23 to be asking questions about the entities that have been

24 proffered as the ones who these properties belong to and all

25 of that, so I want to give you a chance to thoroughly examine

1  the documents yourself and be able to ask any questions you

2  deem appropriate on those.

3          So why don't we do this.  Let's just go ahead and

4  continue it over until -- until Tuesday at 1 o'clock.

5          MS. SMITH:  I'll be here early in case there's

6  something -- I'll try to get here before lunch in case

7  something ends early, and if the Court wants to begin --

8          THE COURT:  Okay.  I have an 11 o'clock on Tuesday,

9  but -- so we'll probably start at 1:00, but -- and then if

10  you can -- if you could provide me and Ms. Karase the copies

11  of your documents, we can make copies if we need to, and then

12  we'll --

13          MS. SMITH:  Your Honor, if I can -- I'll provide

14  Ms. Karase a copy.  I'll be back to my office this evening.

15  I'll e-mail her exactly what I'm going to provide to the

16  Court.  I'll show (unintelligible).

17          So I'll provide a copy.  She's indicated she's

18  willing -- I have a copy in the office.  These are original

19  signed documents.

20          THE COURT:  All right.

21          MS. SMITH:  So these are -- most of these have been

22  (unintelligible) Miami.  They still need to be executed so

23  (unintelligible).

24          THE COURT:  All right.  Thank you.

25          All right.  So the hearing will be continued until

1  Tuesday, April 23rd, 2013, at 1 o'clock.

2          All right.  Then we'll be in recess.

3          COURT SECURITY OFFICER:  All rise.

4          (The proceedings were concluded at 2:07 p.m.)

5                      -  -  -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         CERTIFICATE

2

3    UNITED STATES DISTRICT COURT )

4    MIDDLE DISTRICT OF FLORIDA    )

5

6

7            I hereby certify that the foregoing transcript is a

8    true and correct computer-aided transcription of my stenotype

9    notes taken at the time and place indicated therein.

10

11           DATED this 18th day of April, 2013.

12

13

14                         s/Shelli Kozachenko
                            Shelli Kozachenko, RPR, CRR
15

16

17

18

19

20

21

22

23

24

25