# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

v.                                      **Case No. 1:13-CR-00315-KMW**

**FREDERIC CILINS,**

        **Defendant.**

_____/

## DEFENDANT CILINS' REPLY TO THE GOVERNMENT'S MEMORANDUM IN SUPPORT OF DETENTION PENDING TRIAL

Comes now, the Defendant, Frederic Cilins, by and through undersigned counsel, and files this his reply to the Government's memorandum in support of detention pending trial. The Government's memorandum was filed in response to Mr. Cilins' motion to amend the conditions of release and/or for modification of bond. Mr. Cilins asks this Court to reduce his bond and also asks this Court to deny the Government's request for detention.

### PROCEDURAL POSTURE

Mr. Cilins was arrested in Jacksonville, Florida on April 14, 2013 on charges arising out of the Southern District of New York. Allegedly, Mr. Cilins obstructed justice by offering to pay millions for the destruction of documents and provision of false testimony to the FBI. Mr. Cilins had his initial appearance on April 15, 2013 before Judge Klindt. Detention hearings were held on April 18, 2013, April 25, 2013, and April 29, 2013. On April 29, 2013, Mr. Cilins was ordered detained in Florida. A written detention order was entered on May 8, 2013.

On May 14, 2013, Mr. Cilins arrived in the Southern District of New York. On May 15, 2013, Mr. Cilins had his initial appearance before Judge Maas in the Southern District of New York.

After consultation with Judge Wood's chambers, Judge Maas held a detention hearing. Mr. Cilins was ordered released on a $15,000,000.00 personal recognizance bond, secured by $5,000,000.00 in property or cash and with the signatures of five financially responsible parties. Other conditions included: surrender of all travel documents, travel restricted to the Southern and Eastern Districts of New York and Southern District of Florida, strict pretrial supervision, home incarceration, electronic monitoring, required to reside in his Turnberry Isle home in South Florida, and guarded by a 24/7 armed security company approved by the Court and the U.S. Attorney. A docket entry memorializing these conditions was entered on May 20, 2013.

On May 29, 2013, Mr. Cilins filed his motion to amend the conditions of release and/or for modification of bond. On June 6, 2013, the Government filed a memorandum in support of detention pending trial. A hearing is scheduled on Mr. Cilins' motion for June 20, 2013.

## CHARGES AND ALLEGATIONS

The Government alleges that between March 2013 and April 14, 2013, Mr. Cilins obstructed a grand jury investigation into a potential violation of the foreign corrupt practices act, which purportedly occurred between 2006 and 2008 between BSGR (Beny Steinmetz Global Resources) and the government of Guinea. *See* Complaint; Detention Hearing Transcripts. According to the Government, via telephone and in person, in Jacksonville, Florida, Mr. Cilins offered to pay Mamadie Toure millions of dollars, to destroy documents sought by the grand jury sitting in the Southern District of New York. *See id.* The Government also alleges that Mr. Cilins' used threats to obstruct justice. However, there is absolutely nothing on the Government's audio or videotapes or in the discovery to prove that Mr. Cilins ever threatened anyone. Furthermore, the Government conceded during the detention hearings in Florida that no money ever exchanged hands and Mr. Cilins had a minimal $21,376.00 on him at the time of his arrest (despite promising the payment of

millions).  Finally, the Government cites various "draft" translations of conversations and meetings that occurred in French to support the charges.[1]

The Government's position is that these various documents that Mr. Cilins sought to destroy are genuine "contracts" signed on several different dates between 2005 and 2010 between BSGR, Pentler Holdings, LLC, and Mamadie Toure through Matinda and Company, LTD.[2]  *See* Bates 528-547.  Under these various "contracts," BSGR and Pentler Holdings supposedly agreed to pay Mamadie Toure 17.65% of shares in Pentler Holdings, 33% of the shares in Pentler Holdings, and other various amounts for her assistance in helping BSGR obtain the mining rights to one-half of Simandou.  *See* Bates 528-547. Another contract says that Mamadie Toure had already received $2,400,000.00 for this same assistance.  *See* Bates 528-547. Yet, another contract states that Mamadie Toure would also receive a 5% share of Simandou, itself.  *See* Bates 528-547.  However, despite the fact that the "contracts" state that Mamadie Toure has already received $2,400.000.00 from BSGR and Pentler Holdings, the Government has only alleged that two payments were purportedly made by Pentler Holdings to Mamadie Toure in 2010 for a total of $249,940.00.[3]  *Compare* Bates 528-547 *with* Gov't Memo.  Furthermore, all of these contracts were purportedly between very sophisticated business men and corporations---one of which is one of the largest mining companies in the world–and a Guinean woman in her early twenties, who although she was

---

[1]  Undersigned has reviewed the audio and many of the Government's draft translations. They do not appear to be accurate.  The Government concedes that a "French speaking agent" performed the translations and not a court-certified French interpreter.

[2]  As outlined more fully below, Mr. Cilins does not concede that these are genuine contracts, but rather these are false "contracts" created to extort monies from BSGR, himself, and others.  Unfortunately, extortion and blackmail are a part of business in many African countries.

[3]  Mr. Cilins has proffered that these payments were for legitimate business related to the importation of food stuffs from South America to Africa.

purported to be the fourth wife of the deceased President of Guinea, Lansana Conte, with the influence that flows from that relationship, she lived in her modest family home and not in the Presidential Palace.  The Government's position is that this sophisticated company and its various business associates and employees, who have access to the best silk stocking law firms in the world, would put into writing on 9 separate occasions varying amounts of bribes for the exact same mining contract.

### FACTS[4]

The Government allegations are premised on the idea that Mamadie Toure was the target of Mr. Cilins' efforts to impede this grand jury investigation.  As discussed below, Mamadie Toure has been the subject of a series of extortion, blackmail, bribery and fraud investigations related to the specific mining contract held by BSGR for Simandou, Guinea.  The mining rights to Simandou have been the subject of controversy spanning decades and numerous Guinean government administrations.

### A.      Frederic Cilins

Mr. Cilins is 50 years old and a native of Antibes, France.  Mr. Cilins and his family including his wife, his four children, his grandchild, his mother, his brother and his ex-wife all reside in or around Antibes.  Mr. Cilins father died in December 2012. Mr. Cilins has no criminal history, does not suffer from any mental or emotional illness, and is not a drug addict or alcoholic.  Mr. Cilins does suffer from high blood pressure and takes two separate medications to control his blood pressure.  Mr. Cilins has worked hard in his life.  He is a successful business man, buying and selling goods and services, as well as acting as a middleman in commercial transactions between Europe, Africa, and South America.  He also owns various rental properties in the United States, through

---

[4]  Mr. Cilins does not agree with the facts alleged by the Government in its memorandum.

different LLCs.  He is business partners with Avi LevRan and Michael Noy in both real estate and in the international trade of goods and services.  Mr. Cilins has the support of his family in France, as well as his numerous friends from the synagogue in Miami where he spends a significant amount of time while in the United States.

## B.    Guinea and Mining Contracts

In 1998 or 1999, the Government of Guinea granted Australia's Rio Tinto, the world's largest mining company, a contract for four parcels (Simandou).  At the time, the President of Guinea was Lansana Conte.  The contract provided that Rio Tinto had to do mining research and development (mining concessions) in Simandou.  The contract also provided for Rio Tinto to give a percentage of its mining concessions back to Guinea every year.  Rio Tinto did precious little at Simandou from 1998 to 2005-2006.  In the early to mid 2000s, President Conte and the Minister of Mines began voicing their disdain at Rio Tinto's lack of development of Simandou.

For many years prior to 2005, Mr. Cilins and his partners had been conducting business in numerous countries such as Canada, Morocco, South Africa, Guinea, Mali, Sierra Leone, Senegal, Liberia, and others.  As such, they developed many business contacts.  In 2005 and 2006, Mr. Cilins acted as an intermediary for BSGR and Guinea.  Mr. Cilins was utilized by BSGR because he had many business contacts in Guinea.  Eventually, in 2006, a contract was negotiated by BSGR and the Minister of Mines giving BSGR the rights to conduct research and development on a portion of Simandou.  A contract was signed in a very public ceremony.  Mr. Cilins was present, as were many members of the Government and their family and friends.  It is reported that one of those persons was Mamadie Toure, who claims to be the fourth wife of President Conte even though they were never officially married.

Thereafter, BSGR immediately took steps to conduct the required research and reach the

negotiated milestones. In mid-2008, Guinea formally took one-half of Simandou from Rio Tinto. Later that same year, a contract was signed by the Minister of Mines for BSGR to begin mining on that portion of Simandou. Rio Tinto kept the mining rights to the other portion of Simandou and it remains there to this day. Under its contract, BSGR had to provide for infrastructure to move the iron ore out of the country for export and processing, as well as build a railway across Guinea to benefit the Guinean people.

A few weeks later, in mid-December 2008, President Conte died. That same night, the military announced a coup-d'etat. Dadis Camara took over power as leader of the military coup. Three weeks later, in January 2009, Mamadie Toure left Guinea. Mr. Camara and his government reviewed the mining contracts for both Rio Tinto and BSGR. The contracts were approved and the companies proceeded thereunder.

In late 2009, General Sekouba Konate replaced Dadis Camara as the Interim President of the Transition Government of Guinea. The aim of this government was to transition Guinea to democratic elections. Again, Rio Tinto's and BSGR's mining contracts were reviewed and approved.

## C.    Blackmail and Extortion

In March 2010, elections were held in Guinea. In the first round of voting, Cellou Diallo gained 44 % of the votes, while Alpha Conde gained 18% of the votes. In the second round, Alpha Conde received 52.5% of the vote. The South African technology company, Waymark, was used to run the elections. Allegations of election fraud, vote rigging, and the general buying of votes surround the 2010 elections. Elections for the parliament/legislature were supposed to occur shortly thereafter. President Alpha Conde has postponed them numerous times (for over two years) and is insisting on using Waymark for all future elections.

At some earlier point in time, it was discovered by BSGR that Simandou contained one of the world's largest untapped iron ore deposits.  In April 2010, BSGR entered into a contract with Brasil's mining company, VALE.  Under their agreement, VALE was to oversee the day-to-day operations of the mine.  Shortly thereafter, an attorney purportedly on behalf of Mamadie Toure, contacted BSGR and attempted to extort money from BSGR in relation to the Simandou contract between Guinea and BSGR.  The attorney had several "contracts" allegedly signed by Pentler Holdings and BSGR between 2005 and 2010, purporting to give Mamadie Toure various payments and shares in the companies and Simandou.  The attorney withdrew his claims after BSGR threatened him with prosecution.  Around this same time,  President Alpha Conde announced that he was changing the mining laws and re-reviewing the mining contracts of Rio Tinto and BSGR.

Then, President Alpha Conde with the assistant of several NGO's ran and/or funded by George Soros, and a law firm, DLA Piper, allegedly hired by George Soros, began an investigation into the purported bribery involving Mamadie Toure to exert influence over deceased President Lansana Conte, Dadis Camara, and President Konate regarding the BSGR's contract for Simandou.[5] DLA Piper and the investigators hired by DLA Piper contacted Mr. Cilins to get his comments on the allegations raised by President Alpha Conde.  Mr. Cilins spoke with the investigator hired by DLA Piper and explained his role (as detailed herein) in the BSGR contract for Simandou.  The investigation relied heavily on these "contracts" which had previously been withdrawn by the attorney supposedly acting on behalf of Mamadie Toure and acknowledged to be false.

These "contracts" were supposedly given by Mamadie Toure to Samuel Mebiane, the son of the former prime minister of Gabon.  Samuel Mebiane gave these documents to numerous persons

---

[5]  Interestingly, Mamadie Toure is claimed to have exerted influence over the last two persons in 2009 and 2010, when she had been run out of the country in January 2009 after President Lansana Conte died.

in and out of Guinea. In 2010 and 2011, Samuel Mebiane was involved with South African billionaire Walter Hennig (who has ties to Waymark), in an attempt to seize 30% control of Guinea Mining Company via the Palladino contract signed by Mr. Fofana, President Alpha Conde's Minister of Mines. Samuel Mebiane is connected to President Alpha Conde's son, Mohammed. Mohammed Conde is under investigation by officials with the World Bank for taking $25,000,000.00 from Walter Hennig in relation to the Palladino contract and scandal. In 2011, Walter Hennig attempted to get BSGR to allow him to "resolve" BSGR's problems with President Alpha Conde. Samuel Mebiane is cited in the DLA Piper investigation report, ordered by one of George Soro's NGO's and President Alpha Conde as obtaining 9 "contracts" from Mamadie Toure. The blackmail and extortion of BSGR with these "contracts" continued from 2010 to 2013.

A second attorney purportedly acting on Mamadie Toure's behalf, as well as Mamadie Toure herself, have signed several documents and affidavits (attestations) swearing that these "contracts" showing that BSGR and/or Pentler Holdings had promised to pay her or had paid her for helping to obtain the Simandou contract are false. According to these numerous documents, Mamadie Toure was not promised any money or actually paid any money by BSGR or anyone else, and she has never participated in any bribery or corrupt influence over any Guinean official. These affidavits were signed in 2010, 2012, and 2013. Several of these affidavits were provided to Mr. Cilins in the Government's discovery. Mr. Cilins' various telephone calls and meetings between himself and Mamadie Toure in Jacksonville, Florida in 2013 were to obtain these false documents so that he and BSGR and other could no longer be blackmailed and extorted.

## D.   Investigation and Arrest

This case is politically motivated. According to the Government's discovery, in late 2012 or early 2013, President Alpha Conde met with United States President Barack Obama. The purpose

of this meeting was for President Alpha Conde to ask President Obama to investigate BSGR's contract and conduct as to Simandou. The genesis of this meeting was the relationship between George Soros and President Alpha Conde. George Soros is a prominent democratic campaign contributor reportedly with ties to several mining companies and other entities which will benefit if BSGR is removed from Simandou. President Alpha Conde's motivation for asking for U.S. assistance was to free him to sell or give the Simandou mining rights to a new mining group, as he has already announced he was going to do.

On April 14, 2013, Mr. Cilins was arrested after meeting with Mamadie Toure at the Jacksonville, Florida airport. Mr. Cilins was preparing to board his prearranged flight when agents approached and arrested him. Mr. Cilins did not flee and he was cooperative with agents during the arrest. Mr. Cilins declined to speak with the agents and requested an attorney.

## MEMORANDUM OF LAW

### I.    The Government's Memorandum of Law Should Be Stricken and Its Requested Relief Denied

In its memorandum, the Government seeks to have Mr. Cilins held without bond pending trial. Gov't Memo. On April 29, 2013, Magistrate Judge Klindt in Florida found that Mr. Cilins was a risk of flight and ordered Mr. Cilins to be detained and transferred to the Southern District of Newe York. On May 8, 2013, Judge Klindt entered a written order of detention. On May 15, 2013, undersigned made an ore tenus motion for bond (reconsideration of Judge Klindt's Order), and Magistrate Judge Frank Maas held a detention hearing. After hearing from Mr. Cilins and the Government, Judge Maas concluded that although Mr. Cilins presented a risk of flight, there were conditions that could reasonable ensure that Mr. Cilins would appear for trial. Specifically, Mr. Cilins was ordered released on a $15,000,000.00 personal recognizance bond, secured by

$5,000,000.00 in property or cash and with the signatures of five financially responsible parties. Other conditions included: surrender of all travel documents, travel restricted to the Southern and Eastern Districts of New York and Southern District of Florida, strict pretrial supervision, home incarceration, electronic monitoring, required to reside in his Turnberry Isle home in South Florida, and guarded by a 24/7 armed security company approved by the Court and the U.S. Attorney.

On May 20, 2013, a written docket entry was entered memorializing the Judge's order. Mr. Cilins did not appeal that order by filing a motion to revoke, as required by Federal Rule of Criminal Procedure 3145. Rather, on May 29, 2013, filed a motion to amend the conditions of release or reduce bond. The Government never appealed Judge Maas' order, pursuant to 18 U.S.C. § 3145, or filed a motion for reconsideration, pursuant to Local Criminal Rule 49.1.

Local Criminal Rule 49.1, states:

Unless otherwise provided by statute or rule, or unless otherwise ordered by the Court in a Judge's Individual Practices or in a direction in a particular case, upon any motion, the papers shall be served and filed as follows:
(a) All papers in support of the motion shall be filed and served by the moving party on all other parties that have appeared in the action.
(b) Any opposing papers shall be filed and served within fourteen (14) days after service of the motion papers.
(c) Any reply papers shall be filed and served within seven (7) days after service of the opposing papers.
**(d) A motion for reconsideration or reargument of a Court order determining a motion shall be filed and served within fourteen (14) days after the Court's determination of the original motion. A memorandum setting forth concisely the matters or controlling decisions which counsel believes the Court has overlooked shall accompany the motion.**

(Emphasis added). Pursuant to the local rules, in order for the Government to contest the Court's order releasing Mr. Cilins, it had to file its motion for reconsideration within 14 days after the Court's ruling. The Government failed to do so. Instead, the Government filed a memorandum, (purportedly in response to Mr. Cilins' motion to reduce bond), seeking Mr. Cilins' detention. The

Government has argued nothing new.  Indeed, the arguments that it makes are the same ones that it made in the various Florida hearings before Judge Klindt and the May 15, 2013 hearing before Judge Maas.  In the instant case, Judge Maas heard those arguments and rejected them.

As the Government's memorandum and its requested relief are not procedurally proper or timely filed, the memorandum should be stricken and the relief requested by the Government should be denied.

Additionally, because the Government failed to contest the Judge Maas' ruling, that ruling has now become the law of the case.  The purpose of the law of the case doctrine is "to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." *See* 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4478, at 788 (1981).  Under the law of the case doctrine, a legal decision made at one stage of the litigation, unchallenged in a subsequent appeal when the opportunity existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time.  *See Williamsburg Wax Museum v. Historic Figures*, 810 F.2d 243, 250 (D.C. Cir. 1987).  "As most commonly defined, the doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 816-17, 108 S.Ct. 2166, 2177 (1988) (citing *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391 (1983)); *In re PCH Associates*, 949 F.2d 585, 593 (2d Cir. 1991).  A court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, although as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was "clearly erroneous and would work a manifest injustice." *Christianson*, 486 U.S. at 817, 108 S.Ct. at 2178 (citation omitted); *In*

*re PCH Associates*, 949 F.2d at 593.

Many courts have concluded that the doctrine applies not only to final judgments, but also to matters decided during the course of a trial--*i.e.*, interlocutory orders--and have determined that "law of the case is not synonymous with preclusion by final judgment." *Pit River Home and Agric. Coop. Assn. v. United States*, 30 F.3d 1088, 1097 (9th Cir.1994) (citation omitted); *see also* 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4478 (1981 & Supp.1998) ("These rules do not involve preclusion by final judgment; instead, they regulate judicial affairs before final judgment."); *Id.* § 4478, at 754 n. 0.2 (Supp.1999) (citing cases from the Second, Third, Seventh, and Ninth Circuits that have adopted this position); *In re PCH Associates*, 949 F.2d at 593.

Here, Judge Maas ruled that there were conditions that would reasonably ensure Mr. Cilins appearance.  That ruling is now the law of the case and should not be disturbed without the Government producing some new evidence.  The Government did not challenge that ruling within the time provided.  Accordingly, the Government cannot now use its memorandum to do the very thing which previously failed to do.

## II.    Mr. Cilins is not a risk of flight and 18 U.S.C. § 3142 requires release[6]

The Court of Appeals for the Second Circuit has succinctly stated what the Government must prove to mandate a defendant's pretrial detention. "Because the law ... favors bail release, the government carries a dual burden in seeking pre-trial detention. First, it must establish by a preponderance of the evidence that the defendant, if released, presents an actual risk of flight. Assuming it satisfies this burden, the government must then demonstrate by a preponderance of the

---

[6] Although Mr. Cilins believes that the Court should not consider the Government's request to detain Mr. Cilins, in an abundance of caution, he will address the Government's arguments.

evidence that no condition or combination of conditions could be imposed on the defendant that would reasonably assure his presence in court." *United States v. Sabhnani,* 493 F.3d 63, 75 (2d Cir. 2007) (citations omitted).   Under the Bail Reform Act, in  evaluating the risk of flight a court must consider "the nature of the offense, the weight of the evidence against the suspect, the history and character of the person charged, and the nature and seriousness of the risk to the community".  18 U.S.C. § 3142; *United States v. Chimurenga*, 760 F.2d 400, 403 (2d Cir.1985).  Generally, a court must release a defendant on bail on the least restrictive condition or combination of conditions that will reasonably assure the defendant's appearance when required and the safety of the community. *See* 18 U.S.C. § 3142(c)(1)(B); *United States v. Madoff*, 586 F.Supp.2d 240 (S.D.N.Y. Cir. 2009).

     a.       **The nature of the offense**

While the accusations against Mr. Cilins are serious, there is significant doubt as to the credibility of Mamadie Toure, the Government's motivations for bringing this case, and to quote Judge Klindt, "the Government's ability to actually prove its case."  Klindt Dtn Order.   This is not the first time that the Government's star witness, Mamadie Toure, has been involved in using these same false documents to gain something.  Previously, her goal or those acting on her behalf, was money.  In the instant case, it appears that she wants to remain in the United States and away from those persons in Guinea who seek to prosecute her.   Thus, this factor weighs in favor of Mr. Cilins or at worst is neutral.

Additionally, if convicted, Mr. Cilins is not facing a significant term in prison.  During the detention hearings in Florida, the Government told the Court that Mr. Cilins was facing almost 85 years in jail, as well as his sentencing guidelines were 292 to 324 months.  This was untrue. Undersigned contacted the Sentencing Commission and citing binding case law from the Second Circuit, which states that Mr. Cilins maximum offense level is 30, criminal history I, for an advisory

range of 97 to 121 months if he went to trial and lost.  *See United States v. Giovanelli*, 464 F.3d 346

(2d Cir. 2006).  Although the Government conceded this calculation in front of Judge Maas, now

it its memorandum, the Government argues that it is a "defense calculation" instead of conceding

the point again.   Gov't Memo at 16.  Eight to ten years is not a significant amount of time and

certainly not worth looking over one's shoulder for the rest of one's life.  If Mr. Cilins were to flee,

he would be forced to remain in France and could not continue in his current line of work.

**b.      The weight of the evidence against Mr. Cilins**

In fixing bail, the least amount of weight should be given to the "weight of evidence." *See*

*United States v. Honeyman*, 470 F.2d 473 (2d Cir. 1973).  Again, the Government has substantial

problems with its case, its evidence, and its witness, Mamadie Toure.  From the discovery provided

so far, the Government's case is weak.  Furthermore, Mamadie Toure's credibility is undermined

by her previous extortion attempts and her numerous retractions in her affidavits swearing that there

is no crime.  The tapes, which are in French, have not been accurately translated.  The documents

upon which the allegations are based are false.  Importantly, no original documents have been

identified or produced–only photocopies of photocopies.  This begs the question that if the

"contracts" are real, then Mamadie Toure and now the Government should have the originals.  On

the other hand, Mr. Cilins would have promised Mamadie Toure the world to finally get rid of the

false documents once and for all and stop the blackmail and extortion.

**c.      Nature and circumstances of Mr. Cilins**

Mr. Cilins is a stable, law abiding family and business man.  Mr. Cilins is 50 years old and

a native of Antibes, France.  His entire family reside near the place of his birth in Antibes.  Mr.

Cilins has no criminal history, does not suffer from any mental or emotional illness, and is not a drug

addict or alcoholic.  Mr. Cilins suffers from high blood pressure and takes medications to control it.

He is a successful business man, buying and selling goods and services, as well as acting as a middleman in commercial transactions between Europe, Africa, and South America. He also owns various rental properties in the United States, through different LLCs. He is business partners with Avi LevRan and Michael Noy in both real estate and in the international trade of goods and services. Mr. Cilins has the support of his family in France, as well as his numerous friends from the synagogue in Miami where he spends a significant amount of time. Additionally, Mr. Cilins has significant and legitimate business ties to the United States, not withstanding the Government's arguments to the contrary.

Mr. Cilins did not lie to Pretrial Services as alleged by the Government. And, importantly, Judge Klindt, who held several days of hearings and was able to judge the credibility and demeanor of the Pretrial Services Officer, as well as Mr. Cilins, determined that he was not able to find that Mr. Cilins intentionally lied, mislead, or misrepresented his finances to Pretrial Services. Mr. Cilins stated his monthly rental income of approximately $4000.00 a month or $48,000.00 a year. He told them about his mortgage in France of $1,800.00 a month. He told them about the five properties that he owned solely by himself through his LLC, PHA Investments, LLC. He could not remember the addresses the day after his arrest and without his medication. Upon the first opportunity that undersigned appeared in court on his behalf on April 18, 2013, undersigned informed the Court, Pretrial Services (who was present for every hearing) and the Government, that there were two additional properties that Mr. Cilins owned. Undersigned even put the names of the LLCs on the record for the court and stated the Florida Department of Corporations website at www.sunbiz.org, where the information about who was a member of the various LLCs could be obtained. Undersigned also placed on the record the addresses of the properties and provided copies of the legal descriptions, property appraisers website page showing the address, legal address, and parcel

identification numbers of all of the properties, mortgages, and draft affidavits to both the Court and the Government. Certainly, if Mr. Cilins or undersigned were attempting to mislead the Court, this very detailed information would not have been given to anyone. As stated to the court upon a final review of the mortgage documents in undersigned's email, undersigned contacted Mr. Cilins' business attorney, Alan Marcus, in Miami on April 16 or 17, 2013 to have the mortgage documents prepared. Mr. Cilins made no calls and gave no direction to Mr. Marcus or anyone else how to prepare the documents for the court. It was upon a review that undersigned noticed that Mr. Cilins was listed as a sole owner and not a 1/3 owner.[7] Finally, the Pretrial Services Officer admitted during her testimony that she was not sure what Mr. Cilins understand and how he interpreted her questions. No interpreter was used by Pretrial Services during the interview.

The Government also argues that Mr. Cilins' income of $32,000.00 per year from his business and his rental income of $48,000.00 a year do not meet with the lifestyle or money that he had. First, these figures represent the income for 2012, not any prior years, as Pretrial Services did not ask about any previous years' income. Mr. Cilins business in Europe, like all businesses both here and in Europe, has suffered with the downturn in the economy. Mr. Cilins made significantly more money prior to the downturn than he has in the past year. Second, the Government argues that Mr. Cilins had access to millions of dollars that he offered to pay Mamadie Toure. However, the

---

[7]  Undersigned relied upon Mr. Marcus and as the Court in Orlando and the Government are aware spent the first week on this case proving various statements in the Government's proffer were false. For example, the Government claimed that Mr. Cilins was traveling in the United States on a false passport. Undersigned and her staff spent countless hours on the telephone with the Consulate General de France in Miami and Atlanta, the Sous-Prefet de Grasse in France, as well as Mr. Cilins' family to obtain letters from the various legal entities to prove that Mr. Cilins indeed had two valid passports from France. Undersigned also spent time researching the sentencing guideline issue. There were several other things that the Government alleged that undersigned spent time disproving instead of being able to thoroughly review the documents prepared by another attorney.

cold hard facts are that he only had $21,376.00 with him at the time of his arrest, when he was supposed to have $300,000.00 or more.  Additionally, the Government has nothing more than speculation to show that Mr. Cilins has access to the vast resources of BSGR.

Finally, the fact that France does not have an extradition treaty with the United States is of no moment.  The mere opportunity for flight is not sufficient grounds for pretrial detention.  *United States v. Himler*, 797 F.2d 156,162 (6th Cir. 1986). Indeed, this Court has released foreign nationals pending trial–even those with home countries which will not extradite.  *See generally United States v. Khashoggi*, 717 F.Supp. 1047 (S.D.N.Y. 1989)(Saudia Arabian business man, who traveled frequently, charged with obstruction release on bond).

In sum, the Government has failed to show that Mr. Cilins is an actual risk of flight.  Even assuming arguendo that they have made this showing, the Government has also failed to show that there are no conditions or combination of conditions that will reasonably ensure that Mr. Cilins will appear for court.  Mr. Cilins should be released and the financial portion of his bond lowered.  *See generally United States v. Dreier*, 596 F.Supp.2d 831 (S.D.N.Y. 2009).

## C.        Requiring Mr. Cilins to Proceed by Proffer Violated Due Process

Mr. Cilins was required to proceed by proffer in both Florida and New York.  Under the unique circumstances of this case, the inability to call witnesses on his behalf including the Government agent violated his right to due process of law.  The Bail Reform Act remains silent regarding how the Government must proceed in satisfaction of its burdens.  In the Second Circuit it is well established that the Government may, at a minimum, proceed by way of proffer, just as the defendant is permitted to do under § 3142(f). *See United States v. LaFontaine,* 210 F.3d 125, 131 (2d Cir.2000); *United States v. Martir,* 782 F.2d 1141, 1145 (2d Cir.1986).  Whether presented by proffer or direct evidence, courts retain the responsibility for assessing the accuracy of the

Government's proof. *Martir,* 782 F.2d at 1145. To that end, courts are vested with considerable discretion to determine, on a case-by-case basis, the appropriate method by which the Government must present its case. *Id.* at 1147 ("In the informal evidentiary framework of a detention hearing, the methods used to scrutinize government proffers for reliability must lie within the discretion of the presiding judicial officer...."); *LaFontaine,* 210 F.3d at 131 (courts have discretion to insist upon the production of the underlying evidence or sources where their accuracy is in question).

In the instant case, the Government attorney proffered and was cross examined.  It was evident from her cross-examination that there were many factual inaccuracies in her proffer, *i.e.*, Government argued Mr. Cilins traveled on false passport when this was not true, Government argued after reviewing passport that Mr. Cilins' passport had a Guinean passport stamp from December 2012 when passport had no such stamp, Government claimed Mr. Cilins' guidelines were 292 to 324 months when they are at most 97 to 121 months.  Further, the Government argued about what was on the tapes when it had not listened to the tapes or read any of the documents in question.  Finally, Judge Klindt said that no witnesses would be called and then on third day allowed the Government to call a witness without notice to Mr. Cilins.  The Court should have directed the Government to produce live witnesses subject to cross-examination.  Further inquiry into the reliability of these statements is and was crucial because these statements comprise the critical pieces of evidence supporting the Government's proffer. In these circumstances, Mr. Cilins due process rights were violated by the procedure used by the court in proceeding by proffer only.

**D.   Mr. Cilins Conditions Should Be Amended and/or His Bond Reduced**

There are "only a limited group of offenders who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir.1987)(quoting S.Rep. No. 225, 98th Cong., 2d Sess. 7, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3189).  A person who is eligible for bail cannot be

kept incarcerated because he fails to meet a financial condition of that bail. 18 U.S.C. § 3142(c)(2). A court "may not impose a financial condition that results in the pretrial detention of the person." *Id.*; *See United States v. Orta*, 760 F.2d 887, 890 (8th Cir. 1985)(*en banc*)(the Bail Reform Act prohibits the use of high financial conditions to detain defendants).

Mr. Cilins cannot meet the financial requirements of the order granting his release.  In the instant case, the amount of the bond—$15,000,000.00, secured by $5,000,000.00 in cash and/or property and five financially responsible parties—is tantamount to no bond.  Furthermore, such a high financial amount of bond is not necessary to reasonably ensure Mr. Cilins' appearance at trial. The other conditions imposed—surrender of all travel documents, travel restricted to the Southern and Eastern Districts of New York and Southern District of Florida, strict pretrial supervision, home incarceration, electronic monitoring, required to reside in his Turnberry Isle home in South Florida, and guarded by a 24/7 armed security company approved by the Court and the U.S. Attorney, standing by themselves are sufficient to reasonably ensure Mr. Cilins' appearance.  These non-financial conditions, coupled with the $3.6 million[8] in unencumbered real estate Mr. Cilins already offered as security would provide the Court and the Government with the means to reasonably ensure that Mr. Cilins would appear as required.  In this case, Mr. Cilins asks the Court to reduce or eliminate the financial conditions of his bond including the need for excessive security and five financially responsible persons.  Mr. Cilins requests a hearing so that he and his witnesses may be heard on this matter.

---

[8] This is the minimal and conservative value of the various properties as evidenced by the tax appraiser's office.   The actual values of the properties if placed on the market today are higher.

WHEREFORE, the Mr. Cilins respectfully requests this Court enter an order to amend the conditions of release and/or for modification of bond.  Mr. Cilins also asks this Court to deny the Government's request for detention.

Respectfully submitted,

/s/ *Michelle P. Smith*
Michelle P. Smith
Florida Bar No. 389382
Law Office of Michelle P. Smith, P.A.
827 Menendez Court
P.O. Box 1788
Orlando, Florida 32802-1788
Telephone: 407-601-6700
Facsimile:   888-614-3231
E-mail:  michellepsmith_law@yahoo.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 13, 2013, undersigned electronically filed the foregoing *Motion to Amend the Conditions of Release and/or for Modification of Bond* with the Clerk of Court (CM/ECF) by using the CM/ECF system which will send a notice of electronic filing and copy to the following: Elisha Kobre, Stephen Spiegelhalter, Bruce Lehr, and Sherleen Mendez.

/s/ *Michelle P. Smith*
Co-counsel for Frederic Cilins