UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                    :

    -v.-                                            :

                                   13 Cr. 315 (WHP)

FREDERIC CILINS,                              :
   a/k/a "Frederic Francois
      Marcel Cilins,"                         :

                Defendant.            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## GOVERNMENT'S MOTION TO PRECLUDE


PREET BHARARA                              JEFFREY H. KNOX
United States Attorney                     Chief
Southern District of New York              Criminal Division, Fraud Section
Attorney for the United States of America  United States Department of Justice




Elisha J. Kobre                            Stephen J. Spiegelhalter
Assistant United States Attorney           Trial Attorney

-Of Counsel-                               -Of Counsel-

The defendant's filings to date make clear that he hopes that this case will be a freewheeling exploration of the Entity's[1] historical efforts to win and keep mining rights in the Republic of Guinea. Defendant's Reply to the Government's Memorandum in Support of Detention Pending Trial [docket #16], for instance, weaves a tale about how the Entity won its mining rights only to have a supposed cabal of billionaires and politicians try to strip them. The defendant's efforts to expand this case to examine those issues is, at best, ironic, given that the defendant bribed a witness to destroy contracts relevant to just that inquiry.

Regardless, the present case is actually much simpler. This is a case about the defendant's efforts to obstruct a federal investigation, and it only requires a jury to consider whether the defendant bribed or corruptly persuaded a witness to destroy contracts that the grand jury had subpoenaed, corruptly persuaded the witness to lie to the FBI, or caused the witness to sign a false document. A mini-trial over the collateral issue of the Entity's efforts to win its mining rights, or litigation over the authenticity of various contracts, would run far afield from the crimes actually charged.

The defendant is pending trial because he schemed to destroy contracts sought by a federal grand jury in connection with its investigation into corruption. The grand jury, and the grand jury alone, possessed the legal right to conduct that investigation and resolve issues of credibility, veracity, and authenticity. It certainly was not the defendant's province to resolve those decisions on the grand jury's behalf by preventing it from collecting and analyzing evidence potentially unfavorable to the defendant and his confederates. His defense, set out most succinctly in his reply in support of his motion to compel [docket # 22 at ¶¶3,4]—that "these documents are false, fraudulent, and forgeries that had been used in the past and were currently

---

[1] As alleged in the complaint, the "Entity" engaged in the mining business, and defendant has identified himself as a representative of the "Entity." 13 Mag. 975, Docket #1, at ¶¶ 6, 9.

being used to blackmail himself and others. Thus, Mr. Cilins was not obstructing justice when he attempted to obtain those documents . . . ."—is no defense at all, for the alleged falsity of the contracts is incapable as a matter of law of negating the defendant's corrupt intent.[2]

Accordingly, the government moves the Court in two respects. First, the government moves to preclude the defendant from introducing at trial any evidence or argument that the contracts in question were false, fraudulent, or forgeries, and that the defendant was therefore justified in attempting to destroy them. Evidence relating to the subpoenaed documents' authenticity has no bearing on any fact of consequence to the jury's determination and should, therefore, be excluded pursuant to Rules 401 and 402 of the Federal Rules of Evidence.

Second, should the Court determine that the defendant is allowed to adduce evidence that he believed the contracts were forged, the Court should limit such evidence to the defendant's actual mental state at the time of the charged indictment, which the defendant is free to present by testifying, to the extent that his mental state is deemed relevant. Extrinsic evidence in this regard should be precluded. Indeed, the record suggests no basis upon which the defendant could have known for himself whether the contracts were forged; neither his signature nor name appears in any of the contracts. Thus, even in its best light, the proffered defense is a subjective one: the defendant believed the contracts to be false and was therefore privileged to destroy them. If that is the thrust of the proffered defense, testing the documents now, as the defendant

---

[2]     The government will, for purposes of this motion and evaluating the defendant's proffered defense, assume the two counterfactuals that the defendant urges upon the Court: that the contracts subpoenaed by the grand jury were forgeries and that defendant believed them to be so. Those contentions are false, but their falsity is of no relevance to this motion's disposition. As set out below, it does not matter whether the contracts were authentic. They were under grand jury subpoena.

apparently seeks to do,[3] will shed no light on the defendant's state of mind when he attempted to cause the documents to be destroyed. A trial involving dueling experts and other testimony about the documents' authenticity would be nothing but a sideshow—a display of erudition on a wholly irrelevant issue, and a lengthy and confusing one at that—and should, therefore, be precluded under Rules 401, 402, and 403 of the Federal Rules of Evidence.

## FACTS AND PROCEDURAL POSTURE

### A.    Defendant's Obstruction and Witness Tampering

As set forth in a detailed complaint filed in United States v. Frederic Cilins, 13 Mag. 975, and attached as Exhibit 1 hereto (the "Complaint"), the defendant called and met face-to-face on multiple occasions with a witness cooperating with the FBI witness (the "CW") and offered the CW as much as $5 million for the purpose of securing the destruction of documents crucial to an ongoing grand jury proceeding and FBI investigation in this district, and to induce the CW to lie to FBI agents and sign a false "Attestation" about facts crucial to the investigation. The attached Complaint sets forth in detail the defendant's obstruction and witness tampering, and the following is therefore a brief summary of particular facts.

As alleged in the Complaint, a federal grand jury sitting in this district has, since about January 2013, been investigating potential violations of the Foreign Corrupt Practices Act ("FCPA") and the criminal money laundering statutes relating to, among other things, the laundering into and through the United States of potential bribe payments to government officials of the Republic of Guinea ("Guinea") for the purpose of obtaining valuable mining concessions in Guinea, including a particularly valuable mining concession in Guinea's

---

[3]    Defendant's Motion to Compel [docket # 20] asserts that defendant wants his counsel and "Defense Experts" to "inspect, examine, and test" the contracts (¶ 14). The request explicitly includes "testing of the paper, ink, handwriting, stamps, seals, etc. for each and every document" (¶ 15).

Simandou region (the "Simandou Concession"). (Complaint ¶ 8). During the course of this investigation, the FBI learned that the Guinean government is investigating whether the Entity (see footnote 1, above) and its affiliates obtained the Simandou Concession by conveying things of value to officials of a former government of Guinea. (Complaint ¶ 9). The Entity is a Switzerland-based mining conglomerate with, according to its website, operations in 12 countries and "over a billion dollar annual turnover." As alleged in the Complaint, the Entity stands to lose the Simandou Concession—worth billions of dollars—depending in part on the result of the ongoing corruption investigation by Guinean authorities. (Id.)

The defendant previously identified himself as a representative of the Entity in connection with the Entity's efforts to obtain mining concessions in Guinea. (Complaint ¶ 11). The defendant and others associated with the Entity visited the CW, who was at the time the wife of the then-president of Guinea, in Guinea. During this meeting, the defendant offered the CW $12 million, to be distributed to the CW—a woman with no relevant experience or involvement in mining—and any other ministers or officials within the government of Guinea who might be needed to secure mining rights for the Entity in Guinea. (Id.) The relationship between the Entity and its affiliates and the CW—including the payment of millions of dollars in connection with the Entity's efforts to obtain various mining rights in Guinea—continued for years and is reflected in a series of contracts between the CW and the CW's company and the Entity or its affiliates (the "Contracts"). (Complaint ¶¶ 12, 13). It is these Contracts, evidencing payments for the purpose of obtaining valuable mining rights in Guinea, among other things, that the defendant offered money to the CW to "urgently destroy." (Bates 001282).[4]

---

[4] "Bates" number refers to the document produced in discovery that is bates-stamped number.

Audio recordings of meetings described in the Complaint that occurred in April 2013—draft translations of which have been provided to the defense—demonstrate that the defendant expressed urgency and was both explicit and emphatic about destroying documents evidencing the Entity's payments to the CW, including the Contracts, and otherwise obstructing the grand jury proceeding. By way of example, as reflected in the draft translations, the following exchange, among others, occurred between the defendant and the CW on April 11, 2013:

> CW: They're [the FBI] going to give me a subpoena, summon me to appear in front of the judge, in court – in front of a grand jury in court [noise] and testify and give all the-uh-documents to court.
>
> CILINS: The documents – you told them there was – that you had no documents!
>
> CW: Yes!
>
> CILINS: This must be destroyed – urgent-urgent-urgent ... [sic] You must destroy this – very urgent – very, very urgent [sic]. . . .
>
>                                    \*      \*      \*
>
> CW: I think that, Frederic ... it seems that the same document [noise] we want to destroy is the same the American government is looking at . . .
>
> CILINS: But I know – but it's –
>
> CW: I don't know what to do . . .
>
> CILINS: But everything must be destroyed! Well, I told you this, a long time ago, 'Do not keep anything here . . .' [Whispering] Make sure you're not keeping anything here, not even a [unintelligible]. . . You must destroy everything, everything, everything . . . (Bates 001271-001272).

Later, during this same conversation, the defendant repeatedly stressed the urgency of destroying the documents, for example directing the CW: "we need to urgently, urgently,

urgently destroy all of this; but it's extremely urgent for us; ex-extremely urgent! And, in any case, you, y-y-you have nothing to do with this! You have nothing to do with this!" (Bates 001282). And another meeting later that day, the defendant stated: "I myself am going to destroy all that . . . . I'm not going to destroy it here at the airport but as soon as I get there I have a paper shredder. I can destroy everything . . ." (Bates 001329). (See also Bates 1290) ("It's necessary to find a place for the . . . to-to destroy, destroy them completely; to burn them. But don't do that at home!").

The defendant made clear during these meetings that he was not working alone in his efforts to obstruct the grand jury proceeding and FBI investigation:

> I went specially to see him [a co-conspirator, "CC-1"], to have – talk about all of this very clearly. I always told him, I always told him. Again [noise] last week, I told him, [whispering] . . . [The CW] will never betray you – [the CW] will never give away any documents whatsoever. . . . "Listen" – He told me, "That's good, but I want you to go see – but I want you to destroy these documents." He told me, "Okay, you go – since you want – I want you to tell me, 'I saw that the documents [noise] were destroyed; it's over, there are no more documents.'" (Bates 001299).

The defendant later reiterated that he was acting at the direction of others, telling the CW, by way of example, that: ". . . what I was asked to do is to watch when the documents are destroyed. That's why I asked you if you want to go together; to see, to be a hundred percent sure that everything is destroyed and [whispering] that nothing is dispersed. So if you want us to do this today, we can get it done today." (Bates 001294).

As alleged in the Complaint, the defendant not only urged the destruction of documents, he also presented the CW, during an April 11, 2013, meeting monitored by the FBI, a one-page document titled "Attestation," containing multiple false statements within the scope of the grand jury investigation, for the CW's signature. (Complaint ¶¶ 20(n), 21). The defendant moreover

explicitly directed the CW to "lie" to the FBI, threatening that if the CW was truthful the CW would not be able to remain in the United States:

> Now to go back to the conversation we were having earlier when you told me 'you told me that I have to lie.' Well, of course you have to lie! You can't tell them [the FBI] . . . if you tell them, I assure you, you have to understand this, if you say to them, 'Yes, I received whatever from whomever,' not even particularly from that, from whomever. You have a very big problem! But not a small problem, a very, very big problem. You can forget about the United States. You can forget about the United States, and that's serious. (Bates 001324).

As alleged in the Complaint, during the meetings, the defendant was perfectly clear about what the CW would receive in exchange for the destruction of documents under subpoena by the grand jury and for lying to the FBI – $1 million, with $200,000 paid up front and $800,000 at a later date. The defendant further told the CW that, once the case is complete and the Entity is not kicked out, the CW will receive "five"—*i.e.*, an additional $ 5 million—if the Entity retains its rights to the Simandou Concession after the Guinean corruption investigation is complete. (Complaint ¶ 20(m)). (Bates 001299) ("I'm telling you again, so it's very clear in your head . . . The five that are planned, will be paid, whatever happens. You will have them, if they are not kicked out; if they're still part of the project. What you will get, whatever happens, of – one million, meaning two hundred, eight hundred . . . Those, you will get them. . . "). The defendant later reiterated that the CW will receive $5 million if the Entity was not kicked out and the $1 million regardless of the outcome. (Complaint ¶ 20(m)). The defendant later agreed to try "to get fifty"—$50,000—immediately for the CW. (Bates 001324).

## B.     Procedural History

The defendant was arrested on April 14, 2013, at the Jacksonville International Airport in Jacksonville, Florida, where Cilins had just concluded yet another meeting with the CW. Among the items recovered from the defendant's person incident to arrest was $20,000 in United States

currency.  The defendant also possessed a sheet of paper on which was handwritten "Grand Jury . . . Subpoena."  (Bates 000045).

On April 25, 2013, a grand jury in this district returned a five-count indictment, attached hereto as Exhibit 2, charging the defendant, in Counts One through Three with witness tampering, in violation of 18 U.S.C. §§ 1512(b)(2)(B), 1512(b)(3), 1512(c)(2) and 2; in Count Four with Obstruction of a Criminal Investigation, in violation of 18 U.S.C. §§ 1510(a) and 2; and, in Count Five, with Destruction, Alteration, and Falsification of Records in Federal Investigations, in violation of 18 U.S.C. § 1519.

On June 28, 2013, the defendant filed a motion to compel [docket #20] the United States to produce original copies of the contracts that the defendant sought to destroy.  (The motion was also styled a motion to inspect, examine, and test physical evidence.)  In his motion (¶¶5,13), the defendant asserted that it "is Mr. Cilins' defense that these documents are not genuine contracts, but rather these are false 'contracts' created to extort monies from BSGR, Mr. Cilins, and others" and that "Defense counsel and Mr. Cilins believe that these documents are not genuine.  This hypothesis forms, in large part, the basis of Mr. Cilins's defense."  Defense counsel also asserted (¶7) that, having reviewed the contracts herself, "the documents upon which the Government relies, [sic] appear to be 'manufactured' or 'forged.'"  "It is therefore necessary," defendant asserted (¶¶14-15), that his counsel and "Defense Experts . . . "inspect, examine, and test" the contracts, including "testing . . . the paper, ink, handwriting, stamps, seals, etc. for each and every document."

The government opposed the defendant's motion to continue on the ground that the United States government does not possess the contracts [docket # 21], and on July 2, 2013, the defendant replied [docket # 22].  In compliance with the Court's order of July 3, 2013, the

government sent a letter reporting that the original copies of the contracts that the defendant sought to destroy were not now and never had been in the United States government's possession. The defendant's motion is pending with the Court.

The government files the instant motion in compliance with the Court's order of July 3, 2013, in which the Court ordered the government to file by July 24, 2013, a motion concerning the defendant's apparent defense, as reflected in his motion to compel.


## ARGUMENT

The defendant's argument—that he could lawfully pay for the destruction of documents under grand jury subpoena simply because he claims they were forged—is an argument in support of a privatized justice system for those that are rich enough and brazen enough to remove documents from the grand jury's consideration by paying for them. But the proffered defense is found nowhere in the law. On the contrary, the obstruction statutes' plain meaning; their provision that inadmissible evidence is still protected from destruction; the provision of a single, very limited affirmative defense that was meant to augment the amount of evidence the grand jury would have to consider; and a substantial amount of case law make clear that no man is entitled to withhold documents from a grand jury based solely upon his belief that they are forged or otherwise false. As such, the introduction of any evidence or argument concerning the alleged falsity of the contracts under subpoena in this case should be precluded.

I.   **THE PROFFERED DEFENSE—THAT DEFENDANT IS NOT GUILTY OF OBSTRUCTION BECAUSE HE PURPORTEDLY BELIEVED THE DOCUMENTS THAT HE SOUGHT TO DESTROY WERE FORGED—SHOULD BE PRECLUDED.**

The defendant's contention that he is free to destroy documents that have been subpoenaed by a grand jury because he purportedly believed them to be forged has no basis in law.

### A.  Absent A Claim of Privilege, Withholding From A Grand Jury Documents That One Knows To Be Under Subpoena Is Criminal.

The grand jury is a vital part of the American system of justice.  The use of grand juries to determine probable cause is derived from the English system of law, and "[i]ts adoption in our Constitution as the sole method for preferring charges in serious criminal cases shows the high place it held as an instrument of justice."  Costello v. United States, 350 U.S. 359, 362 (1956) (grand jury indictment may be founded upon hearsay because, historically, a grand jury's "work was not hampered by rigid procedural or evidential rules").

The grand jury possesses exceedingly broad powers to investigate alleged crimes. Branzburg v. Hayes, 408 U.S. 665, 688 (1972) (press does not enjoy absolute immunity from grand jury process).  Moreover, because of the essential task the grand jury performs, its powers of inquisition are not limited by the potential effects of its judgment.  See, e.g., Blair v. United States, 250 U.S. 273, 282 (1919) ("the scope of [the grand jury's] inquiries is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation, or by doubts whether any particular individual will be found property subject to an accusation of crime").

With very few exceptions, no person is entitled to resist the grand jury's command to give evidence or testimony.  See, e.g., Branzburg, 408 U.S. at 682, 688 ("Citizens generally are not constitutionally immune from grand jury subpoenas."); United States v. Bryan, 339 U.S. 323,

331 (1950) (rights to refuse subpoena power of "competent authority" are "distinctly exceptional" because "the public . . . has a right to every man's evidence . . . ."); In re Sealed Case, 676 F.2d 793, 807 (D.C. Cir. 1982) ("Nowhere is the public's claim to each person's evidence stronger than in the context of a valid grand jury subpoena.").

Those exceptions to the grand jury's power to compel the production of documents or testimony are exceptionally narrow and are generally founded on other Constitutional rights. See In re Grand Jury Subpoena Dated July 6, 2005, 510 F.3d 180, 185-86 (2d Cir. 2007) ("It has long been recognized that the grand jury has a right to every man's evidence and that there is a fundamental and comprehensive need for that evidence. Thus, privilege claims that shield information from a grand jury proceeding . . . are not to be expansively construed, for they are in derogation of the search for truth.") (internal quotation marks and citations omitted); In re Sealed Case, 676 F.2d at 806 ("Witnesses may not refuse to testify or produce documents before a grand jury simply because they think the grand jury's demands unreasonable. Only a very limited number of recognized privileges provide legitimate grounds for refusing to comply with a grand jury subpoena, and each of these is firmly anchored in a specific source—the Constitution, a statute, or the common law."). In light of the grand jury's broad and important powers, then, gamesmanship in producing testimony or evidence before a grand jury or other bodies possessing the right to issue compulsory process cannot be tolerated. Indeed, "[a] subpoena has never been treated as an invitation to a game of hare and hounds, in which the witness must testify only if cornered at the end of the chase." Bryan, 339 U.S. at 331.

Congress has repeatedly enacted statutes meant to protect the province of grand juries and federal law-enforcement agencies to investigate criminal activity without interference from

those who would impermissibly infringe on that authority.[5]  Portions of the obstruction statutes, which appear, in part, in 18 U.S.C. §§ 1510, 1512, and 1519, are at issue here.  First, Section 1510(a) criminalizes "willfully endeavor[ing] by means of bribery to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute by any person to a criminal investigator."  Second, Section 1512(b)(2)(B) criminalizes "corruptly persuad[ing] a person . . . with [the] intent to cause or induce a person to . . . destroy . . . an object with [the] intent to impair the object's integrity and availability for use in an official proceeding."  Third, Section 1512(b)(3) criminalizes "corruptly persuad[ing] a person . . . with intent to hinder, delay, or prevent the communication to a law enforcement officer . . . of the United States of information relating to the commission and possible commission of a federal offense . . . ."  Fourth, Section 1512(c)(2) criminalizes "corruptly obstruct[ing], influenc[ing], or imped[ing] any official proceeding."  Finally, Section 1519 criminalizes "knowingly . . . mak[ing] false entries in records, documents, and tangible objects . . . with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States . . . ."

Under these statutes, Congress aggressively protected the prerogative of the grand jury and law enforcement, providing that one can violate Section 1512 even if no "official proceeding [is] pending or about to be instituted at the time of the offense" 18 U.S.C. § 1512(f)(1); see also United States v. Gray, 421 Fed. Appx. 11, 14, 2011 WL 1592027, at *1 (2d Cir. Apr. 28, 2011) (unpublished) (defendant's obstruction of report to private prison facility criminal, where DOJ's

---

[5]     As noted in the Senate Judiciary Committee's report concerning Section 1512, "the obstruction of justice statute is an outgrowth of Congressional recognition of the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined."  S. Rep. No. 97-532, at 18 (1982), reprinted at 1982 U.S.C.C.A.N. 2520, 2524.

policy was to investigate such reports).  Section 1519 is equally comprehensive, applying "broadly to acts to destroy or fabricate physical evidence so long as they are done with the intent to obstruct, impede or influence the investigation or proper administration of any matter . . . within the jurisdiction of an agency of the United States, or such acts done either in relation to or in contemplation of such a matter or investigation."  S. Rep. No. 107-146, at 14-15 (2002), 2002 WL 863249, at *12-13.

The obstruction statutes are, by their terms, quite broad and provide no quarter to an individual who tried to destroy a document that he perceived to be false.  "Statutory analysis necessarily begins with the plain meaning of a law's text and, absent ambiguity, will generally end there."  Cruz-Miguel v. Holder, 650 F.3d 189, 195 (2d Cir. 2011).  Congress unambiguously criminalized in Section 1512 the destruction or attempted destruction of "an object"—any object—"with [the] intent to impair the object's integrity and availability for use in an official proceeding."  If Congress wished to exempt forgeries or false documents from the statutes protecting documents from destruction, it surely could have done so.  It did not.

On the contrary, Congress criminalized the destruction of evidence, even where the document in question was "not admissible in evidence."  18 U.S.C. § 1512(f)(2).  This provision is a telling one, as well-established case law shows that the issues of admissibility and authenticity are intertwined.  Physical evidence is admissible at trial only if authenticated.  See, e.g., United States v. Pluta, 176 F.3d 43, 49 (2d. Cir. 1999).  But, even at trial, the standard for proving authenticity is a forgiving one: the proponent of particular evidence need only "produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  Evidence is admissible, even where the proponent cannot positively rule out that the evidence is something other than what it purports to be.  Pluta, 176 F.3d at 49, citing United

States v. Holmquist, 36 F.3d 154, 168 (1st Cir. 1994) (holding evidence admissible, even where court could not exclude possibility that evidence "had been doctored, or constituted an instrument through which [the authenticating witness], for whatever reason, aspired to carry out an elaborately staged hoax").

Despite the relative laxity of these standards, Congress did away with them in the context of criminalizing the destruction of documents sought by a grand jury—further making perfectly clear that it wanted as much evidence to proceed to the grand jury as possible; clarifying that questions as to a document's authenticity have no bearing on whether one can withhold the document from the grand jury; and explicitly stating that it is not up to the statute's "violator to determine what is, or is not, legally privileged evidence or what evidence may prove to be legally inadmissible. Those findings are made by the court, not someone who seeks to withhold the evidence." S. Rep. No. 97-532, at 14 (1982), reprinted at 1982 U.S.C.C.A.N. 2520, 2525 (quotation set out under heading "Defenses Precluded"); see also Blair, 250 U.S. at 285² ("He is not entitled to urge objections of incompetency or irrelevancy, such as a party might raise, for this is no concern of his.").

Escaping this comprehensive bar against obstruction was not to be easy; Congress legislated a single affirmative defense to obstruction, and even the defense's aim was to augment, rather than diminish, the amount of evidence that a grand jury might consider. Section 1512(b)(2)(A) provides that

> In a prosecution for an offense under this section, it is an affirmative defense, as to which the defendant has the burden of proof by a preponderance of the evidence, that the conduct consisted solely of lawful conduct and that the defendant's sole intention was to encourage, induce, or cause the other person to testify truthfully.

Congress inserted the affirmative defense to protect judges and other court officers who "would violate [§ 1512] by threatening a witness or potential witness with a perjury or false

swearing prosecution if he testifies falsely." S. Rep. No. 97-532, at 19 (1982), <u>reprinted at</u> 1982 U.S.C.C.A.N. 2520, 2525.

Under this single affirmative defense's plain language, to avail himself of the affirmative defense, a defendant must show both that his conduct was entirely lawful and that his sole purpose in engaging in the charged activity was to induce a witness to testify truthfully. Any unlawful conduct, no matter how minor, vitiates the affirmative defense. <u>United States v. Johnson</u>, 968 F.2d 208, 212 (2d Cir. 1992) (affirmative defense unavailable where efforts to induce witness to testify constituted "harassment," a "violation" under New York state law). In this case, the defendant has adduced no evidence, let alone sufficient evidence, to advance an affirmative defense that he acted with a proper purpose. The affirmative defense is, in any event, a narrow one that was not primarily intended to apply to private citizens. <u>Id.</u> at 214 ("[C]ongress meant for the affirmative defense of truth-seeking to have narrow application, as it was 'intended primarily' to protect judges and officers of the court from prosecution for threatening a witness with a perjury or false-statement prosecution.").

### B. Defendant's Position—That He Could Destroy The Subpoenaed Documents Because He Purportedly Believed That They Were Forged—Is Not A Cognizable Defense And Should Be Precluded.

Taken as a whole, Congress enacted a series of statutes to preserve the availability of evidence, irrespective of its ultimate admissibility and no matter whether an actual proceeding had commenced. Against the backdrop of this comprehensive web of statutes that could not be clearer in its intent to sweep within its scope any information relevant to a current or potential investigation, there is no plausible argument to support the defendant's contention that it is lawful to destroy subpoenaed documents simply because he purportedly thinks them forged.

Instead, the case law on what might negate the knowingly corrupt *mens rea* of a document destroyer closely follows the more general law on what documents can lawfully be

withheld from the grand jury.  The Supreme Court most recently examined this issue in <u>Arthur Andersen LLP v. United States</u>, 544 U.S. 696, 703-04 (2005).  Arthur Andersen was convicted of violating Section 1512(b), based upon a factual record showing that Arthur Anderson had, up until it was served with a subpoena, continued destroying documents under its established document retention policy.  <u>Id.</u> at 702.  In <u>Arthur Andersen</u>, the Court reversed Andersen's conviction, ruling that the jury instruction inadequately described the requisite *mens rea* under Section 1512 and nexus to an official proceeding.  <u>Id.</u> at 707.

The <u>Arthur Andersen</u> Court remarked that not all orders to destroy documents are necessarily corrupt, but consistent with the general law outlined above, the Court cabined its descriptions of instances where the persuasion was not corrupt to suggestions that an individual may invoke a Constitutional right to withhold documents or information from a grand jury.  <u>Id.</u> at 703-04 (not all persuasion aimed at causing individual to withhold documents or testimony is "inherently malign . . . .  [F]or instance, a mother who suggests to her son that he invoke his right against compelled self-incrimination . . . or a wife who persuades her husband not to disclose marital confidences . . . .") (internal citations omitted).  It further held that a "'knowingly ... corrup[t] persuade[r]' cannot be someone who persuades others to shred documents under a document retention policy when he does not have in contemplation any particular official proceeding in which those documents might be material."  <u>Id.</u> at 708 (emendations in original).[6]

---

[6]     Second Circuit case law following <u>Arthur Andersen</u> echoes the Supreme Court's holding.  For instance, in <u>United States v. Persico</u>, 645 F.3d 85, 108 (2d Cir. 2011), the Second Circuit affirmed a conviction under Section 1512 over objections that the defendants did not intend to obstruct an official proceeding because a "grand jury proceeding on th[e] matter was . . . foreseeable" to the defendants.  Similarly, in <u>United States v. St. John</u>, 267 Fed. Appx. 17, 22-23, 2008 WL 482300, at *3 (2d Cir. Feb. 22, 2008) (unpublished), the Second Circuit affirmed a conviction, holding that <u>Arthur Andersen</u>'s requirements were satisfied where the district court instructed the jury that the jury could convict "only if it found that each defendant acted with an 'improper purpose' and 'had the purpose of corrupt persuasion,' the latter phrase defined as

Having described what may be a proper purpose, i.e., the assertion of some right existing under the Constitution, a statute, or common law, what is left is improper. Thus, the Second Circuit has described the government's burden under Section 1512 as proving that "the defendant's attempts to persuade were motivated by an improper purpose." United States v. Thompson, 76 F.3d 442, 452 (2d Cir. 1996). Whatever else it may be, an attempt to withhold documents from the grand jury because they are allegedly forged simply cannot be a proper purpose. First, that defense would nullify much of the obstruction statutes, which explicitly provide that it is a crime to persuade someone to destroy evidence that is inadmissible— admissibility being a concept that is nearly coextensive with authenticity. Second, such a defense is nothing less than an assertion that a private citizen can stand in the grand jury's stead, determining for himself how justice should be done.

That such a defense, even if it existed, would protect someone like the defendant would be even more unfathomable; neither the defendant's name nor signature appears on any of the contracts, meaning that his determination that they are forged must be derived from the hearsay of those who were allegedly involved in the contracts' creation. The defendant, who is then at most an officious interloper or vigilante, is particularly ill-equipped to determine whether the documents are real or forged in the first instance. Recognizing such a defense in this situation would mean that anyone who was told by an accused individual that the evidence against him was fake would be entitled to destroy it.

The juxtaposition of the defendant's argument against the only affirmative defense devised by Congress makes it even clearer that his argument is untenable. That sole affirmative defense protects those who induce witnesses to testify truthfully. Unlike those protected by the

---

'includ[ing] an attempt to induce a witness to become unavailable to testify or to testify falsely'" (emendation in original).

defense, the defendant sought to reduce, not augment, the information available to the grand jury. It is true, moreover, that no matter the inducement, a motivated witness is still a witness—an individual who will appear when subpoenaed and will allow the jury to judge his or her credibility. The same cannot be said of documents that have been destroyed. Neither a grand nor trial jury will ever be able to decide for themselves whether those documents were authentic or whether those documents accurately reflected the realities of what actually happened when the documents were created. The government is aware of no precedent that privileges an individual to remove, of his own volition, those decisions from the jury's purview.

Because the defendant's purported belief that the subpoenaed documents were allegedly forged is not part of a cognizable defense to the charges he faces, evidence and argument based upon that belief should be excluded. Rule 401 of the Federal Rules of Evidence provides that evidence is "relevant" if it has "any tendency to make a fact more or less probable than it would be without the evidence," provided that "the fact is of consequence in determining the action." Rule 402 further provides that "[i]rrelevant evidence is not admissible." Here, neither the authenticity of the contracts nor the defendant's perception of their authenticity has any bearing on whether the grand jury required their production or whether defendant was entitled to persuade another to ignore the grand jury's demands.

## II. EVEN IF THE DEFENDANT IS ALLOWED TO PRESENT EVIDENCE AND ARGUMENT CONCERNING HIS PURPORTED BELIEF THAT THE CONTRACTS WERE FORGED, THE PRESENTATION OF EVIDENCE ON THAT POINT SHOULD BE STRICTLY LIMITED.

The government submits that the Court should resolve this motion by barring the proffered defense entirely, meaning that the Court need not resolve the issue addressed here. If the Court were, however, to allow the defendant to present evidence that he believed the contracts were forged, the Court should strictly limit that evidence to what the defendant knew at

the time that he offered to pay the witness to destroy the subpoenaed contracts. It is frankly difficult to conceive the exact contours of the proffered defense, because the defendant has submitted no affidavit or other evidence that would suggest why the defendant believes the contracts to have been forged. As pointed out above, however, the proffered defense must be based upon the defendant's supposed subjective belief that the contracts were forged; neither defendant's name nor signature appear on the contracts, and he could not, therefore, know the circumstances under which they may have been signed.

Even if the proffered defense proceeds, much of the evidence that the defendant apparently wants to gather and present is irrelevant and therefore inadmissible. Evidence that has nothing to do with the defendant's subjective belief at the time of the crime is irrelevant and inadmissible. See Fed. R. Evid. 401, 402. Thus, for example, whatever evidence could be generated through allowing experts to "inspect, examine, and test" the contracts, including "the paper, ink, handwriting, stamps, seals, etc. for each and every document" (Defendant's Motion to Compel [docket # 20], at ¶¶14-15), would shed no light whatsoever on the defendant's state of mind when he bribed a witness to destroy the contracts.

Even assuming that such evidence would have some relevance to the proceeding, it should be excluded. Rule 403 of the Federal Rules of Evidence provides that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of . . . confusing the issues, misleading the jury, undue delay, [or] wasting time." Applying that Rule to evidence that is otherwise relevant, the Second Circuit has reasoned that "[t]he length of the chain of inferences necessary to connect the [proffered] evidence with the ultimate fact to be proved necessarily lessens the probative value of the evidence, and may therefore render it more

susceptible to exclusion as unduly confusing, prejudicial, or time-consuming . . . ." <u>United States v. Ravich</u>, 421 F.2d 1196, 1204 n.10 (2d Cir. 1970).

Here, the chain is broken, as it is impossible to link an expert analysis of the contracts' authenticity to anything that the defendant knew at the time he tried to destroy them. If the defendant is permitted to present evidence that does not directly bear on his state of mind, he will seize on the opportunity to create a time-consuming and confusing trial within a trial. His motion to compel certainly makes that clear: The defendant is intent on misleading the jury into focusing on issues, like the forensic integrity of the contracts, that have nothing to do with the question of his guilt or innocence. To prevent the defendant from unduly lengthening the trial through unnecessary factual and evidentiary diversions, he should be strictly limited to presenting evidence that bears directly on his state of mind, *i.e.*, on conversations and events that he himself observed—if he is permitted to advance any so-called good faith defense at all.

//

## CONCLUSION

For the foregoing reasons, the government respectfully requests that its motion be granted in all respects.

Dated: Washington, DC
July 24, 2013

Respectfully submitted,

PREET BHARARA                           JEFFREY H. KNOX
United States Attorney                  Chief
                                        Criminal Division, Fraud Section
                                        United States Department of Justice

By:   s/ Elisha J. Kobre          By:   s/ Stephen J. Spiegelhalter
      Elisha Kobre                      Stephen J. Spiegelhalter
      Assistant United States Attorney  Trial Attorney
      Telephone: (212) 637-2599         Telephone: (202) 307-1423

## CERTIFICATE OF SERVICE

I, Stephen J. Spiegelhalter, hereby certify that, on July 24, 2013, I caused a copy of the attached Government's Motion to be sent via electronic notification ("ECF") to:

Bruce H. Lehr
Lehr, Fischer & Feldman
1401 Brickell Avenue
Miami, FL 33131

_____/s/_____
Stephen J. Spiegelhalter
(202) 307-1423