## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA,**

          **Plaintiff,**

**v.**                                **Case No.  1:13-CR-00315-WHP**

**FREDERIC CILINS,**

          **Defendant.**

_____/

### RESPONSE TO GOVERNMENT'S MOTION TO PRECLUDE AND
### MR. CILINS' MEMORANDUM IN FURTHER SUPPORT OF PRODUCTION
### OF THE "ORIGINAL" CONTRACTS

Defendant Frederic Cilins, by and through undersigned counsel, respectfully submits this brief in opposition to the Government's Motion to Preclude evidence and argument that the contracts at the heart of this prosecution (the "Contracts") are fakes; that Mr. Cilins and the Confidential Witness ("CW") had knowledge that said contracts were fraudulent; and that the Government or the grand jury knew or should have known that the contracts were fraudulent.  Mr. Cilins also seeks production of the "original" Contracts for inspection, testing, and examination.

**I.**      **Background Facts**

      **A.**      **The Charges**

Mr. Cilins was arrested at the Jacksonville Airport on April 14, 2013, during a meeting with the CW.  Less than two weeks later, the Government obtained a five-count Indictment against him. Three of the Indictment's counts are based on allegations that Mr. Cilins sought to provide false information to the Government through the CW.  Count Two alleges that Mr. Cilins "directed an individual to make false statements to" FBI agents "regarding the commission and possible commission of Federal offenses."  *See* 18 U.S.C. § 1512(b)(3) (witness tampering).  Count Four

accuses him of "agree[ing] to pay money to an individual in exchange for that individual's agreement to sign a document containing false statements relating to violations of criminal statutes." *See id.* § 1510(a) (obstruction).   Count Five accuses him of "provid[ing] to an individual, for that individual's signature, a document containing false statements, knowing that those false statements related to a criminal investigation." *See id.* § 1519 (falsification of records).  The other two counts (Counts One and Three) accuse Mr. Cilins of seeking to "pay money to an individual in exchange for that individual's agreement to provide to [him], for destruction, documents that were to be produced before a grand jury."  They charge him with "corruptly" persuading the CW to destroy documents and "corruptly" obstructing an official proceeding.  *See id.* §§ 1512(b)(2), (c)(2).

### B.  The Government's Reliance on the Contracts as it relates to the Grand Jury Investigation and Allegations of Bribery

The Government has unequivocally claimed in its brief that the Contracts are authentic and, thus, has put their authenticity at issue in this case.[1]  Mot. to Preclude at 3 n.2.  Furthermore, the Government has repeatedly relied upon the Contracts in charging and detaining Mr. Cilins. According to the Government's Criminal Complaint (attached as Exhibit 1 to its motion), beginning in or about January 2013, a federal grand jury in the Southern District of New York has been investigating the foreign business dealings of a non-U.S. corporation, which it refers to as "the Entity."  The Complaint alleges that the Entity is under suspicion in Guinea of bribing officials of

---

[1]  The Government has not, however, disclosed any basis other than the CW's statements for its repeatedly stated belief in the authenticity of the Contracts.  On July 29, Mr. Cilins' counsel requested through a bill of particulars that the Government identify the basis for these representations.  Counsel asked the Government to provide a prompt response in order to help facilitate resolution of the issues in this motion.  The Government responded that "With respect to much of the information that you seek, the Government refers you to the detailed complaint it filed in conjunction with Mr. Cilins's arrest.   The Government is otherwise aware of and has complied fully with its discovery obligations, and it declines to provide any further information in response to your requests." Gov't Letter regarding Discovery and Bill of Particular, dated July 30, 2013.

the Guinean Government in order to obtain valuable mining concessions in the country's Simandou region.[2]  The Guinean Government has launched a probe which questions whether the Entity legitimately obtained the Simandou concession and which threatens to "reclaim" the Entity's mining rights.  The grand jury in New York has been investigating whether the Entity's actions violated the Foreign Corrupt Practices Act ("FCPA"), among other laws.[3]  Mot. to Preclude, at Exh. 1 at ¶¶ 8-9.

Particularly notable for present purposes, the Complaint also describes in detail a series of Contracts that the CW claims to have entered into with the Entity and others.  These supposed Contracts set forth the terms of payment by the Entity and/or others in return for the CW's assistance in obtaining the Simandou concession.  The Complaint describes five of them, each of which it asserts was under subpoena by the grand jury.  *Id.* ¶ 13a-e.

The Complaint acknowledges that the Government has not seen the "originals" of these Contracts, but has been provided copies by another source.  The CW claims that Mr. Cilins was present when some of the Contracts were signed.  The CW also claims that she has received money from the Entity and others pursuant to these Contracts.  *Id.* ¶¶ 12-14.

---

[2]  Although the mining concessions between the Government of Guinea and the Entity have been reviewed and affirmed by three separate and subsequent ruling Governments, the current President of Guinea has deemed the mining concessions subject to another review.  The media has reported that President Alpha Conde has expressed his desire to give the Simandou concessions to Chinalco, a Chinese mining company.

[3]  The Complaint does not identify the Government's basis for believing that a grand jury in the Southern District of New York had jurisdiction over alleged bribes that were supposedly paid to Guinean officials by a foreign corporation.  The FCPA proscribes certain conduct by corporations and persons with U.S. ties.  While its reach is broad, the FCPA does not reach the conduct either of the Entity or Mr. Cilins under the circumstances of this case.  The Supreme Court has recently emphasized the limited reach of U.S. law to matters occurring primarily overseas.  *See Morrison v. National Australia Bank Ltd.*, 130 S.Ct. 2869 (2010).  Thus, the use of the grand jury in this case was at best questionable and may be the subject of a defense motion at an appropriate juncture.

According to the Complaint, the CW claims that Mr. Cilins contacted her and offered to pay money to her in exchange for providing him with the "originals" of the Contracts.  In a series of phone calls, which the Government recorded, Mr. Cilins arranged for an in-person meeting in which he asked the CW to bring "the documents."  Multiple times, the Government asserts its belief that "the 'documents' referenced during th[e] phone call[s] include the Contracts and other agreements between the CW and the Entity or the Guinean Subsidiary concerning bribe payments for mining concessions in Guinea."  *Id.* at ¶ 16a; *see id.* ¶ 17 ("I believe that during the foregoing phone conversations, [Mr. Cilins] was discussing plans to meet with the CW to offer the CW money to either destroy, or provide to [Mr. Cilins] for destruction or concealment, documents relating to the Simandou concession and the Entity and related entities, including the Contracts described above, which were, and remain, the subject of the Grand Jury Subpoena.").

The Complaint proceeds to describe a series of in-person meetings at the Jacksonville Airport between Mr. Cilins and the CW.  Having issued a subpoena to the CW in the name of the grand jury—under questionable circumstances given the limited reach of U.S. law—the Government proceeded to have the CW set up meetings to lure Mr. Cilins to the United States on false premises.  During the second of these meetings, the CW provided Mr. Cilins with a "ruse account," devised by the Government, of having been approached while at the immigration office by FBI agents investigating bribe payments and Guinean mining contracts.  The CW told Mr. Cilins that the agents threatened to obtain a subpoena requiring her to testify and turn over documents.  Mr. Cilins also expressed his concern multiple times about the Guinean investigation being conducted into the Entity's mining rights—referencing questions he received from an "investigative agency" about the Contracts and a "report" from a law firm hired by Guinea, which accused the Entity of paying the CW for her participation in a bribery scheme.  Mr. Cilins told the CW that the documents needed

to be destroyed, emphasizing that he needed the CW to bring the documents directly to him and not to destroy them herself.  They also discussed terms by which Mr. Cilins would compensate the CW for her cooperation.  *Id.* ¶¶ 18b, 19-20.[4]

The Complaint alleges that Mr. Cilins presented the CW with a written document, referred to as the "Attestation," and asked her to sign it.  The Complaint identifies three statements from the Attestation:

> "I have never signed a single contract with the Entity, neither directly or indirectly through anyone else."

> "I never intervened with Guinean officials in favor of [the Entity]..."

> "I have never received any money from [the Entity], neither directly or indirectly. . . . [The Entity] never gave me . . . any money, neither directly to me nor to anyone else on my behalf.  They did not either promise to pay me anything, neither to me, nor to anyone else on my behalf."

*Id.* at ¶ 21a-c (alterations in original).  The Complaint further alleges, through the sworn statement of Special Agent Kilpatrick, that "*each* of [these statements] is false," and that "I know [that they are false] based, among other things, upon information from the CW and my review of the Contracts."  *Id.* at ¶ 21 (emphasis added).

### C.    Mr. Cilins' Motion for Production of the Contracts and the Government's Responses

On June 28, 2013, Mr. Cilins moved under Federal Criminal Rule 16(a)(1)(E) to compel the Government to produce "original" copies of the Contracts for inspection, examination, and testing.

---

[4]  In its latest two filings, as the Government now acknowledges, the CW did not possess such documents at the time of her meeting with Mr. Cilins, because she turned them over to the Guinean Government before the grand jury subpoena was issued.  The Government was aware of this when it told the CW to arrange the U.S. meetings with Mr. Cilins.  Thus, it appears that the Government knew that compliance with the subpoena was impossible.  Indeed, the entire dialog between the CW and Mr. Cilins related to an impossible scenario—destruction of documents not in the CW's possession.  This set of facts may give rise to a defense or potentially serve as the basis for a defense motion at an appropriate juncture.

As the motion explained, the inspection and testing of the "original" versions are material to Mr. Cilins' defense, bearing directly on the crucial question of whether he acted with the requisite *mens rea*. *See* Deft's Motion to Compel Production at 4-5 [doc. #20]. The only basis for opposing the request that was cited in the Government's response was that the Government does not possess the "originals" of the Contracts. [doc. #21].

At the July 3, 2013 hearing, the Court discussed Mr. Cilins' motion and the Government's response. The Court concluded that the issue of production and testing of the original Contracts, their fraudulent character being used as part of Mr. Cilins' defense, and the Government's desire to preclude Mr. Cilins' use of the Contracts should be fully briefed and argued by the parties.

Consistent with that Order, the Government filed its Motion to Preclude, moving to bar Mr. Cilins from introducing evidence or arguing to the jury that the Contracts are not authentic, but rather are forgeries. It also seeks to preclude Mr. Cilins from arguing that he genuinely believed them to be forgeries. Gov't Mot. to Preclude [doc. #28]. The Government's Motion to Preclude describes a theory of prosecution that is indifferent as to whether the Contracts at the heart of this case were authentic or fake, though the Government has represented to this Court that they are real. *See* Mot. to Preclude at 3 n.2. And, the Complaint and the Indictment both reflect a prosecution theory that Mr. Cilins sought to destroy authentic contracts.

Despite the Government's repeated references to the "proffered defense," *see, e.g.*, Mot. to Preclude at 3, 10, 11, 20, Mr. Cilins is not required at this stage to reveal his intended defense strategy. Even more premature are the Government's attempts to force Mr. Cilins to offer evidence in support of a potential defense argument. *See, e.g., id.* at 3 ("the record suggests no basis upon which the defendant could have known for himself whether the contracts were forged"); *id.* at 20 ("the defendant has submitted no affidavit or other evidence that would suggest why the defendant

believes the contracts to have been forged").  Nevertheless, for purposes of opposing this Motion, Mr. Cilins represents that he possesses evidence supporting his position that the Contracts were fabricated, that he knew the Contracts were fabricated, and that the CW knew the Contracts were fabricated.  A few, but not all, examples of such evidence are: (1) Mr. Cilins never signed these Contracts or was present in Guinea for the signing of purported Contracts, as the CW has claimed—the Government has the original of his 2008 passport and a complete color copy of his 2007 passport, which were filed as exhibits in the Florida proceedings; and  (2) on at least two prior occasions before the grand jury investigation began, the CW denied in writing that she had received any monies in connection with mining rights in Guinea related to the Entity, admitted that the Contracts were false, and denied ever having intervened with Guinean officials on behalf of the Entity.

Additionally, a simple review of the documents calls their legitimacy into question.  A few of the many issues apparent on the face of the documents are: (a) the notary stamps and clerk-of-court certifications reflect dates that are different from the dates that the documents were allegedly signed; (b) the signatories on behalf of the Entity or the Entity's agent are not delineated; (c) the name of the Entity's employee is reversed; and (d) there are font, margin, and other issues with each document.  The Defense has recently employed the services of a document expert to review the Contracts.  According to Dr. Lyter, a forensic expert, there are reasons to doubt the veracity and authenticity of the documents.  *See* Affidavit of Dr. Albert Lyter, III, attached as Exh.1.

## II.     Memorandum of Law

A defendant has a constitutional right to present evidence favorable to his defense,  *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982), and a right to have a jury determine his guilt by assessing "competing inferences, the credibility of the witnesses, and the weight of the evidence."

*United States v. Rea*, 958 F.2d 1206, 1221-22 (2d Cir. 1992).  In view of these constitutional concerns, "'[e]vidence should be excluded on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds.'"  *United States v. Dupree*, 833 F. Supp. 2d 255, 260 (E.D.N.Y. 2011) (quoting *United States v. Paredes*, 176 F. Supp. 2d 179, 181 (S.D.N.Y.2001)); *see United States v. Van Putten*, No. 04-CR-803, 2005 WL 612723, at *3 (S.D.N.Y. Mar. 15, 2005) (same).  Evidence is relevant, and hence presumptively admissible, if it has "any tendency" to make any consequential fact "more or less probable than it would be without the evidence."  Fed. R. Evid. 401; *see United States v. Quattrone*, 441 F.3d 153, 188 (2d Cir.2006) ("[S]o long as a chain of inferences leads the trier of fact to conclude that the proffered submission affects the mix of material information, the evidence cannot be excluded at the threshold relevance inquiry.").

In its motion, the Government proclaims the grand jury's entitlement to "every man's evidence" and its "broad and important powers" to subpoena documents and testimony.  Mot. to Preclude at 12 (quotation marks omitted).  However, this appears to be a thinly veiled attempt to *exclude* potential defenses and to *exclude* evidence from the trial jury's consideration.  In asking this Court to shield from the jury all evidence regarding the authenticity of the Contracts, the Government fails to carry its burden of showing that the evidence it seeks to preclude is "clearly inadmissible on all potential grounds."  *Dupree*, 833 F. Supp. 2d at 260 (quotation marks omitted).  To the contrary, such evidence is tied to almost every aspect of the Government's case.  Additionally, by not seeking to obtain the "original" Contracts, the Government frustrates the search for the truth.

Although it is not incumbent upon Mr. Cilins to disclose his potential defense strategy at this early pre-trial stage, he respectfully submits that the Contracts' authenticity is relevant to his defense in several ways.  For example, the Government's false statement charges (Counts Two, Four, and

Five of the Indictment) depend on allegations that Mr. Cilins encouraged the CW to falsely contradict the Contracts.  So, Mr. Cilins cannot be held criminally liable if the Contracts were fabricated or he believed them to be.  The Government's document-destruction charges (Counts One and Three) are another example of how the Contracts' authenticity is relevant to Mr. Cilins' good-faith and state of mind — whether the contracts are *fake* evidence that has been fabricated for misuse in a Guinean proceeding (which is regularly referenced in the recorded conversations), for use by the CW to extort money from Mr. Cilins (which is implicit in their conversations), and/or for the CW to now obtain legal immigration status in the United States and immunity from prosecution for other offenses in Guinea.  Proof of fakes (and the absence of proof that the Contracts are real) is also fundamentally relevant to Mr. Cilins' state of mind as to whether the contracts were, in fact, called for by the grand jury;  his motive (or lack thereof) to obstruct justice; and the credibility of the CW and her FBI handlers.

### A.    The Inauthenticity of the Contracts Is Relevant to the Government's False Statement Charges in Counts Two, Four, and Five

The Government's motion focuses exclusively on allegations of document destruction.  Yet, Counts Two, Four, and Five of the Indictment are devoted to claims that Mr. Cilins sought to persuade the CW to make "false statements" related to an unspecified criminal investigation.  The Government's theory is that Mr. Cilins sought the CW's signature on an "Attestation" in order to falsely exonerate the Entity, which amounted to witness tampering (Count Two), obstruction (Count Four), and the falsification of records (Count Five).

Although the nature of these false statements is not specified in the Indictment, the Government previously identified three statements from the Attestation in the Complaint:

> "I have never signed a single contract with the Entity, neither directly or indirectly through anyone else."

"I never intervened with Guinean officials in favor of [the Entity] ..."

"I have never received any money from [the Entity], neither directly or indirectly....
[The Entity] never gave me ... any money, neither directly to me nor to anyone else
on my behalf.  They did not either promise to pay me anything, neither to me, nor to
anyone else on my behalf."

*Id.* at ¶ 21a-c (alterations in original).

The authenticity of the Contracts bears directly on all three of the Attestation's supposedly false statements.   If the statements in the Attestation are indeed accurate because the Contracts are fakes—or if Mr. Cilins believed them to be—then these false statement charges necessarily fail.  *See United States v. Lighte*, 782 F. 2d 367, 372-73 (2d Cir. 1986) ("a false statement ... is knowingly false only if it was untrue when made and known to be untrue by the individual making it" (quotation marks omitted)).  The Government admits as much when Special Agent Kilpatrick says that he "knows" that the Attestation contains false statements "based, among other things, upon ... my review of the Contracts."  Mot. to Preclude, Exh. 1, at ¶ 21.  Indeed, it is hard to imagine how the Attestation's first statement ("I have never signed a single contract with the Entity") can be proven false *without* establishing the Contracts' authenticity.  And, of course, if Mr. Cilins believed the statements in the Attestation to be truthful, he cannot be prosecuted for knowingly encouraging the CW to make a false statement.  Having accused Mr. Cilins because he asked the CW to contradict the Contracts, the Government cannot now shield the Contracts from inquiry and most importantly, the jury's view.  Doing so thwarts the search for the truth.

**B.    The Inauthenticity of the Contracts Is Relevant to the Government's Document-Destruction Charges in Counts One and Three**

Counts One and Three of the Indictment accuse Mr. Cilins of seeking to "pay money to an individual in exchange for that individual's agreement to provide to [him], for destruction, documents that were to be produced before a grand jury."  The Government reduces Mr. Cilins'

anticipated defense of these charges to the following straw man: "[Mr. Cilins] is free to destroy documents that have been subpoenaed by a grand jury because he purportedly believed them to be forged." Mot. to Preclude at 11. This mischaracterizes Mr. Cilins' position and underscores one reason why the Court should deny the Government's motion. Authenticity is a necessary piece of the puzzle before the Court and before the jury. The fact that the Government does not have the originals is telling–it cannot make the "more likely" argument by proving authenticity, so it wants to claim authenticity is irrelevant to prevent Mr. Cilins from making the "less likely" argument. However, the Government does not get to choose the relevance of a fact by framing the issue strategically in a brief. The following is illustrative: If the Government had evidence that Mr. Cilins personally had altered the Contracts in an effort to exculpate himself (or knew that it had been done), would the Government be claiming that the authenticity of the alterations was irrelevant?

Mr. Cilins has a right to develop his defense strategy up to and through the close of the Government's case at trial. He is not required to disclose his intended defense in advance of trial—much less at this very early stage, before the Government has made its evidentiary proffers. Nevertheless, it is apparent even now that the authenticity of the Contracts, and Mr. Cilins' belief in their lack of authenticity, will be highly relevant to the document-destruction charges.[5] Mr. Cilins identifies the following ways in which evidence relating to the Contracts' authenticity will have a "tendency to make a [relevant] fact more or less probable."[6] Fed. R. Evid. 401.

For instance, should it become clear that the Government or the grand jury was aware at the

---

[5]   The Guinean Government was placed on notice that the documents are false through direct representations from the Entity. In light of the close, coordinated relationship between the U.S. and Guinean investigations, the U.S. Government is similarly on notice.

[6]   By enumerating these arguments, Mr. Cilins does not mean to imply that these are the *only* ways in which the authenticity of the documents may become relevant.

time of its subpoena that the Contracts were not authentic or that the CW did not possess or have access to them, it would have been impossible for the CW to comply with the subpoena.  In that case, Mr. Cilins may argue that he cannot be prosecuted for obstructing a subpoena which could not be complied with.  He also may argue that such a transparent attempt to manufacture obstruction charges against him was an improper use of the grand jury that cannot support criminal liability.  *See United States v. Jacobs*, 547 F.2d 772, 775 (2d Cir. 1976) (dismissing perjury charge where Government's use of the grand jury "was essentially a strategic ploy"); *see also Madonna v. United States*, 878 F.2d 62, 66 (2d Cir. 1989) (considering the defendant's "contempt trap" argument but ultimately rejecting it because "the prosecution acted properly").  Mr. Cilins reserves his right, at an appropriate time, to assert other defenses in which the authenticity of the documents may play a part.

## C.   The Inauthenticity of the Contracts Is Relevant to Mr. Cilins' *Mens Rea*

The central trial issue will be whether the jury believes that Mr. Cilins, in view of all relevant facts and circumstances (including that he is a foreign national unfamiliar with the American judicial system), acted in good faith or with "corrupt" intent or purpose.  *See* 18 U.S.C. § 1512(b) (requiring proof that the defendant acted "knowingly ... corruptly"); *id.* § 1512(c) ("corruptly"); *Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005) (defining "corrupt" to mean  "wrongful, immoral, depraved, or evil").  It is well settled that this is not a legal question to be resolved by the Court (unless the evidence is insufficient and warrants dismissal), but rather a question of criminal intent for determination by a properly instructed jury.  *See* 2 Sand *et al.*, Modern Federal Jury Instructions, Instruction 46-6, at 46-24 (1998) ("[T]he word 'corruptly' means simply having the improper motive or purpose of obstructing justice."); *Morisette v. United States*, 342 U.S. 246, 274 (1952) ("Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury.").  Binding case law makes clear that when a defendant

12

is charged with obstruction of justice, proof of *real* evidence of a U.S. offense sought by investigators is directly relevant to the defendant's state of mind. *See* section II.D., *infra*. At oral argument, the Government admitted that if it had such proof, it would be arguing its relevance to the jury:

> Your Honor, if this legal issue that was discussed earlier is resolved, that would make those documents irrelevant to any defense in this case. That's the Government's position right now, that we don't believe that those documents are relevant. And as I did express to Mr. Lehr, we don't believe those documents are a necessary or crucial part of our evidence in the case. *It doesn't mean, of course, if we had the documents we might seek to introduce them*, and we would, of course, give ample time for defense counsel to come and inspect them.

Tr. of Hearing on July 3, 2013 at p. 18 (emphasis added). But the law does not support such a one-sided approach or a selective search for the truth.

## 1.    Specific Intent Is Required for the False Statement Charges

All three charges involving false statements require the Government to prove that Mr. Cilins had the "intent" to commit the charged offense. *See* 18 U.S.C. § 1519 ("knowingly ... with the intent to impede, obstruct, or influence the investigation"); 18 U.S.C. § 1510 ("willfully endeavors by means of bribery to obstruct, delay, or prevent"); 18 U.S.C. § 1512(b)(3) ("knowingly ... hinder, delay, or prevent "); *see also United States v. Genao*, 343 F.3d 578, 586 (2d Cir.2003) (noting that § 1512(b)(3) conviction requires "a specific intent to interfere with the communication of information"); *United States v. Abrams*, 543 F.Supp. 1184 (S.D.N.Y. 1982) (finding that to prove a violation of § 1510, the government must prove the defendant wilfully endeavored to prevent the communication of information); *United States v. Gray*, 642 F.3d 371, 376-77 (2d Cir. 2011) (noting that § 1519 requires specific intent).

If the Contracts are false or Mr. Cilins believed they were false, then the statements in the Attestations would not be false as alleged by the Government. If the statements in the Attestation

are not false, then Mr. Cilins could not have formed the requisite intent to commit the crimes charged. Hence, the authenticity of the Contracts bears directly on all three of the Attestation's supposedly false statements. *See Lighte*, 782 F. 2d at 372-73.

### 2.    Corrupt Intent Is Required for the Document Destruction Charges

Both document-destruction charges require proof that the defendant acted "corruptly," and one of them requires such corruption to be "knowing." *See* 18 U.S.C. § 1512(b)(2)(B) ("knowingly ... corruptly"), (c)(2) ("corruptly"). This is a demanding *mens rea* standard, which must be strictly construed "out of deference to the prerogatives of Congress and out of concern [for the need to provide] a fair warning." *United States v. Aguilar*, 515 U.S. 593, 600 (1995) (quotation marks and citation omitted). The Supreme Court has emphasized that "restraint is particularly appropriate" in the context of an obstruction charge, given that "persuad[ing] a person with intent to cause that person to withhold testimony or documents from a Government proceeding or Government official is not inherently malign." *Arthur Andersen*, 544 U.S. at 703-04.

Although the *Arthur Andersen* Court declined to articulate "[t]he outer limits of [the *mens rea*] element" for obstruction, *id.* at 706, it did establish some general principles which are relevant here—and which contradict the Government's position. First, it defined "corrupt" to mean "wrongful, immoral, depraved, or evil," *id.* at 705, such that "[o]nly persons conscious of wrongdoing" can be liable under the statute, *id.* at 706. Thus, the Court specifically disapproved of a jury instruction which had told the jury it could convict so long as the defendant "intended to 'subvert, undermine, or impede' Governmental factfinding" and which had permitted conviction "even if [the defendant] honestly and sincerely believed that its conduct was lawful." *Id.* (quotation marks omitted). These instructions had impermissibly read the term "corruptly" out of the statute. *Id.* at 706-07.

In its Motion, the Government seeks to preclude evidence based on the very same flawed theory that the Supreme Court rejected in *Arthur Andersen*.  The Government says that any document destruction is criminal if it is done "with the intent to impair the [document's] integrity and availability for use in an official proceeding."  Mot. to Preclude at 14 (quotation marks omitted).  This formulation is almost identical to the improperly broad one used to convict Arthur Andersen:  "[T]he jury was told to convict if it found petitioner intended to 'subvert, undermine, or impede' Governmental factfinding."  544 U.S. at 706; *see id.* ("No longer was any type of 'dishonest[y]' necessary to a finding of guilt").  To show that Mr. Cilins acted "corruptly," the Government must do more.  It must show that he acted with a "wrongful, immoral, depraved, or evil" state of mind and must refute the notion that he "honestly and sincerely believed that [his] conduct was lawful."  *Id.* at 705-06.

These principles suggest several ways in which the Contracts' authenticity—and Mr. Cilins' belief therein—are relevant to the jury's *mens rea* inquiry.  If the jury finds that Mr. Cilins "honestly and sincerely believed" that the grand jury would not have sought fabricated documents, or was not entitled to them, then it may conclude he was not "conscious of wrongdoing."  If the jury determines that his intent was to prevent extortion by the CW or to protect against the use of fake evidence in a foreign investigation, rather than to thwart justice in the U.S., it may conclude that his actions were not "wrongful, immoral, depraved, or evil."  Moreover, the fact that the Contracts *were* fakes is strong evidence to corroborate Mr. Cilins' claim that he *believed* them to be fakes.  These are quintessential questions of fact, inference, and interpretation—questions for the jury alone to answer.  *See Morisette*, 342 U.S. at 274 ("Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury.").

In its Motion, the Government incorrectly describes *Arthur Andersen* as limiting the universe

of non-corrupt persuasion to "suggestions that an individual may invoke a Constitutional right to withhold documents or information from a grand jury." Mot. to Preclude at 17. This is plainly wrong. *Arthur Andersen* did mention privileges—both the constitutional right against self-incrimination and the common law marital privilege—as *examples* of non-corrupt attempts to persuade a person to withhold testimony. *See* 544 U.S. at 704 ("Consider, for instance ... "). But it did not say or even imply that these are the *only* instances in which an attempt to withhold information from a Governmental proceeding would not be corrupt. To the contrary, it reversed Arthur Andersen's conviction because the judge had given an improper jury instruction that precluded the company's defense that documents were destroyed without consciousness of wrongdoing, pursuant to its document-retention policies. *Id.* at 706-07; *see id.* at 704 ("It is, of course, not wrongful for a manager to instruct his employees to comply with a valid document retention policy under ordinary circumstances.").[7] The Government cites no authority—and there is none—for the notion that any attempt to withhold documents from a Governmental proceeding involves "consciousness of wrongdoing" unless the basis for withholding is a constitutional privilege.[8]

---

[7]  The Government says that the document-retention policy was relevant in *Arthur Andersen* only because the company "'d[id] not have in contemplation any particular official proceeding in which those documents might be material.'" Mot. to Preclude at 17 (quoting 544 U.S. at 708). This is incorrect: The lack of a "nexus" instruction was an additional error, separate and apart from the trial court's misconstruction of the term "corruptly." *See Arthur Andersen*, 544 U.S. at 707 ("The instructions were *also infirm for another reason*. They led the jury to believe that it did not have to find any nexus between the 'persua[sion]' to destroy documents and any particular proceeding." (emphasis altered, brackets in original)).

[8]  An example illustrates the problems with the Government's position. Imagine that a jilted lover threatens to frame her ex with murder by providing forged letters to a grand jury. The ex responds by offering her money to turn over the forged letters to him, whether for destruction or simply to prevent their being used against him. Plainly, a jury would be entitled to decide that he had not acted "corruptly." The Government cites no authority pointing to a contrary conclusion.

### 3.    The Affirmative Defense in § 1512(e) Does Not Relieve the Government of its Burden

Similarly unavailing is the Government's argument based on the affirmative defense specified in § 1512(e).  *See* Mot. to Preclude at 15-16.  That defense—like all affirmative defenses—only comes into play once the Government has already met its burden to prove all elements of the substantive offense, including *mens rea*.  Even if Mr. Cilins ultimately declines to invoke § 1512(e), that does not relieve the Government of its burden to show that he acted with "corrupt" intent.  As the Second Circuit has explained, "the overlap between the elements of the offense and the affirmative defense makes it imperative for the trial court to give the jury clear instructions that the Government retains the burden of proving beyond a reasonable doubt all of the elements of the offense."  *United States v. Thompson*, 76 F. 3d 442, 453 (2d Cir. 1996) (construing predecessor to § 1512(e)).

Ultimately, the jury will make a decision about what was going through Mr. Cilins' mind as he spoke to the CW.  The jury must decide for itself whether or not the Government has proven beyond a reasonable doubt that his purposes were corrupt.  The Government may not foreclose this crucial judgment by asserting peremptorily that any intent to shield documents from a grand jury is necessarily "corrupt."  As the Court of Appeals has explained, *"*Since bad faith and evil intent involve intangible mental processes, proof of willfulness usually must be accomplished by means of circumstantial evidence.  This being so, trial courts should follow a liberal policy in admitting evidence directed towards establishing the defendant's state of mind."  *United States v. Collorafi*, 876 F.2d 303, 305 (2d Cir. 1989); *see United States v. Hoffman*, 137 F.2d 416, 420 (2d Cir. 1943) ("In view of the importance of the issue as to the [defendant's] state of mind, we think it clear that he was entitled to the same leeway given the Government in proving the background facts, and that the restrictions thus placed upon his evidence unfairly hampered his proof.").  For "[h]owever clear

the proof may be, or however incontrovertible may seem to the judge to be the inference of a criminal intention, the question of intent can never be ruled as a question of law, but must always be submitted to the jury." *Morisette*, 342 U.S. at 274 (quotation marks omitted); *see United States v. Cleary*, 565 F.2d 43, 47 (2d Cir. 1977) (reversible error to "effectively remove[] from the jury's consideration a very important item of proof bearing on [the defendant's] intent").

### D.    The Inauthenticity of the Contracts Is Relevant to Mr. Cilins' Motive and Intention

The authenticity of the Contracts, and Mr. Cilins' belief that they are forgeries, is also highly relevant evidence as to his motive and intention.  The Government's theory is that Mr. Cilins sought to destroy the Contracts in order to thwart its investigation into the Entity's mining activities in Guinea.  *See* Mot. to Preclude at 5-7.  Thus, the Government will likely argue to the jury—as it has in this Court—that Mr. Cilins had a strong motive to destroy the Contracts because they evidenced corruption on his behalf and on behalf of the Entity.  Mr. Cilins must be allowed to offer evidence to rebut this inference.

 It is hornbook law that "[e]vidence tending to show motive, or the absence of motive, is always relevant, wide latitude being allowed in its admission."  22A C.J.S. Criminal Law § 992 (2010).  In the obstruction of justice context specifically, the Second Circuit has recognized the logical connection between an obstruction charge and evidence of the defendant's motive to conceal wrongdoing:  "[W]hen a defendant has been charged with attempted or actual obstruction of justice with respect to a given crime, evidence of the underlying crime and the defendant's part in it is admissible to show the motive for his efforts to interfere with the judicial processes."  *United States v. Willoughby*, 860 F.2d 15, 24 (2d Cir. 1988).  The Government itself routinely seeks in obstruction cases to admit evidence of the underlying crime in order to show the defendant's motive to conceal.  *See, e.g.*, Gov't Motion in Limine at p.8, *United States v. Norris*, No. 03-CR-632, 2010 WL 3052320

(E.D. Pa. June 1, 2010) ("Evidence that defendant and his company participated in the illegal conduct the Grand Jury was investigating provides powerful evidence of defendant's motive to obstruct the investigation."); Gov't Response to Deft's Mot. for Judgment at p. 5, *United States v. Wein*, No. 11-CR-161, 2012 WL 6059414 (E.D. Va. Apr. 6, 2012) (citing *Willoughby*).

For the same reason, a defendant must be afforded an equal opportunity to negate the inference of an improper motive. "Evidence tending to show the absence of motive is likewise relevant and admissible." 22A C.J.S. Criminal Law § 992. Because the jury will be asked to assess Mr. Cilins' state of mind—to determine why he told the CW what he did—motive will undoubtedly be central to the jury's inquiry. Mr. Cilins should be allowed to negate the inference that he sought to destroy the Contracts because he believed them to be damning evidence of wrongdoing. If necessary, the Court can offer an appropriate limiting instruction. *See United States v. Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006) (permitting Government to introduce evidence of defendant's salary to establish his motive to obstruct justice, explaining "that [such] evidence may be admitted where other safeguards are employed such as limiting instructions"); *see also United States v. Blum*, 62 F.3d 63, 68 (2d Cir. 1995) (finding abuse of discretion in district court's exclusion of motive evidence on the rationale that it would confuse or distract the jury).

The Defense anticipates that the Government will argue that the best evidence of intent is the audiotapes of the meetings. However, the audiotapes of the meetings are not unimpeachable evidence of what either Mr. Cilins or the CW was thinking. For instance, if the Contracts are fakes and Mr. Cilins knew or believed that they were fakes, then it follows that the CW attempted to manipulate Mr. Cilins with documents that she knew were fakes. He knew the false nature of the Contracts and thus knew of the CW's manipulation to obtain money from him. In turn, he manipulated the CW by telling her anything she wanted to hear so that she would give him the fake

Contracts, which had been used to extort Mr. Cilins, the Entity, and others.  If this proves true, this would mean that the tapes are just a set of statements unrelated to the truth by either Mr. Cilins or the CW.

### E.   The Inauthenticity of the Contracts Is Relevant to the CW's Credibility and State of Mind

This case will turn in large part on evidence about the CW—what she said to Mr. Cilins, what he said to her, what he asked her to sign.  She will almost certainly testify at trial about her conversations with Mr. Cilins and what she understood his statements to mean, especially with regard to the "documents" he asked her to bring to him.  Her testimony will also be necessary to substantiate the allegation that Mr. Cilins provided her with and obtained her signature on the Attestation.  Moreover, the April 11, 2013 conversation between Mr. Cilins and the CW contains numerous testimonial statements by the CW that go directly to the elements of the offense.  The Government has also relied on the CW's testimony as a means of identifying and authenticating the Contracts themselves.  Mot. to Preclude. Exh. 1 at ¶ 12 ("The CW also referenced a series of cont[r]acts which the CW entered into with the Entity"); *id.* at ¶ 13 ("As described by the CW and set forth in the Contracts, the Contracts set forth the terms of payment by the Entity . . . to the CW").  Indeed, almost every allegation in the criminal Complaint derives in some way from information provided by the CW.  *See, e.g., id.* at ¶ 11 ("From the CW, I learned ..."); *id.* at ¶ 15 ("Agent-1 learned from the CW ..."); *id.* at ¶ 17 ("Based upon information from the CW ...").

Given the CW's centrality to the Government's case, it will obviously matter a great deal how the jury perceives her—whether as a reliable witness, or instead as a dissembling extortion artist who seeks to obtain favor (and possibly immigration benefits) from the U.S. Government, as well as favor from the Guinean Government.  If the Contracts are inauthentic, as Mr. Cilins believes, then everything the CW has said will be cast in a radically different light.  *See Blum*, 62 F.3d at 69

(reversible error to exclude evidence indicating that Government witness had fabricated documents that formed the basis of obstruction and false statement charges).  Additionally, if Mr. Cilins can show that the CW has previously attempted to peddle the same fraudulent contracts, that fact would bear directly on her credibility.  What if handwriting analysis were to prove the CW personally forged some or all of the Contracts?  Even if Mr. Cilins did not know she had done this, it would still change the whole tenor of why she is meeting with him, what she told the FBI, her good faith (or lack thereof) in dealing with Mr. Cilins and others, and whether her dealings with Mr. Cilins at the airport are the conclusion of a long series of lies towards Mr. Cilins and others.  Accordingly, the defense must be permitted to inform the jury about the Contracts' inauthenticity as a means of impeaching the CW's credibility.  *See* Fed. R. Evid. 607 (permitting impeachment of any witness); Rule 806 (permitting impeachment of non-testifying declarant).

**F.     The Government's Position Violates Notions of Due Process and Mr. Cilins' Right to a Fair Trial**

The Government's motion makes clear its position—the Contracts are real—and it will argue its position to the jury in an attempt to prove its case against Mr. Cilins.  The Government has put its imprimatur on the Contracts.[9]  It does so without ever having had the originals and without testing them.  This is akin to asking a question on cross-examination without having any basis, and then refusing, upon demand by the other side, to provide a factual basis for the question.  To further compound the problem, the Government seeks to prevent Mr. Cilins from demonstrating that the documents are not real and thus he could not be guilty of the crimes charged.  Allowing the Government to proceed in this manner would subvert justice, violate Mr. Cilins' Fifth and Sixth

---

[9]  This is especially troublesome in light of the Government of Guinea being placed on notice by the Entity that the documents were fakes and based upon the abnormalities found on the face of the Contracts.

Amendment rights to a fair trial and due process of law, and foil the search for the truth. *See, e.g.,* *United States v. Almonte*, 956 F. 2d 27, 30 (2d Cir. 1992) ("The due process clause of the Fifth Amendment and the compulsory process clause of the Sixth Amendment guarantee each criminal defendant the right to present a defense."); *Rosario v. Kuhlman*, 839 F. 2d 918, 924 (2d Cir. 1988) ("The right to present a defense is one of the minimum essentials of a fair trial." (quotation marks omitted)).

Additionally, it appears that the Government is using its Motion to improperly attempt to force Mr. Cilins to testify.  The tactical nature of the Government's Motion is underscored by its fallback position that the authenticity of the Contracts can become relevant only if Mr. Cilins testifies (and hence subjects himself to cross-examination).  It is impermissible for the Government to pressure a defendant to take the stand by seeking to foreclose other evidence relevant to his state of mind, even if the defendant is inclined, as Mr. Cilins is in this case, to exercise his right to testify. Because the authenticity of the Contracts is fundamental to the Government's burden of proof, *any* evidence on that score is relevant—not just Mr. Cilins' testimony.

A simple analogy underscores how flawed the Government's position is.  If the Government had proof or information that the Contracts were indeed forged, no doubt such proof or information would have to be disclosed to the Defense under *Brady*.  This would be true regardless of whether such information took the form of admissible evidence, and regardless of whether it constituted a complete defense in itself.  *See United States v. Rodriguez*, 496 F.3d 221, 226 n.4 (2d Cir. 2007) ("[T]he Government's obligations under *Brady* to disclose such information does not depend on whether the information to be disclosed is admissible as evidence in its present form. The objectives of fairness to the defendant, as well as the legal system's objective of convicting the guilty rather than the innocent, require that the prosecution make the defense aware of material information

22

potentially leading to admissible evidence favorable to the defense."). By the same token, the question at this stage is not whether Mr. Cilins can identify with specificity the defense he intends to advance at trial or the form in which he intends to admit evidence regarding the Contracts. Rather, the question is whether *the Government* has justified a categorical prohibition on any potential argument or evidence that the Contracts are not authentic. Plainly, it has not.

The Government is also wrong to suggest that the rather basic question of the Contracts' authenticity will lead to a time-consuming mini-trial. This Court is regularly called upon to oversee adversary presentations on the validity of documents pertinent to a trial. In fact, such disputes routinely play out for documents far less central to a case than these Contracts. The Court also retains discretion (consistent with a defendant's right to a fair trial and his right to present his defense theory) to rule *at trial* and in the context of the totality of the evidence whether particular proof is redundant, overly burdensome, or risks juror confusion. It is inconceivable that this criminal case—which is, at base, a search for truth—could be fairly tried while tying one arm behind Mr. Cilins' and his Defense team's back. That is precisely what the Government's Motion asks this Court to do, in advance of trial and without the benefit of an evidentiary context. The Government's effort to sanitize the issues in this case is artificial and transparently tactical. This would undoubtedly risk injecting reversible error into the trial.

## G. The Government Should Want to Determine the Authenticity of the Contracts and Can Obtain Them for Inspection and Testing

The Government can obtain the Contracts in question for inspection and testing. The Government and the Government of Guinea are and have been working together by conducting a joint investigation as to whether the Entity, Mr. Cilins, and others bribed persons in Guinea to obtain the mining rights for Simandou. In the discovery and the Complaint, the Government states repeatedly that it is working with the Guinean Government and has received copies of the Contracts

and other materials from officials of Guinea or from its counsel, which is located here in New York. In turn, the Guinean Government has represented to the Entity, in writing, that it gave the "original" Contracts to the U.S. Government. *See* Def. Exh. 1, July 3, 2013 hearing.  Furthermore, the Guinean Government (President Alpha Conde) approached the U.S. Government (President Obama) seeking assistance with its investigation by asking the U.S. Government to start its own investigation.  *See* Gov't Discovery at Bates 00431.  Thus, it appears that the two Governments are sharing discovery, documents, and results of their investigations and are indeed jointly investigating the Entity, Mr. Cilins, his business partners, and others.  As a result, the Government should be able to obtain any item, including the "originals" of the Contracts, which the Government claims are still in possession of the Guinean Government.  *See, e.g., Kyles v. Whitley*, 514 U.S. 419 (1995) (concluding that an individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police); *see United States v. Bin Laden*, 397 F.Supp.2d 465 (S.D.N.Y. 2005) (finding that Deputy U.S. Marshals were part of prosecution team because they participated in teleconference with the prosecutor).  The Government should accordingly be required to produce the "original" Contracts for inspection, examination, and testing.

## III.  Conclusion

The Government's Motion to Preclude improperly seeks to force Mr. Cilins into disclosing his entire defense strategy well before trial, asks this Court to foreclose viable defenses and an entire category of evidence without the benefit of context or evidence, attempts to force Mr. Cilins to testify, seeks to remove from the jury's consideration quintessential questions of fact and inference, and prevents this Court and the jury from discerning the truth.

For the foregoing reasons, the Government's Motion should be denied.[10]

Respectfully submitted this 7th day of August, 2013,

/s/   *Michelle P. Smith*
Michelle P. Smith
Florida Bar No. 389382
Law Office of Michelle P. Smith, P.A.
827 Menendez Court
P.O. Box 1788
Orlando, Florida 32802-1788
Tel.:   407-601-6700
Fax:   888-614-3231
E-mail:  michellesmith@mpsmithlegal.com
          michellepsmith@gmail.com

/s/ *Bruce H. Lehr*
Bruce H. Lehr
Florida Bar No. 318930
LEHR, FISCHER, FELDMAN, LEVI & MENDEZ
1401 Brickell Avenue, Suite 910
Miami, Florida 33131
Tel: 305-377-1777
Fax: 305-377-0087

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 7, 2013, undersigned electronically filed the foregoing *Defendant Cilins' Response to Government's Motion to Preclude and Mr. Cilins' Memorandum in Further Support of Production of the "Original" Contracts* with the Clerk of Court (CM/ECF) by using the CM/ECF system which will send a notice of electronic filing and copy to the following:

Elisha Kobre, Stephen Spiegelhalter, Bruce Lehr, and Sherleen Mendez.

/s/   *Michelle P. Smith*
Co-counsel for Frederic Cilins

---

[10] If, however, the Court is inclined to preclude evidence of the Contracts' falsity and also inclined not to require the Government to obtain originals from the Guinean Government for inspection and testing, Mr. Cilins would alternatively request that this Court take the matter under advisement and delay ruling until the discovery process is complete, pretrial motions can be filed, and the Court hears evidence on these issues.