UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                          :

UNITED STATES OF AMERICA          :
                                          :

       -v.-                                :      S1 13 Cr. 315 (WHP)
                                          :

FREDERIC CILINS,                  :
         a/k/a "Frederic François Marcel Cilins,"    :
                                          :

                     Defendant.      :
                                          :
------------------------------------------------------------x

# THE GOVERNMENT'S SENTENCING MEMORANDUM

 

PREET BHARARA
United States Attorney
Southern District of New York

JEFFREY H. KNOX
Chief, Fraud Section, Criminal Division
United States Department of Justice

Attorneys for the United States of America

Elisha J. Kobre
Assistant United States Attorney

Tarek Helou
Trial Attorney
Fraud Section, Criminal Division

- Of Counsel -

**INTRODUCTION**

"That has to be destroyed, urgently, urgently, urgently.  That has to be destroyed very urgently.  Very, very urgently."  Those were the first words out of defendant Frédéric Cilins's mouth last year after he realized that the FBI had asked a cooperating witness (the "CW") for documents related to alleged bribery in Guinea.  Throughout the previous year, the defendant had been trying to persuade the cooperating witness to destroy contracts that appeared to connect him and associates to alleged bribe payments made through the CW to help a particular corporation secure iron ore mining rights in Guinea's Simandou region worth billions of dollars.  The defendant, who flew to the United States from France just to meet with the CW and convince her to destroy documents, did not know that she had been cooperating with the government.

The obstruction in this case lasted one year, spanned several continents, involved several people, and could have significantly undermined, and even ended, the Government's investigation if the defendant had managed to buy the CW's silence.  The planning behind the defendant's crime was remarkable.  He flew twice from France to the United States to persuade the CW to lie and to destroy documents, and also prepared a false declaration for her to sign.  He even offered to pay the CW to leave the country so the FBI could not talk to her.

Under 18 U.S.C. § 3553(a), a sentence within the guidelines range is appropriate.  This defendant did not gingerly dip his toe in the pool of obstruction.  He dove right in.  Moreover, after the defendant was arrested, he hid the value of his assets from Pretrial Services so he could be released pending trial.  The facts of this specific case – the obstruction lasted one year, involved several people on three continents, related to an underlying investigation of allegedly very serious illegal conduct, and was perpetrated by a defendant who had millions of dollars to

bribe a witness to derail that investigation – warrant a sentence that reflects how serious the defendant's crime was.

## BACKGROUND AND RELEVANT FACTS

**I.      The Alleged Bribery**

In 2005, a foreign mining conglomerate (the "Mining Company") sought the help of the CW to obtain rights to mine iron ore in the Simandou region of Guinea (the "Simandou Concession). (PSR, ¶¶ 7, 9.) The Simandou Concession was held by another company, and its projected worth was and is billions of dollars. (PSR, ¶ 7.) At that time, the CW's husband was a high-ranking Guinean government official and in position to influence the award of the Simandou Concession. (PSR, ¶ 9.) Representatives of the Mining Company or affiliated with it visited the CW and identified themselves as representatives of the Mining Company. (PSR, ¶ 10.)

Between 2006 and 2008, the CW signed contracts with the Mining Company and related companies, including a company that the defendant co-owned (the "Defendant's Company") which held a minority interest in the Mining Company's Guinean subsidiary. (PSR, ¶¶ 9, 11, 12.) In those contracts, the Mining Company and the Defendant's Company promised to pay the CW, and the CW promised to help the Mining Company obtain the Simandou Concession. (PSR, ¶¶ 9, 11, 12.) In December 2008, the Mining Company received the Simandou concession. (PSR, ¶ 7.) Thereafter, the CW signed additional contracts with the Mining Company and related companies. After 2010, but still as part of the alleged bribery scheme, the CW received money through the contracts that she signed.

The defendant himself paid the CW $100,000 on July 27, 2010 and $50,000 on August 5, 2010. (Exs. 1-3 (bank records).) The CW received the following additional payments directly or indirectly from the other owners of the Defendant's Company. Those payments total

$2,136,391.02 and account for the value of the payments in the Plea Agreement.  (Plea

Agreement at p. 2; PSR, ¶ 28.)

| Date | Amount | Method of Payment |
|------|--------|-------------------|
| July 21, 2010 | $149,970 | Cash |
| August 5, 2010 | $99,970 | Cash |
| October 2011 | $500,000 | Wire |
| January 2012 | $250,000 | Wire |
| January 2012 | $150,000 | Wire |
| May 2012 | $936,451.02 | Wire |

## II.    In January 2012, Guinea Starts to Investigate the Simandou Concession, and the Defendant Tries to Persuade the CW to Lie about the Simandou Concession and Destroy Documents Related to It

In January 2012, the government of Guinea established a commission to review all

existing mining contracts.  (*See, e.g.,* http://www.contratsminiersguinee.org/blog/021513-

communique-eng.html.)  That review included the review of the Mining Company's ownership

of the Simandou Concession.  (PSR, ¶ 7.)

In April and May, 2012, the defendant tried to persuade the CW to sign a declaration

falsely stating that the CW had no relationship with the Mining Company.  He and the CW

exchanged several versions of a declaration between April 27, 2012 and May 5, 2012, which she

never signed.  (PSR, ¶ 23.)  On May 8, 2012, the defendant, while in Guinea, met with two

people who know the CW.  That meeting was recorded.  (Ex. 4 (May 8, 2012 transcript of

recording of meeting between defendant and two other people).)

The defendant discussed having the CW sign a document containing false statements

about the Mining Company's acquisition of the Simandou Concession.  (*Id.* at 1-4, 8-9, 13-14.)

At the end of that meeting, the defendant spoke with the CW by telephone and discussed the

contracts with her.  (*Id.* at 20-24.)  On November 26, 2012, the defendant signed a declaration

falsely claiming, among other things, that he never knew that the Mining Company paid the CW.

(Ex. 5 (Nov. 26, 2012 declaration of defendant).)  The defendant intended that declaration to be used during the Guinean proceeding discussed above.

### III.    In January 2013, the United States Begins Investigating the Alleged Bribes to Obtain the Simandou Concession

The United States government began investigating alleged bribes paid to win the Simandou Concession in January 2013.  A few weeks later, on February 2, 2013, the FBI gave the CW a grand jury subpoena requiring the CW to testify.  (PSR, ¶ 8.)  The grand jury subpoena also required the CW to produce documents related to the Mining Company.  (*Id.*)  The CW then began cooperating with the Government.

In March 2013, the defendant called the CW and offered to pay her to give him the contracts discussed above so he could destroy them.  (PSR, ¶ 13.)  The CW, who by this point was cooperating with the Government, had agreed to let the Government record her calls and meetings with the defendant.  (*Id.*)  Over the next month, the defendant and the CW spoke by telephone and met several times.  In those meetings and calls, the defendant offered to pay the CW if she would agree to destroy the contracts and sign a statement saying she had never signed any contracts with the Mining Company or received any money from it.  Once the defendant learned that the CW had been approached by the FBI, he told the CW that she had to lie to the Government and offered to pay for her to leave the United States so that she could avoid telling the FBI what had happened.  Some of those meetings and calls are discussed in detail below.[1]

#### A.    The March 15 and 16, 2013 Telephone Calls

On March 15, 2013, the CW spoke to the defendant over the telephone.  (PSR, ¶ 14(b)).  The defendant told the CW that he wanted to meet her in person and did not want to talk over the telephone.  (*Id.*)  The CW asked the defendant if she should bring the documents – meaning the

---

[1]  Unless set forth in quotation marks, the conversations are described in substance and in part.

contracts – and the defendant said they first needed to meet to go over the details and then, "do it," meaning destroy the contracts.  (*Id.*)  The next day, the CW spoke to the defendant again. (*Id.*)  The CW told the defendant that the CW could not meet that week.  (*Id.*)  The defendant responded that the CW should meet with him because there might be a great deal of discussion of money, which they could not discuss over the telephone.  (*Id.*)

### B.      The March 20, 2013 Telephone Call

On March 20, 2013, the defendant and the CW spoke over the telephone again.  (PSR, ¶ 14(c)).  The CW asked if an executive at the Mining Company ("CC-1")[2] had agreed to pay her an unspecified amount of money that the CW had requested.  (*Id.*)  The defendant responded that CC-1 had agreed to pay her that amount, and that the defendant would have an attorney draft papers reflecting their agreement.  (*Id.*)

### C.      The March 25, 2013 Meeting

The defendant and the CW met at an airport in Jacksonville, Florida on March 25, 2013. During that meeting, the defendant told the CW that she would receive $300,000 now, and the rest of the money, an unspecified amount, later.  (PSR, ¶ 16(a).)  The defendant said the CW would receive some of the rest of the money directly, and the remainder would be held by an attorney.  (*Id.*)  The defendant said he would return to meet with her, and they would destroy the contracts.  (*Id.*)  The CW raised the possibility that the United States Government could approach her.  (PSR, ¶ 16(c); Ex. 6 (Tr. of Mar. 25, 2013 meeting) at pp. 35-36.)  The defendant responded by asking the CW if that had happened and saying that it could happen.  (*Id.*)  The CW then reminded the defendant that he had told her before that because the United States Government *could* approach her, she should not keep the documents in the United States.  (PSR,

---

[2]  The person identified as CC-1 here is the same person identified as "CC-1" in the Superseding Indictment (Doc. # 51).

¶ 16(c); Ex. 6 at p. 36.)  The defendant then reaffirmed that they should destroy the documents,
meaning the contracts.  (*Id.*)  The defendant told the CW that he had to return to France the next
day, but would be back in the United States on April 8 and wanted to meet with her then.  (PSR,
¶ 16(d).)

### D.     The First April 11, 2013 Meeting

During this meeting, the CW told the defendant that FBI agents approached her and said
they were investigating bribe payments and mining contracts in Guinea.  (PSR, ¶ 18(a).)  The
CW also told the defendant that the FBI agents said they would give the CW a subpoena forcing
her to testify in front of a grand jury and provide them with documents.  (*Id.*)  When the
defendant understood that the CW might receive a subpoena seeking documents, he immediately
said that the documents had to "be destroyed, urgently, urgently, urgently.  That has to be
destroyed very urgently.  Very, very urgently."  (Ex. 7 (Tr. first Apr. 11, 2013 meeting) at p. 10;
*see also* (PSR, ¶ 18(b).)  The CW told the defendant that the documents the grand jury wanted
were the same documents that the defendant wanted to destroy, and the defendant said "I know.
I know" and reminded the CW that he had told her to destroy everything.  (*Id.* ¶¶ 18(b) and 23.)
The CW then showed the defendant a document in French that described how a grand jury works
in the United States.  (PSR, ¶ 18(d).)  The defendant read the document and said they had to
destroy the documents immediately.  (*Id.*)  During the meeting, the defendant told the CW
several more times that they had to destroy the documents urgently and proposed specific false
statements that the CW could tell FBI agents if they questioned her again.  (PSR, ¶¶ 18(f), 18(*l*).)

The defendant then asked the CW to make an official statement claiming she was not
involved in the alleged bribery and was not actually married to her husband; both of those facts
were false.  (PSR, ¶ 18(h).)  The defendant also told the CW that they needed to find a place to

burn all of the documents quickly (PSR, ¶ 18(j)) and that he would pay her $1 million to destroy the documents and "five," meaning $5 million, if the Mining Company kept the Simandou Concession (PSR, ¶ 18(m)).  The defendant then gave the CW a declaration to sign (the "False Attestation") which included several false statements.  (PSR, ¶ 18(n).)[3]  The defendant said several times during the meeting that he needed to witness the documents being destroyed. (PSR, ¶ 18(o).)  The CW and the defendant agreed that the CW would go home to get the documents and that they would meet again later that day.  (*Id.*)

### E.    The Second April 11, 2013 Meeting

The CW and the defendant met at the Jacksonville Airport again later that day.  The CW told the defendant that she was concerned that he was asking her to lie to the FBI.  (PSR, ¶ 20(a).)  The defendant responded by repeating that the CW needed to lie to the FBI.  (*Id.*)  The CW also told the defendant that she wanted money immediately, and the defendant responded that he would try to get $50,000 to give to her immediately, but that he needed permission from a senior employee of the Mining Company before he could pay her.  (Ex. 8 (Tr. second Apr. 11, 2013 meeting) at pp. 5-9.)  The defendant told the CW that she needed to give him the original documents, and that he would call her to arrange another meeting.  (PSR, ¶ 20(b).)

### F.    The April 13, 2013 Telephone Call with CC-2 and Email Message from CC-2

On April 13, 2013, the defendant spoke with a co-owner of the Defendant's Company ("CC-2"), by telephone.[4]  (PSR, ¶ 23.)  CC-2 asked the defendant for an email address to which CC-2 could send the defendant edits to the False Attestation.  (*Id.*)  The defendant gave CC-2 his

---

[3]   Those false statements were that: (1) the CW never signed a contract with the Mining Company (PSR, ¶ 19(a)); (2) she never intervened with Guinean officials in favor of the Mining Company (PSR, ¶ 19(b)); (3) she never received money from the Mining Company (PSR, ¶ 19(c)); and (4) the Mining Company never promised to pay her (*id.*).
[4]   The person identified as CC-2 here is the same person identified as "CC-2" in the Superseding Indictment (Doc. # 51).

email address.  (*Id.*)  CC-2 then emailed the defendant proposed edits to the False Attestation.
(*Id.*)

### G.    The April 14, 2013 Meeting

The defendant and the CW met again on April 14, 2013.  During that meeting, the
defendant repeated that they needed to destroy the documents, and that the CW would receive $1
million if they did.  (Ex. 9 (Tr. Apr. 14, 2013 meeting) at pp. 20-21.)  The defendant also
proposed editing the False Attestation to include changes that CC-2 had sent him the night
before.  (*Id.* at pp. 16-17.)  Finally, the defendant offered to pay for the CW to fly out of the
United States so that she would not have to answer questions from the FBI.  (*Id.* at pp. 17, 18;
Doc. #62 (change of plea transcript).)

## IV.    The Defendant Is Arrested and Withholds Information about His Assets During His Detention Proceedings

Immediately after the April 14, 2013 meeting, the defendant was arrested; he was
carrying $20,000 in cash.  (PSR, ¶ 21.)  He made his initial appearance the next day in the
Middle District of Florida, and a Pretrial Services officer requested information from him,
including what property he owned, to determine if he was eligible for appointed counsel.  The
defendant claimed that he owned five properties in the United States worth approximately
$779,000, but denied owning any other property.  (Ex. 10 (Tr. Apr. 18, 2013 Detention Hr'g) at
pp. 12-13 (Pretrial Services Officer testifying about facts told to her by defendant).)[5]  In reality,
as the defendant later admitted, he also co-owned two other properties in Florida; in total, those
properties and the defendant's five properties were worth approximately $3.6 million.  (Ex. 11
(Tr. Apr. 29, 2013 Detention Hr'g at p. 52 (Hon. James Klindt reciting facts from detention

---

[5]  The defendant was arrested in the Middle District of Florida and had several detention hearings
there.  References to documents from his detention hearing are from that docket, M.D. Fla. case
number 13-mj-01087-JRK.

hearing).)  The defendant's co-owners were the same co-owners of the Defendant's Company which, as discussed above, signed contracts with the CW.  (*Id.* at 9-11, 52.)  The defendant also told Pretrial Services that he earned approximately $80,000 per year even though he had $20,000 in cash when he was arrested and owned real estate worth millions of dollars in the United States.  (Ex. 12 (May 8, 2013 Order Detain'g Def. Pend'g Trial) at p. 5-6.)

## LEGAL STANDARD

### I.      Determining the Applicable Guidelines Range and Appropriate Sentence

The Court should begin the process of determining an appropriate sentence by calculating the correct guidelines range.  *Gall v. United States*, 552 U.S. 38, 49 (2007).  The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2).  *Id.* at 50 & n.6.  Although the sentencing guidelines are not binding, they "reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives."  *United States v. Rita*, 551 U.S. 338, 350 (2007).

The guidelines range will be the starting point and initial benchmark for the sentence.  *Gall*, 552 U.S. at 49.  The Court should keep the guidelines range in mind throughout the process, let the parties argue for a sentence they believe is appropriate, and consider the factors identified in § 3553(a).  *Id.* at 49-50.  If the Court imposes a sentence outside the guidelines range, it must consider the extent of the deviation and ensure that its justification for deviating from the range supports the degree of variance in the sentence that it imposes.  *Id.* at 50.

## II.     The Applicable Guidelines Range

The parties and the Probation Office agree that the following sentencing guidelines

calculation is correct, resulting in an offense level of 21.

| Base offense level | U.S.S.G. §§ 2J1.2(c)(1), 2X3.1(a)(1), 2C1.1(a)(2) | 6 |
| Multiple bribes | U.S.S.G. § 2C1.1(b)(1) | 2 |
| Value of the alleged bribes (more than $1 million) | U.S.S.G. § 2C1.1(b)(2) | 16 |
| Acceptance of responsibility | U.S.S.G. § 3E1.1(a)-(b) | -3 |
| Total | | 21 |

The Probation Office has determined that the defendant has no criminal history, and thus

is in Criminal History Category I.  The guidelines range, at offense level 21 in Criminal History

Category I, is 37-46 months in prison.

## A SENTENCE WITHIN THE GUIDELINES RANGE IS APPROPRIATE

While the Court must consider all of the factors in § 3553(a), the Court shall decide how

much weight to give each of those factors.  *United States v. Capanelli*, 479 F.3d 163, 165 (2d

Cir. 2007).  When determining the appropriate sentence in this case, the Court should focus on

the following 3553(a) factors:

- The nature and circumstances of the offense under § 3553(a)(1);

- The seriousness of the offense under § 3553(a)(2)(A); and

- The need for deterrence under § 3553(a)(2)(B).

## I.     This Offense Was Calculated and Wide-ranging

The circumstances of this offense show that the defendant was single-minded in his

desire to destroy the contracts that the Government requested.  This crime was calculated, with

the defendant traveling from Europe twice to get the contracts that he wanted to destroy.  He also

worked with several other people to obstruct the investigation.  Finally, the conduct was lengthy,

as shown by the more than 15 meetings and calls between the defendant and the CW where he discussed destroying documents.

The defendant went to extraordinary lengths to try to keep the CW quiet.  To try to destroy the contracts, the defendant flew from France to Guinea and also twice from France to the United States.  He also wrote phony declarations for the CW to sign that falsely exculpated the subjects of the underlying investigation.  The defendant, however, is a wealthy international businessman and was willing to go to whatever lengths were necessary to obstruct justice.

As the evidence shows, the defendant did not act alone; rather, he acted in concert with at least two others.  The defendant's own words, recorded during meetings with the CW and over a wiretap, show that he worked with others, including CC-1 and CC-2 at a minimum, to obstruct this investigation.  For example, during the first April 11, 2013 meeting discussed above, the defendant assured the CW that she would get millions of dollars if she destroyed the contracts because everything he told her came "directly from [CC-1]."  (Ex. 7 at p. 61.)  The defendant promised that CC-1 was involved in the obstruction and said CC-1 told him to destroy the relevant documents and to report back to CC-1 after he had personally witnessed their destruction.  (*Id.* at p. 60; PSR, ¶ 18(o).)  Additionally, while the defendant was in the United States, he discussed his progress obstructing the investigation with CC-2.  (PSR, ¶ 23.)  During that call, CC-2 suggested edits to the False Declaration and then emailed his proposed edits to the defendant.  (PSR, ¶ 23.)

The seriousness of the defendant's obstructive conduct is also evidenced by the lengths he went to in order to undermine the Government's investigation:  his illegal efforts continued for nearly a year and involved several specific acts of obstruction.  In April 2012, the defendant sent the CW a false declaration to sign.  In May 2012, the defendant went to Guinea, met with

people who knew the CW, and tried to find her so that he could get her to destroy the contracts. The defendant continued meddling with the CW and in March 2013 came to the United States to ask her to destroy documents. After returning to France, the defendant came to the United States again and met with the CW several times in April 2013.

## II.      This Was a Very Serious Crime

The defendant engaged in very serious criminal conduct. To begin with, he sought to obstruct a major investigation involving allegations of serious criminal conduct and corruption – a possible long-running bribery scheme to obtain billions of dollars worth of Guinea's mineral wealth. The investigation touched several continents, involved evidence and dozens of subjects that were overseas, and addressed conduct that spanned almost a decade. The subjects of that investigation were wealthy, international businessmen, including the defendant, who had enough money and sophistication to attempt to thwart investigators. An example of this sophistication, in addition to those discussed above, is the defendant's use of attorneys, which could make the scheme more difficult to detect. He promised the CW that he would use an attorney to invest some of the money that he intended to give her (PSR, ¶ 16(a)) and have an attorney write a contract memorializing their agreement (PSR, ¶ 14(c)). Thus, while obstruction of any criminal investigation can make that investigation more difficult for law enforcement to pursue, those difficulties were exacerbated in this case because the investigation that the defendant obstructed was already complicated, and because his obstructive conduct was particularly sophisticated.

## III.     There Is a Significant Need for General Deterrence in This Case

In determining the appropriate sentence, the Court should also consider the need to deter others who would otherwise obstruct ongoing criminal investigations, particularly those like the defendant who have substantial financial resources to offer in support of obstruction. A key role of the criminal justice system is to find the truth. The defendant sought the opposite – he came

to this country to hide the truth so that the Court and a jury would never find out what happened and never determine if the Mining Company paid bribes to obtain the Simandou Concession. The defendant considered the risks of letting the underlying investigation run its course and made a deliberate decision that obstructing the Government's investigation was worthwhile.  A significant sentence within the guidelines range is necessary to demonstrate to others that obstruction of justice is a serious crime for which defendants will face appropriate consequences.

## IV.    The Facts that the Defendant Relies on Do Not Warrant a Below-Guidelines Sentence

The defendant's family and friends have written letters showing how much they care for him and how much he means to them, but at bottom, they suggest that he lived two lives.  While at home in Southern France, he may have been a devoted father, husband, and friend.  But as a businessman, while in the United States and Guinea, he persistently tried to derail an investigation of serious crimes.  For example, two days before the defendant was arrested, his first grandchild was born; at the same time, he was setting up a meeting with the CW so that he could bribe her to destroy critical documents.  Additionally, some of the defendant's family members wrote that the defendant often reminded them how lucky they were because they did not have to endure the daily hardships that afflict people in poor countries in Africa.  (Def. Sent. Mem. at 5-6.)  But he deliberately obstructed an investigation into allegations of massive corruption – the kind that often seriously harms the very people whose hardships he described.

Although it is unfortunate that the defendant's choices and actions will keep him away from his family and friends, it is not unusual that a defendant's incarceration will cause hardship to his family.  *Cf. United States v. Smith*, 331 F.3d 292, 294 (2d Cir. 2003) (reversing downward departure when defendant was not sole caregiver or financial supporter of child, and defendant's wife would have to postpone college studies and seek additional employment).  His family's

hardship, while significant, does not warrant a sentence below the guidelines range in this case. *Cf. id.*; *see also United States v. Turner*, 291 Fed. App'x 438, 439 (2d Cir. 2008) (mitigating family circumstances not sufficient to warrant sentence below guidelines range); *United States v. Santiago*, 330 Fed. App'x 239, 240 (2d Cir. 2009) (affirming sentence within guidelines range when district court considered "'extremely sympathetic' family circumstances" including defendant's history of drug abuse and having child in foster care but gave greater weight to other factors under § 3553(a)).

The defendant's immigration status also should not affect the sentence.  Approximately 37% of defendants convicted in federal court as recently as 2005 were non-U.S. citizens and thus, like this defendant, subject to deportation and less likely to serve part of their sentences in home confinement.  *United States v. Wills*, 476 F.3d 103, 108 (2d Cir. N.Y. 2007).  Because nothing about his immigration status is extraordinary, this factor does not alter the conclusion that a Guidelines sentence is appropriate.  *Id.*

## V.      The Court Should Impose a Substantial Fine

A significant fine is appropriate in this case.  The guidelines call for a fine within the range of $7,500 to $75,000.  (PSR, ¶ 83.)  The guidelines place upon the defendant the burden of proving that he is unable to pay a fine.  *United States v. Blandford*, 33 F.3d 685, 712 (6th Cir. 1994) (citing U.S.S.G. § 5E1.2(f)).  The defendant refused to give the Probation Office any information about his finances.[6]  (PSR, ¶ 72.)  Because the defendant refused to provide information identified in Rule 32(d)(2)(A)(ii), the Court can base its analysis of his financial

---

[6]  This is the second time that the defendant has tried to thwart a court from following federal law and finding out how much money he has.  As discussed above, the defendant lied to Pretrial Services when he sought pretrial release.

condition – and thus its determination of what is an appropriate fine – on only the evidence in the record.  U.S.S.G. § 5E1.2(d)(2).

All of the evidence in this case shows that a substantial fine is necessary.  The defendant is a sophisticated, international businessman.  The following facts show that he had substantial resources before this case began, while he was obstructing the underlying investigation, and after he was arrested:

- In 2010, he wrote checks to the CW totaling $150,000 (exs. 1-3);

- In 2011, he transferred more than $3.6 million from a bank account in Israel to a title company in the United States (exs. 13-16 (bank records));

- In 2012, he transferred more than $100,000 from the same bank account in Israel to the same title company in the United States (exs. 17-18 (bank records));

- In 2013, before he was arrested, he offered the CW $1 million to destroy documents and $5 million more if the Mining Company kept the Simandou Concession (PSR, ¶ 18(m));

- In 2013, when he was arrested, he had $20,000 in cash (PSR, ¶ 21);

- In 2013, after he was arrested, he admitted that he co-owned real estate worth approximately $3.6 million *in the United States* and could afford to pay for 24-hour-a-day security to ensure he did not flee.  (Ex. 11 at p. 59.)

## VI.   Forfeiture

The Government agrees that the Court should order that the defendant forfeit $20,000 seized from him when he was arrested.  (Def. Sent. Mem. at 26.)

## CONCLUSION

In this case, the defendant, a sophisticated international businessman, traveled to multiple continents, worked with other people, and spent almost an entire year trying to destroy critical documents in an important investigation.  He repeatedly acted with nefarious intent and offered large sums of money to further his illicit goal.  The Court should punish his conduct fairly and send the appropriate message that others who consider interfering with a criminal investigation into serious allegations of corruption should think twice.  A significant sentence within the guidelines range is, therefore, appropriate.

Dated: New York, New York
       July 18, 2014

Respectfully submitted,

PREET BHARARA
United States Attorney

JEFFREY H. KNOX
Chief
Criminal Division, Fraud Section
United States Department of Justice

By:   s/ Elisha J. Kobre

By:   s/ Tarek Helou

Elisha J. Kobre
Assistant United States Attorney
Telephone: (212) 637-2599

Tarek Helou
Trial Attorney
Telephone: (202) 305-3611

**CERTIFICATE OF SERVICE**

I, Tarek Helou, hereby certify that, on July 18, 2014, I caused a copy of the attached Government's Sentencing Memorandum to be sent via electronic notification ("ECF") to:

William J. Schwartz, Esq.
Annika Marie Goldman
Emily Abrahams
Cooley LLP
1114 Avenue of the Americas
New York, NY 10036

Sherleen M. Mendez
Lehr, Fischer & Feldman
1401 Brickell Avenue
Miami, FL 33131

Michelle Patrice Smith, Esq.
Law Office of Michelle P. Smith, P.A.
827 Menendez Court
Orlando, FL 32801

/s/
_____
Tarek Helou
(202) 305-3611

-18-