*Ammon Rousseau Translations*
*Accredited by the French Consulate in New York*

# Attestation

I the undersigned Frédéric Cilins, born on [DOB], 1962 in Antibes (France), with French nationality, certify the accuracy of that which follows.

The company $_\text{Company}^\text{Mining}$ informed me of the allegations made by the Guinean administration against it and in which my name is brought up and they questioned me about these allegations.

I have worked for years in the import-export field and in international trade. I focus on watching for commercial opportunities wherever they may present themselves. During my career, I have done business in the most diverse countries and I have been able to acquire a strong capacity for mobility and adaptation.

I have been present in Africa since the start of the 2000s, first in Kenya and Uganda, then in the Congo, Angola, and finally in West Africa. In Guinea, my activity involved, among other things, the purchase and resale of pharmaceutical products. In 2005 I learned about the existence of the company $_\text{Company}^\text{Mining}$ and understood the interest that it could have in the development of mining projects in Guinea.

Therefore, having the possibility of access to the $_\text{Company}^\text{Mining}$ group, I focused on the study of mining problems in Guinea, and taking advantage of my local presence, I offered to assist $_\text{Company}^\text{Mining}$ and to cooperate with them.

I understood very quickly the importance of the massif of Simandou and the scandal in the eyes of all Guineans whom I met due to the complete inertia of the mining companies that had been in the country for several years and conducted only the most limited exploration activity. I was able to appreciate the reactivity and dynamism of $_\text{Company}^\text{Mining}$ due to its smaller size and its private nature. It seemed to me that there was an opportunity here for both Guinea and $_\text{Company}^\text{Mining}$. For $_\text{Company}^\text{Mining}$ I offered, moreover, the advantage of knowledge of the environment that they didn't have, besides, speaking French was a necessity in Guinea.

Outside of Guinea, I collaborated with $_\text{Company}^\text{Mining}$ in Liberia, Mali, and Sierra Leone on projects that had not always born fruit.

During a large number of meetings with the le *Ministere des mines et le Centre de promotion et de developpement miniers* (CPDM) (ministry of mines and center of promotion and development), I presented $_\text{Company}^\text{Mining}$ and the successful projects the group had carried out. Among others, I put forward the ^Mining Company Subsidiary^ in Sierra Leone, the copper and cobalt mines in the Democratic Republic of Congo (^Mining Company Subsidiary^ mines, the treatment facilities of ^Mining Company Subsidiary^, and the ^Mining Company Subsidiary^), the copper and cobalt mines in Zambia (^Mining Company Subsidiary^). I also discussed the ferronickel mine and factory in Macedonia and Kosovo, or even the ^Mining Company Subsidiary^. The group was also a majority shareholder of ^Unrelated Mining Company^ in South Africa. I insisted on the groups technical capabilities in particular for engineering where their ^Mining Company Subsidiary^ is one of the leaders in the field and active throughout Africa.

Ammon-Rousseau Translations
*Accredited by the French Consulate in New York*

2

There was never a question that I concealed my cooperation with _Mining Company_. Of course, I specified that I was not an employee of _Mining Company_, but was working independently. But the essential part of my work consisted in presenting the company and promoting its striking power.

At my initiative, _Mining Company_ submitted its applications for iron ore exploration permits which it obtained in February 2006 on the north and south zones of Simandou, which had not yet been subject to an exploration or permit application. Some months later, it also submitted and obtained bauxite exploration permits on the prefectures of _Mining Company Subsidiary_. Next, I assisted _Mining Company_ in getting set up in the country, which was maybe secondary but indispensable and critical. At this time, I became aware of the extent and rapidity of the efforts accomplished by the group to launch operations.

Obviously, I had to meet _CW's Husband_, probably two or three times. I talked about _Mining Company_ and the work accomplished by it. During one of our interviews, I brought him a watch as a gift. I do not have a precise memory of the value of this watch, but I can certify that it was less than $5,000 USD. I did not inform _Mining Company_ of my initiative, since it was a local practice well-established and known in Guinea as simple good manners. Guineans call this practice the "kola". Besides, I was the one who financed the purchase of this watch, like all the other expenses I incurred, and I never asked for reimbursement from _Mining Company_.

The president was not a mining specialist. He was a military man very attached to the agricultural world. Nevertheless, he insisted on the importance of Simandou for the country and repeated to me during one meeting "the Guineans are watching us" and that _Mining Company_ had to do all it could.

In general, my contacts within the Guinean administration were very aware of the _Mining Company_'s seriousness, reliability, and results of in the field. Particularly, in the context that Guinea, whose subsoil contains some of Africa's largest iron reserves, was never at the time able to extract any significant amount.

During my first stay in Guinea, i.e. several months before I met with _Mining Company_, I met _CW_, wife of _CW's Husband_

Like the wives of other African heads of state, she managed a charitable association.

On my side, I never made a gift of pharmaceutical products to this association or any other association directed by _CW_, or even to her personally. I know, besides, that pharmaceutical companies, which distributed their products in Guinea, may have donated products to _CW_'s organization. I was never involved in any way in these operations, which I believe were prior to my meeting her.

During this period, I also met _Person #10_, a renown Guinean journalist and someone who clearly stood out. He shared with me his knowledge of the country. He introduced me to _CW_, who carried out some import and resale activities in the agro-foodstuff sector, whom he thought was likely to interest me due to my other activities.

243 East 78th Street, New York, NY 10075 Tel: 212-772-3590 ammon-rousseau@nyc.rr.com

Ammon-Rousseau Translations
*Accredited by the French Consulate in New York*

3

I met her several times at her house in Dubreka and I did some business in this field with her. As well as I can remember, she practiced her activity independently and not through a company. I am not aware of any of her activities, let alone accounts, outside of Guinea. At the time of our contacts, [CW] told me that she had a site, possibly diamondiferous, in the Forecariah sector and asked me if it was likely to interest [Mining Company]. I spoke about it to the company, whose geologist, after analyzing the soil, gave an unfavorable report on going ahead with the project. Therefore, [Mining Company] declined [CW]'s offer.

To my knowledge, the relationship between [Mining Company] and [CW] was limited to this possible business opportunity. I never asked [CW] to intervene for [Mining Company] with anyone and in particular not with the president, whose spouse she never was, as far as I know.

My knowledge of [CW], who did not know French very well and seem far from business circles, led me to doubt that she could have any connections with the Guinean administration or have any power or influence on it. It seemed very unlikely that she could ever plan the organization of meetings at the Ministry of mines. In any case, I never was able to notice that she played a part in these meetings, or even organized them. As far as I could understand, it seemed to me, that [CW] was given certain supernatural powers relating to African culture, of what kind or with what alleged effects I obviously don't know and from which she gained a certain social status. I can confirm that [CW] was never present during our meetings with the president or was never kept informed by me or, to my knowledge, by [Mining Company] about these meetings, at the time of the project, and when meetings were arranged.

Moreover, I don't know of any gifts or payment of funds from [Mining Company] to [CW]. As for me, if I gave her any of the customary gifts, as for example, a bottle of perfume, it is well understood not to have anything to do with [Mining Company] who knew nothing about it, because this is a part of "local politeness" and since I wanted to maintain good relations with someone who was part of the local landscape.

Finally, I attest that I never made payments, let alone concealed ones, to anyone in or outside of Guinea on behalf of [Mining Company] or subscribed to any payment commitment on their behalf in this regard. During a meeting at the Ministry of Mines in February 2006, in front of the press and numerous civil servants, [Person #5], then CEO of [Mining Company], officially handed over to the Minister a miniature "formula 1" racing car. Considering the circumstances, I never had the impression that it involved an object of value.

I stopped assisting [Mining Company] in Guinea and I left the country during the year 2006 since I no longer had any business underway. By then, [Mining Company] had recruited a "Country Director" in the person of [Person #4].

[document is signed]                                         Antibes,
                                                             on 11/26/2012