```
                                                                    1

                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                       JACKSONVILLE DIVISION

   UNITED STATES OF AMERICA,    Jacksonville, Florida

              Plaintiff,        Case No. 3:13-mj-1087-JRK

   -vs-                         Monday, April 29, 2013

   FREDERIC CILINS,             1:39 p.m.

              Defendant.        Courtroom 5D
   _____


      TRANSCRIPT OF DETENTION/PRELIMINARY/IDENTITY HEARING/INITIAL
                              APPEARANCE
               BEFORE THE HONORABLE JAMES R. KLINDT
                   UNITED STATES DISTRICT JUDGE


                       A P P E A R A N C E S
   GOVERNMENT COUNSEL:

         Kelly Karase, Esquire
         United States Attorney's Office
         300 North Hogan Street, Suite 700
         Jacksonville, FL  32202


   DEFENSE COUNSEL:

         Michelle Smith, Esquire
         Law Office of Michelle P. Smith
         P.O. Box 1788
         Orlando, FL  32802-1788


   COURT REPORTER:

         Shelli Kozachenko
         221 North Hogan Street, #185
         Jacksonville, FL  32202
         Telephone:  (904) 301-6842

         (Proceedings reported by microprocessor stenography;
   transcript produced by computer.)
```

Case 1:13-mj-01087-RKW Document 28 Filed 05/08/13 Page 48 of 77 Page 331
Case 1:13-mj-01087-RKW Document 28 Filed 05/08/13 Page 48 of 77 Page 12

8

```
 1  jury is, and, of course, those explanations should be left
 2  either to the Court or to Mr. Cilins' lawyer.
 3          And so I just want to make sure that any
 4  explanation that's given is given by whoever should be giving
 5  it in the courtroom.  If it's a question of translation, I
 6  don't know exactly how best to deal with that.
 7          But I'm just instructing the interpreter that if
 8  Mr. Cilins has a question, that you interpret that question
 9  either for his lawyer or for the Court.  And I would suggest
10  you do it first to his lawyer and then, if it's appropriate,
11  she would so address the Court, because I don't want anything
12  being interpreted for the Court that isn't supposed to be
13  interpreted.
14          THE INTERPRETER:  I understand.
15          THE COURT:  All right.  Thank you.
16          Is that instruction -- is that accurate, and do you
17  have any objection to that, Ms. Smith?
18          MS. SMITH:  I have absolutely no objection to that
19  instruction and very much appreciate it.  I just happened to
20  catch the question between the two of them in listening to
21  you and catching it in the other ear, so I do appreciate
22  that.  Thank you very much.
23          THE COURT:  All right.  Thank you.
24          So does that mean that you're listening to half of
25  what I'm saying and half of what the interpreter's saying?
```

```
 1            MS. SMITH:  I'm not going to admit that, Judge.
 2            THE COURT:  All right.
 3            MS. SMITH:  I'm listening to both of you
 4   simultaneously.
 5            THE COURT:  All right.  Thank you.
 6            All right.  So -- let's see.  Where were we?  We
 7   were talking about this response to defense e-mail filed by
 8   the United States.  It's about five-and-a-half pages, and it
 9   goes into some detail regarding the affidavits and
10   submissions by the defendant.
11            So it seems to me that what we've had here is a de
12   facto reopening of the detention hearing, and so I think the
13   best way to proceed first is to hear what you all have to say
14   about that, and secondly, how you want to proceed.
15            So why don't I start with you, Ms. Karase, and see
16   what your intention is here with respect to the filings and
17   what's been submitted and how you think we should proceed.
18            MS. KARASE:  Yes, Your Honor.  With respect to the
19   government's response that was filed last evening, it was
20   merely meant as a clarification to explain the two
21   individuals who are offering security on behalf of this
22   defendant and to make the Court aware of their involvement in
23   the underlying criminal case.
24            I don't believe it would be appropriate for the
25   Court to accept their security without knowing that they face
```

```
 1  some culpability as well based on their involvement.  And so
 2  the pleading was merely meant to inform the Court a little
 3  bit more about these two individuals, being Michael Noy and
 4  Avraham --
 5            MS. SMITH:  Your Honor --
 6            MS. KARASE:  -- Lev Ran.
 7            MS. SMITH:  Forgive me, Ms. Karase.  I'm sorry.
 8            We just lost the translator.  I think -- I know he
 9  didn't -- he mistranslated that last part because I've now
10  been listening to both, about the two individuals, so I'm
11  sorry to stop the proceedings.  I just want it to be
12  accurate.
13            THE COURT:  All right.  So what needs to be done?
14            MS. SMITH:  It was the last sentence she said about
15  the two individuals, if she knows where she picked up.  She
16  might need to slow down.  I think we're both going to have
17  that problem very much.
18            THE COURT:  All right. Are we caught up though?
19            THE INTERPRETER:  Yes.
20            THE COURT:  You're fine now and you're caught up?
21            THE INTERPRETER:  Yes.  Yeah.
22            THE COURT:  Mr. Cilins, you're with us now?
23            THE DEFENDANT:  (Nods head up and down.)
24            THE COURT:  He's indicating affirmatively,
25  Mr. Cilins is, that he's with us now, all right?  He's caught
```

```
 1  up.
 2          All right, Ms. Karase.  Go ahead.
 3          MS. KARASE:  Well, to repeat the last sentence,
 4  Your Honor, I just had stated that the two individuals,
 5  Michael Noy and Avraham Lev Ran, are involved in the
 6  underlying criminal case.
 7          The pleading sets forth the details, but in
 8  summary, Michael Noy was closely following the witness
 9  tampering that the government alleges was taking place and
10  was communicating and checking on the progress of that
11  tampering and that obstruction through his communications
12  with Defendant Cilins.
13          The other co-owner, Avraham Lev Ran, was one of the
14  parties to a contract that was sought to be destroyed through
15  Mr. Cilins's negotiations with the CW and was also one of the
16  documents responsive to the grand jury's subpoena that was
17  ordered to be produced.
18          And so while I appreciate that in trying to compile
19  these documents, mistakes can happen, when these two
20  individuals' names were brought up and the fact that they
21  agreed to the provision of the $3.5 million of jointly held
22  assets as security, it's an important consideration for the
23  Court to know what their motivation may be in agreeing to
24  that.
25          THE COURT:  I guess my first question about it is
```

```
 1   that Mr. Noy's name appeared on documents, I believe, as
 2   early as the first hearing where we convened, and there were
 3   a number of days in between those, and I guess my concern
 4   involves that to some degree.
 5           Did the government not have that information when
 6   these matters were being considered initially?  Is it
 7   information that was just brought to the government's
 8   attention?  And if the government did know it, didn't the
 9   government think that it was just as relevant when the
10   initial documents were tendered as the government thinks it
11   is now?
12           MS. KARASE:  It wasn't until the proceeding on
13   Thursday when we were in court when these individuals were
14   identified as partners of the defendant, and I believe that
15   that was the first time that I became aware of that.
16           I thought that the original affidavits described
17   Mr. Cilins as being the sole owner of the entities.
18           THE COURT:  Well, but Mr. Noy signed notarized --
19   one or more notarized documents that were submitted the very
20   first day of the detention hearing and identified himself as
21   manager of Hollywood Beachfront Townhomes.  So to the extent
22   that he, by way of these documents, was making
23   representations to the Court, I would have at least thought
24   the government would have deemed it relevant to have provided
25   that information.
```

```
 1  at that point in the proceedings to make a determination on
 2  whether the government had a strong case or not, and I feel
 3  the same here.  Although I do believe that both of you have
 4  provided a great deal of information, it's just that you view
 5  it quite differently, so I find this factor to be neutral at
 6  best.
 7           You know, I see a number of people are here for our
 8  3:30 proceeding, and I'm afraid that that's not going to take
 9  place at 3:30.  I'm hoping that by 4 o'clock we can proceed,
10  so if you all want to go about your business until 4 o'clock,
11  that's fine with me.
12           All right.  Now, with respect to the next factor
13  listed under 3142(g) -- and if I didn't say it, of course,
14  the weight of the evidence is No. 2 -- next is the history
15  and characteristics of the person.
16           As to the mental and physical condition of
17  Mr. Cilins, he appears to be in very good health, except that
18  he does suffer from high blood pressure.  But other than
19  that, he has no mental health issues or physical health or
20  medical concerns, and he did provide a urine sample that
21  yielded negative results the day he made his initial
22  appearance.
23           In terms of the family ties, it appears the
24  defendant does not have any ties to the United States.  He
25  has a wife and children who reside in France, and I did not
```

1  see and I have not heard that he has any other family tie --
2  or has any family ties to the United States.  I do note that
3  it was proffered that his wife is willing to travel to the
4  United States to serve as a third-party custodian on his
5  behalf but that she would have to travel back and forth.
6          In terms of employment and financial resources, the
7  defendant reported that he is self-employed and currently
8  owns and operates CWF.  He said that he earns approximately
9  25,000 Euros, which is the equivalent of about 32,578 United
10 States dollars, annually.  And then he advised the pretrial
11 services officer of five properties that he owns, and he
12 receives rental income from those properties, and the stated
13 rental income monthly from the properties was $4,050.
14         At the -- during the hearing Ms. Smith proffered on
15 the defendant's behalf and proffered the business entities of
16 Mr. Cilins that are related to the ownership of these
17 properties and additional properties.  The approximate market
18 value of the properties, according to what was told to the
19 pretrial services officer by Mr. Cilins, was $779,000.
20         The additional -- there were additional properties
21 proffered by Ms. Smith that Mr. Cilins has an ownership
22 interest in, and when all was said and done, I think an
23 approximate value of $3.6 million of the property is fairly
24 accurate and accurate enough for these purposes.
25         The defendant does not have any known criminal

1  history.  He has no failures to appear, and as I said, he
2  doesn't appear to have any drug or alcohol abuse issues.
3          There are other matters that are relevant to
4  this -- to the consideration under 3142(g).  I don't know if
5  this falls under past conduct or just general information,
6  but the defendant does have two passports, which is lawful in
7  France, and from what I understand from the proffer, an
8  accepted practice, so I'm not drawing any negative inference
9  from that, but those passports do reflect a great deal of
10 travel by the defendant.
11         And this was just a review that I did over the
12 weekend and some today.  I saw that he had traveled to
13 Senegal on multiple occasions, Liberia, Guinea on multiple
14 occasions, Mali, Sierra Leone, Sierra Leone, Canada, South
15 Africa, United States.
16         And I make that point because -- not because the
17 travel in itself is illegal, and I'm not suggesting in any
18 way it is.  In fact, I believe Ms. Smith proffered much of
19 that information.  But it does show that the defendant has
20 contacts in various places kind of outside of France and
21 outside of the United States.
22         And I believe it was also proffered that he does
23 have -- he has business in those areas, and that's why he
24 travels there.  And I believe it was also represented that he
25 traveled in -- throughout Europe based on -- because of his

1 appearance as required.

2 My notes reflect that the defendant has suggested a
3 fairly extensive and comprehensive list of conditions,
4 starting with the use of an electronic monitor, the posting
5 of $3.6 million in property, a residence that belongs to the
6 family in South Florida -- I believe that's the Turnberry
7 residence in Aventura, Florida. It's the family residence
8 where the family spends time in South Florida.

9 The defendant has offered to pay for or have those
10 related to him -- when I say related, either family or
11 friends -- pay for 24-hour security. And in conjunction with
12 the electronic monitoring, I think it was suggested that the
13 defendant would be under house arrest, only allowed to travel
14 to the Southern District of New York for court appearances
15 and to meet with his attorney.

16 His wife is willing to travel and to be a
17 third-party custodian, although she'd have to travel, I
18 believe, back and forth some to France. And the Court also
19 could impose other conditions, some of which are standard and
20 others that are not: in addition to the home confinement,
21 the posting of the money, the 24-hour security, and the wife
22 serving as the third-party custodian in the residence in
23 South Florida. Regular contact with pretrial services would
24 be another possibility. Daily telephonic contact with
25 pretrial services would be another possibility.

1    I wanted to refer to one of the cases that was
2    provided to me by Ms. Smith because I believe in that case --
3    I think I have it up here if you'll just give me a moment.
4    Well, maybe I don't.  I might have left it on my desk because
5    I made some notes from it.
6         But one of the, I believe, district judges
7    reviewing one of the magistrate judges' orders added a long
8    list of additional -- of additional conditions, some of which
9    I'm not sure I had heard of before, but there were a number
10   of those, and I might see if I can get those cases brought
11   out to me.  If anyone's listening, they're on the floor in my
12   office.
13        I wasn't really meaning you, Megan, but . . .
14        (Brief pause.)
15        THE COURT:  All right.  I was wrong.  They're not
16   in front of me.  They were on the floor in my office.  I have
17   them now though.
18        This was -- I was looking at Judge Rakoff, Rakoff,
19   R-a-k-o-f-f's opinion in *United States against Dreier*,
20   D-r-e-i-e-r.  That's the 596 F.Supp.2d 831 case that I had
21   referenced earlier.
22        And in that particular case he went through the
23   conditions, and he found that the conditions that were
24   additional to what had been added was that the defendant
25   expressly consent in writing to the use of armed security

```
 1                          CERTIFICATE
 2

 3   UNITED STATES DISTRICT COURT )

 4   MIDDLE DISTRICT OF FLORIDA   )

 5

 6

 7        I hereby certify that the foregoing transcript is a

 8   true and correct computer-aided transcription of my stenotype

 9   notes taken at the time and place indicated therein.

10

11        DATED this 2nd day of May, 2013.

12

13

14                            s/Shelli Kozachenko_____
                              Shelli Kozachenko, RPR, CRR
15

16

17

18

19

20

21

22

23

24

25
```