1

D73TCILA

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        13 CR 315 (WHP)

 5   FREDERIC CILINS,

 6              Defendant.

 7   ------------------------------x

 8                                   New York, N.Y.
                                     July 3, 2013
 9                                   10:00 a.m.

10
     Before:
11
                    HON. WILLIAM H. PAULEY III,
12
                                          District Judge
13

14                          APPEARANCES

15   PREET BHARARA
          United States Attorney for the
16        Southern District of New York
     ELISHA KOBRE
17        Assistant United States Attorney

18   LEHR, FISCHER & FELDMAN
          Attorneys for Defendant
19   BRUCE LEHR

20   LAW OFFICE OF MICHELLE SMITH
          Attorneys for Defendant
21   BY:  MICHELLE SMITH

22   ALSO PRESENT:   ARLETTE WEILL, French interpreter
                     CHRISTOPHER MARTINEZ, FBI
23                   JEFFREY STEIMEL, Pretrial Services

24

25
```

D73TCILA

```
1              (In open court)

2              DEPUTY CLERK:  Case of United States of America

3    against Frederick Cilins.

4              Appearance for the government.

5              MR. KOBRE:  Good morning, your Honor, Elisha Kobre for

6    the government.

7              DEPUTY CLERK:  Appearance for the defendant.

8              MR. LEHR:  Good morning, your Honor, Bruce Lehr,

9    L-E-H-R, and --

10             MS. SMITH:  Your Honor, Michelle Smith on behalf of

11   Mr. Cilins.  Mr. Cilins is seated to my left.  And also present

12   with us is the interpreter.

13             THE COURT:  Good morning, Ms. Smith and Mr. Lehr.

14             Would the French interpreter identify herself for the

15   record?

16             THE INTERPRETER:  Yes, your Honor, my name is Arlette

17   Weill A-R-L-E-T-T-E  W-E-I-L-L.

18             THE COURT:  Good morning.

19             THE INTERPRETER:  Good morning, your Honor.

20             THE COURT:  Please stand and my deputy will administer

21   the oath to you.

22             (Interpreter sworn)

23             THE COURT:  Mr. Cilins, are you able to understand

24   what's being said here this morning through the French

25   interpreter?
```

D73TCILA

1           THE DEFENDANT:  Should I get up, your Honor?

2           THE INTERPRETER:  The defendant asks if he should get

3    up.

4           THE COURT:  No, he can just respond to my questions

5    through the interpreter.

6           THE DEFENDANT:  Yes, your Honor.

7           THE COURT:  Very well.  All right.  This matter has

8    been randomly reassigned to me from Judge Wood.

9           Mr. Kobre, briefly what are the nature of the charges

10   against the defendant and what discovery does the government

11   have to provide to his counsel?

12          MR. KOBRE:  Yes, your Honor, the defendant is charged

13   in a five-count indictment with three counts of witness

14   tampering, obstruction of a criminal investigation, and

15   destruction of documents in an FBI investigation.  The

16   indictment was returned on April 25th.  The parties appeared

17   before Judge Wood on I believe it was May 20th, and the

18   government has produced the discovery that the government has

19   to this point.  I was informed this morning by defense counsel

20   that some -- the discovery consisted of documents as well as a

21   number of audio recordings, meetings and phone calls.  The

22   government produced that.  I was informed this morning by

23   defense counsel that apparently some of the files are corrupt,

24   and the government will, of course, make copies that are

25   readable and produce those immediately to the defense.

4

D73TCILA

1          THE COURT:  Well, has the government produced all of

2     the discovery that it has in this case?

3          MR. KOBRE:  Yes, your Honor.

4          THE COURT:  And approximately how many recordings are

5     there and what's the other discovery that's been produced?

6          MR. KOBRE:  Your Honor, there are about ten -- I would

7     say about ten to fifteen recordings.  There are audio and video

8     recordings.  There are recordings of meetings that occurred

9     between the cooperating witness in this case and the defendant.

10    There are recordings of phone calls between the cooperating

11    witness and the defendant.  There are video recordings as well

12    of some of the meetings that occurred down in Florida.  There

13    are bank records.  There are email accounts that were produced.

14    There are a number of electronic media were seized from the

15    defendant incident to his arrest.  Those are in the process of

16    being searched, and defense counsel has given the government a

17    hard drive, and those will be produced as soon as we're able to

18    make copies of those and produce them to the defendant.  The

19    government is in the process of obtaining additional bank

20    records and other records in this case that are not yet in the

21    government's possession, but as soon as the government has them

22    it will produce those to the defense as well.

23          THE COURT:  All right.  First, with respect to the

24    electronic media that the government needs to duplicate, what

25    is the volume of that, material?

D73TCILA

1          MR. KOBRE:  There are four -- my recollection, your

2     Honor, is there are four thumb drives that were seized, two

3     computers, and an iPad, or it may be that the two computers

4     include the iPad.  And there is a process, forensics has to

5     make forensic media of those, the forensics of the FBI, so it

6     does take a little longer.  But that is being done, and we have

7     at least a part of that that is being copied now and we're in

8     the process of doing that.

9          THE COURT:  When does the government expect those

10     computer forensics will be completed?

11          MR. KOBRE:  Your Honor, it's hard for me to give you a

12     precise date now.  I could find out and get back to your Honor

13     on a precise date when it will be completed.

14          THE COURT:  The government has had them since the time

15     of his arrest?

16          MR. KOBRE:  That's correct, since April 15.  But they

17     were in Florida, your Honor, so they had to be transported

18     here.  I can get back to your Honor very shortly with a date.

19          THE COURT:  When were they transported here?  With the

20     defendant back in May?

21          MR. KOBRE:  No, it took, I believe, several weeks for

22     them to be shipped here.  I can have a date for your Honor.  I

23     believe at least a large portion -- I have been told by the FBI

24     agent assigned to this case a portion of them are ready to be

25     produced and will be copied within days and produced to the

D73TCILA

1  defense within days.  There may be some -- I believe one of the

2  computers the FBI had a little bit more difficulty, it's

3  maybe -- I believe I was told that it's not an American-made

4  computer.  For whatever reason, it was a little more difficult

5  to open up, and I don't know where that process stands right

6  now with respect to that computer.

7              THE COURT:  And you also indicated that the government

8  is seeking additional bank records?

9              MR. KOBRE:  Yes, your Honor.

10             THE COURT:  What are they and when will they be

11 produced?

12             MR. KOBRE:  There are subpoenas out for bank records.

13 The banks have been working with us.  Some of these records are

14 from foreign bank accounts, so they will take some additional

15 time to get.  There are also MLATs, Mutual Legal Assistance

16 requests.  Those things take time, they have to go through

17 various processes with people in the Department of Justice,

18 then, of course, they're sent to a foreign country.  So we're

19 working as diligently as we can to get those materials, but we

20 don't have them at this point.  It's difficult to give your

21 Honor a precise date at this time.

22             THE COURT:  With respect to the recordings that the

23 government has produced, are they in French?

24             MR. KOBRE:  They are, your Honor, and the government

25 has -- pursuant to stipulations that defense counsel have

D73TCILA

1    executed, the government has provided defense counsel with

2    draft transcripts that were prepared by FBI language analysts

3    of those recordings.

4           THE COURT:  And when you say "draft transcripts," do

5    you mean translations?

6           MR. KOBRE:  That's correct, your Honor.

7           THE COURT:  Does the government anticipate any

8    superseder here?

9           MR. KOBRE:  At this point, your Honor, no.

10          THE COURT:  How long will it take to try this case?

11          MR. KOBRE:  Your Honor, it shouldn't -- the government

12   believes it shouldn't take more than a week to ten days.

13          THE COURT:  All right.  Thank you, Mr. Kobre.

14          Mr. Lehr or Ms. Smith?

15          MS. SMITH:  Your Honor, may I approach the lectern?

16          THE COURT:  Yes.

17          MS. SMITH:  Your Honor, with regard to the outstanding

18   discovery requests, there are some additional items that we

19   have requested that have not yet been provided.  The first

20   one -- and just to clarify a few things, there were two iPhones

21   or two phones taken, a Blackberry and another phone, taken on

22   the day of arrest, which was April 14th, 2013.  There was an

23   iPad and at least several thumb drives.  We do not have the

24   discovery off of any of those that I am aware of.  As I

25   understand Mr. Kobre, he has four thumb drives and two

D73TCILA

1   computers, maybe including the iPad, but there are also two

2   phones.  We would like a complete set of our client's records

3   that they seized, and we believe under Rule 16 we're

4   entitled -- because they were seized from our client, we

5   believe we are entitled to all seizures taken from Mr. Cilins.

6          Further, your Honor, there are the original documents

7   in question.  I filed a motion to compel.  I requested those,

8   as did Mr. Lehr, from Mr. Kobre, we both individually did

9   several weeks ago.  Mr. Kobre responded to Mr. Lehr that he did

10  not personally have those original documents.  And the

11  documents in question are the documents that form the basis of

12  the investigation.  They're the basis of the alleged

13  obstruction and destruction of documents.

14         Mr. Kobre indicated to Mr. Lehr -- Mr. Lehr is here

15  and willing to swear to their conversation, if need be, with

16  the Court -- that when asked who did have them:  The

17  government.  Who in the government has them?  I decline to say

18  so.

19         So the government has these documents.  Mr. Kobre

20  filed a response indicating the government does not have the

21  original documents, your Honor.  It is our belief, based upon

22  the photocopies that we have received from Mr. Kobre, that

23  these documents are forged, they're fraudulent, and they are

24  simple cut and paste jobs.  And just a brief look at the

25  documents they look, pardon the expression, sketchy, Judge.

D73TCILA

They look very sketchy from the copies that we received in

discovery.  So we believe, based upon the arguments that I made

in the motion to compel, that those documents are both material

to our defense and they are within the possession and/or

control of the government.  Certainly the government has not

argued in its response that they are not material.

Your Honor, we also made an additional request on

June 28.  I did so by writing in a six-page letter asking for

the government witnesses.  We were aware of couple of them,

asking for their criminal histories, asking for any information

regarding the cooperating witnesses, immunity agreement, the

government says she's negotiating an immunity agreement.  She

also has been extended her visa.  We have become aware that she

is now able to have a Florida driver's license, so she may have

been extended legal status which she did not previously have.

We asked for all the documents and items relating to that.  And

these would constitute Brady, Giglio and also Rule 16

discovery.

Your Honor, I could go on ad nauseam.  It's a six-page

request, I'm more than happy to tender it to the Court, of what

we believe are still outstand, but those are some of the

highlights of what are outstanding at this time.

THE COURT:  Mr. Kobre.

MR. KOBRE:  Briefly, your Honor.  With respect to the

electronic media, I believe it is true that we are at fault.  I

D73TCILA

1   had forgotten about that, but of course those items, as soon as

2   we are able to make copies, we will produce those as well.

3           THE COURT:  When you will be able to make copies of

4   those?

5           MR. KOBRE:  I don't know if -- that may be included

6   among what's already been processed, so if that's the case I

7   will be able to do it right away.  Again, I don't know, your

8   Honor, if it hasn't been processed it will be done as soon as

9   possible.  Very shortly.

10          THE COURT:  Two months is long enough on those

11  materials.  Get somebody on it.  I'm going to require to you

12  produce the information on the iPhone and Blackberry and the

13  iPad and the thumb drives.  You're going to do so by next week.

14          MR. KOBRE:  Your Honor, I ask that there is a -- these

15  materials have been in a laboratory, they need to be

16  forensically examined.  I ask, your Honor, to -- we are

17  diligently working on it.  I would ask your Honor to allow the

18  government a little bit of additional time.

19          THE COURT:  How much time?

20          MR. KOBRE:  I don't know, but I would --

21          THE COURT:  You see, that's a problem.

22          MR. KOBRE:  Your Honor, I don't have the case agent

23  here with me today.

24          THE COURT:  Why not?

25          MR. KOBRE:  My understanding, your Honor, if I could

D73TCILA

```
 1   just have, I'm not trying to --

 2              THE COURT:  Why isn't the case agent here?

 3              MR. MARTINEZ:  I'm here.

 4              THE COURT:  Why don't you come up and give Mr. Kobre a

 5   hand.

 6              MS. SMITH:  Your Honor, this is Agent Christopher --

 7              THE COURT:  He can introduce himself.  The government

 8   doesn't need to be introduced by defense counsel.

 9              Mr. Kobre, who is the agent?

10              MR. KOBRE:  Your Honor, this is Special Agent

11   Christopher Martinez of the FBI.

12              THE COURT:  All right.  Good morning Agent Martinez.

13              MR. KOBRE:  Could I have a moment?

14              THE COURT:  Confer with him.

15              (Pause)

16              MR. KOBRE:  Your Honor, the four thumb drives, the

17   electronic media from that we can produce immediately.  That

18   been downloaded.  With respect to the two phones, they're

19   Blackberries.  They are password protected.  The government

20   doesn't have the passwords for them, and we are working

21   diligently to essentially --

22              I'm sorry, your Honor, just one moment.

23              (Pause)

24              MR. KOBRE:  If defense counsel will give us the

25   password, of course that would expedite matters, but absent
```

D73TCILA

 1   that, it will take us time to essentially crack the code for

 2   those Blackberries.

 3            As far as the computers, those have not yet been

 4   downloaded, but we would ask your Honor for two weeks to

 5   produce those items.

 6            THE COURT:  What about the passwords, Ms. Smith?

 7            MS. SMITH:  We'll provide them.  I have been informed

 8   by Mr. Lehr that we will provide them.

 9            THE COURT:  Do you want to provide them right now?

10            MS. SMITH:  We'll provide them before the end of

11   hearing.  We'll provide them to Mr. Kobre and Mr. Martinez so

12   they're not on the record.

13            MR. LEHR:  Your Honor, if I may, I just spoke to my

14   client.  He's more than happy to provide them, he just needs

15   some time out of the pressure of the Court to remember them,

16   but he says he will provide them.

17            MS. SMITH:  We'll try to get them today.

18            MR. LEHR:  Today.

19            THE COURT:  All right.

20            MR. KOBRE:  So the government would request two weeks.

21   As soon as we have those passwords, we will download them and

22   produce them.

23            THE COURT:  If you're going to get the passwords

24   today, why do you need two weeks to download them?

25            MR. KOBRE:  Your Honor, this occurs in a forensics

D73TCILA

1    laboratory with agents specially trained to make sure that the

2    hard drive is -- the integrity of the data is not changed, and

3    so it just requires that amount of time to do it.

4              And your Honor --

5              THE COURT:  If they provide valid passwords today, the

6    government is to produce the downloaded information to the

7    defendants, taking account of the holiday, by July 12.

8              MR. KOBRE:  Yes, your Honor.

9              MS. SMITH:  And your Honor, for the record, I

10   understand that only one of the phones is actually password

11   protected, but our client has written the password on the

12   yellow piece of paper that I'm going to tender to Mr. Kobre

13   right now.

14             MR. KOBRE:  Thank you.

15             Your Honor, the government has been provided with the

16   password on a yellow piece of paper.

17             THE COURT:  With respect to the thumb drives, I'll

18   permit the government to make production of those -- the

19   information on those thumb drives by July 17.

20             MR. KOBRE:  Sorry, your Honor, do you mean the

21   computers or --

22             THE COURT:  You asked for two weeks.

23             MR. KOBRE:  Two weeks, yes, your Honor.

24             THE COURT:  Didn't you?

25             MR. KOBRE:  Yes, your Honor.

D73TCILA

<pre>
 1                THE COURT:  July 17 is two weeks from today.  I'm

 2      granting the government's request with respect to those

 3      matters.

 4                Mr. Kobre, where are the original agreements?

 5                MR. KOBRE:  Your Honor, if I could address that.  It's

 6      not correct to say that the government has not argued that

 7      those are not material.  And if I could --

 8                THE COURT:  There's too many "nots" in the statement

 9      you just made.  I can't cut through them.

10                MR. KOBRE:  The documents -- Ms. Smith has repeatedly

11      stated that those documents form the basis for the charges

12      here.  They do not.  The documents -- and if I could just have

13      a moment before I address directly your Honor's question, which

14      I will.

15                The defendant here is charged with attempting to

16      destroy documents that he knew were under subpoena by the grand

17      jury.  Whether there are original documents, whether those are

18      documents are genuine or not genuine is not relevant to the

19      defense in this case.

20                THE COURT:  That's an issue that may have be tee'd up,

21      and I'm going to tee it up as a motion.  I'm going to fix a

22      briefing schedule, because I understand from what I have read

23      that that's an argument that is advanced by the defendant, and

24      I think it would be helpful to the parties for the Court to

25      resolve that question.
</pre>

D73TCILA

1          MR. KOBRE:  Yes, your Honor.  But that is the

2     government's position.

3          With respect to the documents, I did have a

4     conversation with Mr. Lehr, and I told him very clearly during

5     that conversation that those documents were not in my

6     possession.  I can tell your Honor today that my information

7     from the cooperating witness in this case is that those

8     documents have been given to the government of Guinea.  They're

9     not in the possession of the United States government.

10          That's my information, your Honor, and although I did

11     not tell Mr. Lehr in the conversation where they had been, I

12     did tell him they were not in the possession of the government.

13          THE COURT:  When were they given to the government of

14     Guinea?

15          MR. KOBRE:  Months ago, your Honor.  Again, that's the

16     information from the cooperating witness.

17          THE COURT:  Prior to the recorded conversations that

18     are part of the discovery in this case?

19          MR. KOBRE:  Yes, your Honor.

20          THE COURT:  All right.

21          MR. KOBRE:  Lastly, your Honor, if I could address the

22     defense counsel sent a six-page letter.  Essentially all the

23     requests in that letter pertain to Giglio or 3500 material.

24     Those items, as your Honor knows, are typically not produced

25     until shortly before trial.  The government has not identified

D73TCILA

1    its witnesses in the case.  As much as Ms. Smith would like to

2    characterize in her response who the government witnesses will

3    be and who our quote, unquote, star witness is, the government

4    has not identified its witnesses.  And the government will, of

5    course, produce all the Giglio and 3500 material with respect

6    to any government witnesses at the appropriate time as ordered

7    by the Court before trial.

8           THE COURT:  Ms. Smith, how much time does the

9    defendant need to review these materials that the government

10   has produced or that the government is going to produce?

11          MS. SMITH:  Your Honor, we're not sure as to the exact

12   depth of what is on the zip drives, what's on the phones,

13   what's on the computers.  We talked to our client, but I don't

14   know the exact volume.  Some of these flash drives are old.

15   I'm not aware of how long it will take to review those.  He

16   asked for a two-gig hard drive, which is a substantial amount

17   of data.  To date we have gone through about 1,550 or so paper

18   documents and audio recordings with the exception of three,

19   which would be docs 574 and 1190 which do not work, they're

20   corrupt or not working.  So we have been through 1,500

21   documents and all the recordings to date.

22          Your Honor, they are all in French.  There's some

23   Susu, which is another language on one of the tapes.  I'm

24   having difficulty finding a Susu interpreter to translate the

25   Susu, even though it's only a couple of minutes.  The rest of

D73TCILA

1    them are in French.  And we are employing French interpreters

2    to start our version of the translations to see and to read the

3    government's draft translations.  So I can't give you an exact

4    time.  We had planned on being ready for September 9th, which

5    is what was on Judge Wood's pretrial schedule for that next

6    calendar after September 9.  We do not want to delay this trial

7    out.  So we had planned, regardless of what the government

8    drops on us, basically to get ready for that date, unless there

9    is some massive amount of additional discovery that is coming.

10        With regards to the original documents that we're

11   asking, we expect to have them sent to -- or have an examiner

12   come into the FBI's office and have them examined, inspected,

13   and tested both for ink, stamps, the revenue stamps, the seals,

14   signatures, basically because, again, the photocopies provided

15   to us in discovery, they just don't look right.

16        THE COURT:  And on that score, Mr. Kobre, is the

17   government making any effort to get these original documents

18   from the government of Guinea?

19        MR. KOBRE:  Not at this point, your Honor, no.

20        THE COURT:  Does the government plan to make that

21   effort?

22        MR. KOBRE:  Your Honor, the government does not have a

23   plan at this point to try to obtain those documents, but again,

24   we haven't decided whether we would seek to introduce those at

25   trial or not.  We don't believe that they're relevant to the

D73TCILA

1   defense.

2          Your Honor, if this legal issue that was discussed

3   earlier is resolved, that would make those documents irrelevant

4   to any defense in this case.  That's the government's position

5   right now, that we don't believe that those documents are

6   relevant.  And as I did express to Mr. Lehr, we don't believe

7   those documents are a necessary or crucial part of our evidence

8   in the case.  It doesn't mean, of course, if we had the

9   documents we might seek to introduce them, and we would, of

10  course, give ample time for defense counsel to come and inspect

11  them.

12         THE COURT:  How do you plan to inspect documents that

13  are in Guinea?

14         MS. SMITH:  Your Honor, number one, we do not believe

15  they are currently in Guinea.  Number two, Mr. Kobre himself --

16  again Mr. Lehr is here, he represented on the 19th of June

17  directly to Mr. Lehr that they were in the possession of quote,

18  unquote, the government, meaning the United States government.

19  He declined to say with what agency, what entity or with whom.

20         Your Honor, I would like to tender to the Court --

21         THE COURT:  Where do you believe they are?

22         MS. SMITH:  Your Honor, I have a letter from the

23  government of Guinea that has been translated that indicates

24  they are on their way back to the United States government.

25  The letter was signed on May 7, 2013.  I received this in the

D73TCILA

| | |
|---|---|
| 1 | last couple of days -- I think it was yesterday, actually, your |
| 2 | Honor, I would have to check, yesterday or the day before.  I |
| 3 | have both the letter, the certification from Geotech |
| 4 | Translations, the translation of the letter, and then a |
| 5 | photocopy, because I do not have the original letter.  It was |
| 6 | emailed to me from the Comité Technique de Revue des Titre et |
| 7 | Convention, Miniers, in other words, the Minister of Mines, |
| 8 | Committee for the Technical Review for Minister of Mines in |
| 9 | Guinea. |
| 10 | I'll let Mr. Kobre take a look at this, but I would |
| 11 | like to tender this to the Court indicating that the documents |
| 12 | were sent back on May 7. |
| 13 | THE COURT:  Show it to counsel. |
| 14 | MS. SMITH:  Your Honor, for the record, counsel is |
| 15 | reviewing the letter that I just tendered to him. |
| 16 | THE COURT:  Do you have copies? |
| 17 | MS. SMITH:  Your Honor, I honestly did not think I |
| 18 | will need them, they're in a different bag.  I will tender the |
| 19 | copy that I have to the Court to have it marked for |
| 20 | identification and ask that it be admitted into evidence today. |
| 21 | MR. KOBRE:  I apologize, your Honor, I had not been |
| 22 | provided these documents at any time before this moment or been |
| 23 | informed of their existence. |
| 24 | THE COURT:  I understand, Mr. Kobre. |
| 25 | MS. SMITH:  Your Honor, for the record, it is one page |

D73TCILA

1    of certification, one, two, three pages of the translation, a

2    blank in-between sheet, and three pages of the original

3    document, including the seal signed by Nava Toure, the Minister

4    of Mines.

5             And your Honor, while Mr. Kobre was reviewing it,

6    Mr. Lehr walked up, and he and I are both sure that they came

7    in yesterday, but it could have been the day before.  It was

8    this week that we received them.

9             (Pause)

10            THE COURT:  All right.  Well, the Court has reviewed

11   the material that's been hand up.  I will mark it as Court

12   Exhibit 1.

13            MS. SMITH:  Thank you, your Honor.

14            MR. KOBRE:  Your Honor, if I could have one moment to

15   address the Court.

16            THE COURT:  Yes.

17            MR. KOBRE:  This is the first that I am hearing that

18   the government has it.  All of the knowledge that I have is

19   that the United States government does not have those

20   documents.  The agent who is present here today was present

21   also when the cooperating witness said that the cooperating

22   witness had given those documents to the government of Guinea.

23   And I don't know -- I just have no knowledge of this

24   whatsoever.  I would ask for a copy of that.

25            THE COURT:  We'll make copies.

D73TCILA

 1           MS. SMITH:  Your Honor, I can forward the email that

 2   was sent to me and send that to Mr. Kobre also, sent to me by

 3   Mr. Lehr.  I would be happy to do that once I leave the

 4   courtroom and have my phone, I could provide him a copy this

 5   morning.

 6           THE COURT:  All right.  The point is that I think it

 7   warrants further inquiry, Mr. Kobre, given the letter's

 8   apparent date of May 7, 2013, indicating that the documents

 9   have been forwarded to the government -- returned to the

10   government of the United States.

11           MR. KOBRE:  Yes, your Honor, we will make inquiry.

12           THE COURT:  All right.  Do you want to be heard

13   further on this issue?  Because I think it best to tee up the

14   motion about the viability of the defense that the documents

15   are fraudulent.  When do you want to file such a motion?

16           MS. SMITH:  Your Honor, if I could have two weeks.  I

17   have a fairly --

18           THE COURT:  It's fine.  And actually, I think quite

19   frankly, that the government should move -- should be the

20   moving party, because they're the ones who seek to preclude it,

21   right?

22           MR. KOBRE:  Yes, your Honor.

23           THE COURT:  So when can the government file its

24   motion?

25           MR. KOBRE:  The government would ask for three weeks.

D73TCILA

1              THE COURT:  All right.  File your motion by July 21.

2         How much time would you like to respond, Ms. Smith?

3              MS. SMITH:  I would like at least ten days, I think I

4    can do it sooner than that, but at least 10 to 14 days, Judge.

5              THE COURT:  So why don't you respond by -- the

6    government will file its motion on July 24, and the defense can

7    file its opposition by August 7.  I'll take any reply from the

8    government on August 14.  And I'll want to hear argument on

9    this motion.  I'll fix a date as soon as we have taken up other

10   matters this morning.

11             Now at this juncture, does the defense lawyer have any

12   pretrial motions that it wishes to make?

13             MS. SMITH:  Until we see the rest of the discovery and

14   until we have had an opportunity to see these original

15   documents and examine them, I'm not sure what we're going to

16   know that we're going to need to move.  We have been diligently

17   doing research on various issues, but I think it's imperative

18   that we have the entire discovery that is provided under

19   Rule 16 before I can honestly answer the Court.  I anticipate

20   there will be some pretrial motions, either motions to dismiss,

21   motions to exclude, motions, as your Honor has indicated, for

22   the admission of the original documents.

23             THE COURT:  Well, can the government complete its

24   production of all discovery in this case by August 2?

25             MR. KOBRE:  Your Honor, there are requests for

D73TCILA

1    documents from foreign countries in this case.  The government

2    is endeavoring to get them as quickly as possible.  As soon as

3    we have them we'll turn them over.  I don't know that I can say

4    August 2nd.  I can say the government has produced -- there

5    were a number search warrants executed in this case, those were

6    all produced over month ago back in mid May.  And the

7    electronic media we'll produce on the schedule that your Honor

8    has set.  There may be additional bank records or other

9    documents that come in.  We're working as diligently as we can

10   to get them, but it's hard to give a fixed date to when we will

11   have them.  We will produce them as soon as we get them.

12           THE COURT:  The purpose of this proceeding is to fix

13   dates.

14           MR. KOBRE:  I understand that, your Honor, but if your

15   Honor were fix a date and documents would come in later than

16   that, we would, of course, produce them to the defense.  And as

17   long as the defense wasn't prejudiced by it, we would want to

18   introduce those potentially at trial.  So everything in the

19   government's possession will be produced by August 2nd,

20   absolutely.

21           THE COURT:  When will the government be ready to go to

22   trial?

23           MR. KOBRE:  The government is ready to go to trial

24   whenever your Honor fixes the date.

25           THE COURT:  Ms. Smith, when do you want to go to

D73TCILA

trial?

MS. SMITH:  Your Honor, if I may let Mr. Lehr respond
to that.

THE COURT:  Mr. Lehr.

MR. LEHR:  Your Honor, unfortunately, the issue that
crops up is the translations and the quantity of information
that has to be preliminarily reviewed and those things we want
to use at trial to be translated by a certified translator.  I
would think sometime in November would be a realistic date.

THE COURT:  I can put the case down for jury selection
and trial on December 2.

MR. LEHR:  Absolutely, your Honor.

MR. KOBRE:  Yes, your Honor.

THE COURT:  Now what I would like to do is set this
matter down for an oral argument on August 21 -- excuse me,
August 16 for oral argument, that's a Friday.  If you're coming
from Florida, I can fix it in the afternoon.

MR. LEHR:  I would prefer morning.  I'm a Sabbath
observer for the afternoons.

MS. SMITH:  And your Honor, we tend to come in the
night before usually a day or two ahead of time so we could
meet with our client.

THE COURT:  I'll set it down for oral argument at
10:30 on August 16.

Now are there other applications before the Court

D73TCILA

1      today?

2              MS. SMITH:  There are, your Honor.  And so I'm clear,

3      I may have missed -- your Honor may have said it, I understand

4      the thumb drives and the phones, does that include the laptop

5      and iPad or any computers for the 7/17 date that you gave, your

6      Honor, for the thumb drives?

7              THE COURT:  It is the thumb drives on the 17th and the

8      phones next week.

9              MS. SMITH:  There's an iPad and I believe a computer

10     or some other computer-type equipment Mr. Kobre mentioned.  I

11     didn't hear a date and I don't know if they're included in one

12     of those two dates.

13             THE COURT:  Are they password protected, Mr. Kobre?

14             MR. KOBRE:  I don't believe so, your Honor, but --

15             MR. LEHR:  If I may.

16             THE COURT:  How could you have an iPad that's not

17     password protected?

18             MR. LEHR:  I just asked me client and he informs me

19     the only thing that was password protected was one telephone.

20             MR. KOBRE:  Your Honor, if we could have until the

21     July 17 date to produced the iPad.  With respect to the other

22     computer, I am informed by the agent we have not been able to

23     get into that computer at all so far.  There is some difficulty

24     getting into that.

25             THE COURT:  Fine.  By July 17 you will give me a

D73TCILA

1    report, you will give me a letter report on the status of the

2    government's efforts to get into that computer.

3              MR. KOBRE:  Yes, your Honor.

4              THE COURT:  That's the foreign manufactured computer?

5              MR. KOBRE:  I believe that's right, your Honor, yes.

6              MS. SMITH:  Thank you, Judge.

7         Your Honor inquired if there was any other

8    applications.  There was an application filed before Judge Wood

9    on May 29th to either amend the conditions of bond or for

10   modification of bond.  That is ripe.  I tendered to Judge Wood

11   about 450, 500 pages of transcripts, the motions, and

12   Mr. Kobre's response.  It was my understanding from her clerk

13   that everything came over to your Honor, and I believe your

14   Honor set the date for today to hear that motion.  So that's

15   the other issue pending before the Court at this time.

16             THE COURT:  That's correct, and I reviewed it, and the

17   government also appeals, as I understand it.  So we have

18   dueling appeals from Magistrate Judge Maas' determination.

19             MR. KOBRE:  That's correct, your Honor.

20             THE COURT:  All right.  Go ahead, Ms. Smith.

21             MS. SMITH:  Your Honor, the order in question, Judge

22   Maas' order, while we appreciate bond, is basically tantamount

23   to no bond.  The conditions set were a $15 million bond, 10

24   million of it security by five financially responsible parties,

25   5 million security by property or cash or some sort of other

D73TCILA

security, and 24 hour a day, seven day a week armed guard,

which we have three potentials in place.  I have given the

names to Mr. Kobre.  He never responded back whether they were

or were not acceptable to him.  They are nationwide and in fact

international companies who provide both protection and armed

guard services.  Pretrial Services, strict Pretrial Services

supervision in Miami, residing on home confinement and

electronic monitoring on Turnberry Isle, a vacation home that

he owns in Miami.

        And we believe that those conditions alone, without

the -- or at least a reduced financial condition, coupled with

those other strict and severe conditions, are enough by

themselves to ensure that he is not a risk of flight.  It is

illogical to understand that a 24 hour a day, seven day a week

armed guard by a professional company who hires local law

enforcement, former law enforcement, and former military and

military reserves, that Mr. Cilins is going to realistically be

a risk of flight with somebody literally camped out on his

doorstep 24 hours a day.

        We believe that the 15 million he cannot make.  We

understand that the government's position that he has all these

unlimited resources.  He does not.  We understand the

government's position that he doesn't make $80,000 a year.

Your Honor, in fact the government's discovery that they

produced, as well as his statements to Pretrial Services, he

D73TCILA

did indeed make about $86,400 last year, according to an

application he made with Wachovia Bank for a credit card.  That

was filed months, if not six or eight months, before this

investigation began.  I have that document, I can tender it to

the Court, and it was provided to me in discovery.

He makes about 48,000 a year, $4,000 a month, on his

rental properties.  Currently he makes about 30 or 35, I think

about 33,000 on his business, which probably right now is not

making that.  In previous years he made more, but there has

been a significant worldwide economic downturn.  In 2012 he did

not the money that he made in years previous.

The argument has argued that Mr. Cilins lied to

Pretrial Services.  Judge Klindt, who actually heard the

testimony of the Pretrial Services officer, found that he could

not find evidence that there was lies.  Judge Klindt put on the

record in a lengthy order that was placed before your Honor, as

well as in the transcripts, that he understands that people,

when they came in, especially someone who has never been

arrested before, this is a traumatic experience.  Mr. Cilins

has no criminal history.  Pretrial Services was not clear.  She

did not -- she never testified she asked about 2011 income,

2012, any other year except his current year's income, his

current year's income is consistent with what he put on an

application for a credit card long before he made an

application for bail.

D73TCILA

| | |
|---|---|
| 1 | THE COURT:  What investments does he have in France |
| 2 | and other countries around the world? |
| 3 | MS. SMITH:  Your Honor, he owns a home in France.  My |
| 4 | understanding is he owns a home in France that he's paying a |
| 5 | mortgage on.  That's listed in the Pretrial Services report. |
| 6 | THE COURT:  A mortgage is listed.  What's the value of |
| 7 | the home in France? |
| 8 | MS. SMITH:  Your Honor, may I have just a moment? |
| 9 | THE COURT:  Yes. |
| 10 | (Pause) |
| 11 | MS. SMITH:  Your Honor, the home that he owns in |
| 12 | France is worth somewhere around 1 million, 1.1 million Euros. |
| 13 | The mortgage is 250 Euros, which both generally -- 250,000 |
| 14 | Euros, your Honor, I stand corrected, 250,000 Euros mortgage, |
| 15 | which basically translates to about 400, $425,000 U.S.  The |
| 16 | home would translate to somewhere around 2, 2 and a quarter |
| 17 | million dollars.  Forgive me, my math is not good, and I'm |
| 18 | trying to do a quick conversion.  That's the assets that he has |
| 19 | in France. |
| 20 | THE COURT:  Does he have any other investments? |
| 21 | MS. SMITH:  Your Honor, to the best of my knowledge, |
| 22 | he does not have any other investments.  He may have had a bank |
| 23 | account at one point in time that we were provided discovery on |
| 24 | where a wire transfer came through, but I'm not sure whether it |
| 25 | was his bank account or another bank account that was provided |

D73TCILA

1    to me yesterday.  And I have been told by Mr. Lehr there are no

2    investments in other countries.

3              He has investments in Miami.  He owns a total of

4    himself, through an investment company that was told to Judge

5    Klindt the day I first was there, through the name of that Pha

6    Investments, P-H-A Investments.  There were five homes, most of

7    which are condos, I think four condos in Miami, one is the

8    home, the actual home in Adventura, the Turnberry Isle home.

9    Those are listed in the current Pretrial Services report and

10   those are disclosed, if you read the entire transcripts, in the

11   order to Judge Klindt in Florida.  Those are worth somewhere

12   about one, one and a half million dollars.

13             There are other investments that he, Avi Lev Ran,

14   Michael Noy have on two pieces of property.  I have since

15   learned there are two hotels, or a hotel property and parking

16   area, on Miami Beach in Hollywood Beach, Florida they bought as

17   an investment that they bought in the neighborhood of 4.2, $4.3

18   million in two pieces of property in the hotel.  The tax

19   assessor currently has them valued somewhere around 2 million.

20   Those actual numbers are in the Pretrial Services report.  One

21   property is 1.3 and one property is 1.6.  He is a one-third

22   owner of both of them.

23             The conservative estimate of his United States

24   holdings are 3.6 million.  The market value is probably about

25   $5.2 million, but we took the conservative of 3.6, which is the

D73TCILA

```
 1    tax collector in Florida has been significantly marketing down

 2    in keeping with what they believe is a true value.

 3              THE COURT:  Why would your client decline to authorize

 4    Pretrial Services to make an Equifax inquiry regarding your

 5    client's assets?

 6              MS. SMITH:  I don't believe he ever did.

 7              THE COURT:  Didn't you look at the Pretrial Services

 8    report?

 9              MS. SMITH:  I did, your Honor.  And in Florida, that

10    is not a standard in Florida.  And I was with the gentleman,

11    Jeff Steimel, who is present in the courthouse, I don't believe

12    he ever asked to do an Equifax report.  I was present with an

13    interpreter when he met with him.  I was not present during the

14    initial meeting with Pretrial Services Ms. Watson in

15    Jacksonville.  Mr. Cilins on that day was interviewed without

16    counsel and without an interpreter present.  The day that

17    Mr. Steimel was there it was with both me and an interpreter,

18    the Court's interpreter, the day we appeared in front of Judge

19    Maas.

20              MR. LEHR:  Could we have one moment, please?

21              THE COURT:  Yes.

22              (Pause)

23              MS. SMITH:  And your Honor, Mr. Lehr is indicating

24    that -- I guess with the translator sitting here and they're

25    discussing, Mr. Lehr and I both speak French -- Mr. Cilins is
```

D73TCILA

 1    willing to allow an Equifax.  If it was offered, he said he did

 2    not understand it -- is what Mr. Lehr just walked up and

 3    indicated to me -- and he will allow that to happen.

 4              THE COURT:  What about -- that's fine.  Then an

 5    authorization should be signed so that pretrial can conduct an

 6    inquiry.

 7              What about the observation in the Pretrial Services

 8    report from Jacksonville that Mr. Cilins did not want Pretrial

 9    Services to contact his wife?

10              MS. SMITH:  Your Honor, I have spoken with his wife

11    and I have spoken with Mr. Cilins about this, and I think we

12    addressed this with Judge Maas.  Mr. Cilins' wife Brigitte is a

13    lovely and somewhat fragile woman.  I don't think he wanted her

14    to learn from stranger that he had been arrested.  Obviously,

15    she does not speak any English.  She speaks -- she can get a

16    hello and goodbye out with me, but that's about it of English,

17    but I think more sheer embarrassment and to not worry her that

18    a third party connected to government was calling her.  We will

19    allow them to speak with Ms. Bure if they want to do that.  I

20    have no objections to that.  I think at the time when he was

21    initially arrested that, as he previously explained to me, he

22    didn't want her scared to death.

23              And Mr. Lehr says he had no way of speaking to her

24    before to explain what it was about or what was going on.  She

25    is now obviously very much aware of what is going on.  I spoke

D73TCILA

1      with her within days of the Pretrial Services hearing, but no

2      one in Jacksonville asked to call her after that initial

3      appearance.  Nobody, again, tried to call her.

4              Ms. Watson did not want to reinterview Mr. Cilins, did

5      not want to redo anything.  She sat through the court

6      proceeding.  She was present much where your deputy clerk -- I

7      don't know what you call him here in New York, forgive me -- is

8      sitting now next to the court reporter in the courtroom.  There

9      were two of them sitting there, and Ms. Watson was present

10     during every hearing we had, and she was making notes and

11     amending written on the Pretrial Services report.  The report

12     that you have is -- actually the first report that is appended

13     to the report from Mr. Steimel is the initial report that I saw

14     when I appeared on April 18, four days after he was arrested

15     and three days after he appeared in federal court.  The

16     corrections that occurred in court never made it to this

17     report, but she sat there the entire time and made notes.

18             THE COURT:  As part of your application for

19     modification of bail you're not seeking to modify the condition

20     that Judge Maas imposed of 24/7 security, are you?

21             MS. SMITH:  No, Judge.  Your Honor, I am not seeking

22     to modify that.

23             THE COURT:  What's the cost of 24/7 security?

24             MS. SMITH:  Your Honor, the cost is between 30 and $65

25     an hour for an armed guard, depending on which company is used

D73TCILA

1    of these three companies.  I think it totals up on a 24-hour

2    period somewhere around 600, 800, a thousand dollars a day.  We

3    anticipate not dragging this out and so that he doesn't have to

4    continue to pay.  We have just gotten a trial schedule, and

5    obviously thought with Judge Wood we would be in trial in

6    October, November, also.  So we're not seeking to modify that.

7         I have spoken with family.  I have spoken with

8    friends.  I have spoken with his in-laws.  They have indicated

9    that they will put up the money to get this done to see that he

10   is home so that he can meet with both Mr. Lehr and I in the

11   comfort of either his home or in our offices so we can

12   adequately prepare a defense instead of coming to New York and

13   sitting in the jail or MCC Brooklyn, trying to do so here.

14   They are willing to make the sacrifice.  He has many friends

15   and family.  He has friends in Miami who are willing to come

16   sign for him, none of them worth $10 million.  Some of them

17   worth one, one and a half million dollars, one of them is a

18   20-plus year friend, others are people that he knows through

19   the synagogue in Miami.  He's not, as some of the reports I

20   have seen that have been provided by the government, he's not

21   an Israeli citizen, he's not even Jewish, he's Catholic.  But

22   he has lots of friends in Miami, several of which are willing

23   to come forward, none who can sign for $10 million.  But they

24   are all willing to put their own assets because they have faith

25   that he will show up.

D73TCILA

1            He has put up a very, very vigorous defense.  As Judge

2    Klindt put it, he wasn't sure exactly how the government was

3    going to prove the case based upon many of the arguments that

4    we raised during the bail hearing.  He has no intentions of

5    running from this.  And certainly with a 24 hour a day, 7 day a

6    week guard and ankle monitor, Pretrial Services I'm assuming in

7    Miami, one of strict supervision is usually a daily contact

8    with Pretrial Services and random show ups at the house.  He's

9    not going anywhere and has no intentions of going anywhere.

10            THE COURT:  Part of the security that you're offering

11    here, the substantial part of it is property in which he holds

12    only one-third equity interest?

13            MS. SMITH:  Yes, Judge, he actually owns one-third

14    both of the --

15            THE COURT:  Doesn't the government assert that the

16    co-owners are involved in this scheme here?

17            MS. SMITH:  They have asserted that, your Honor.  They

18    asserted that on the very last day of our hearing.  They

19    asserted that in Florida.  Nevertheless, all three of them have

20    agreed to place the property -- those two properties up for the

21    Court.  They are viable properties.  I have spoken with the

22    manager of the hotel.  I have spoken with other staff of the

23    hotel.  That is a viable that -- two parcel-property is a

24    viable, operating business in Miami.  Again, if you did --

25    other than the tax collector value, which is low, the property

D73TCILA

1   is worth much more than 2.6 or $2.8 million.

2          Forgive me, I'm being corrected by Mr. Lehr who is

3   from Miami, they're in Hollywood, not Miami which is just north

4   of Miami.  But yes, the government has made that -- they have

5   not shown definitively that these other two persons are a part

6   of any scheme.  In fact, they have not shown that Mr. Cilins

7   is.  And if indeed we are correct that the documents are

8   fraudulent, and Mr. Cilins -- we believe some of the case law

9   and the evidence will show if those are truly false, he did not

10  commit a crime.

11         I understand you have put forth a briefing schedule,

12  and we welcome that.  We're very -- Mr. Lehr and I are both

13  very pleased we're going to get to bring that argument to the

14  fore for your Honor or the appellate court, whoever it is, to

15  consider.  It is our belief and it is our position that

16  Mr. Cilins did not violate U.S. law, and that he has every

17  intention of staying here and fighting these and doing whatever

18  is necessary.  But your Honor, the 15 million he cannot raise.

19         THE COURT:  Has your client or you on his behalf

20  contacted the French government to receive any assurance from

21  the French government that if he did flee to France that France

22  would return him to the United States?

23         MS. SMITH:  Your Honor, the persons that I have

24  contacted at the consul in Atlanta -- the consul in Miami, as I

25  have told Judge Klindt, is difficult to deal with.  The consul

D73TCILA

```
 1  in Atlanta has indicated it would have to come from someone
 2  much higher than them.  I have not had any calls back on that.
 3  And I spoke with the sous-préfet de Grasse, the passport agency
 4  of the government in France, but again, they indicated it would
 5  have to come from higher up.
 6          Your Honor, Mr. Lehr is indicating that he has spoken
 7  with Mr. Cilins and he will sign any extradition waiver at this
 8  point in time.  If they want to draft an extradition waiver, he
 9  will sign that today, or if your Honor grants the motion for
10  bond, that he will waive extradition should he flee.
11          THE COURT:  Anything further?
12          MS. SMITH:  Your Honor, the government made additional
13  arguments.  I understand we both have competing motions, so I
14  don't know how your Honor wants to handle the argument, I
15  assume I will get some rebuttal time.
16          THE COURT:  You will.
17          MS. SMITH:  I'll sit down and hush then.
18          THE COURT:  Mr. Kobre.
19          MR. KOBRE:  Your Honor, briefly.  First, why don't I
20  start where defense counsel left off with respect to the $3.6
21  million of property.  The other two co-owners of those
22  properties are individuals by the names Michael Noy and Avraham
23  Lev Ran.  The government has produced to the defense
24  independent evidence that those two people are involved in the
25  defendant's criminal conduct.
```

D73TCILA

1              Avraham Lev Ran, there is a wire transfer that the

2    government produced to the defense from Avraham Lev Ran for

3    over $100,000 from him to Bank Leumi in Israel to the CW,

4    directly to the CW, in addition to the fact that he's a

5    signatory on the contracts.  But putting aside his being a

6    signatory on one of the contracts, there's a wire transfer and

7    bank records that show that payment.  Michael Noy, the

8    government produced wiretaps, wiretapped the defendant's phone,

9    in which they were discussing this false attestation that was

10   provided by the defendant to the CW and discussing his efforts

11   at obstruction.  So those two people are directly involved in

12   his criminal conduct.

13              Circling back to the misstatements that were made by

14   the defendant to Pretrial Services, your Honor, has already

15   pointed out some of them.  But these are just one after the

16   other after the other of misstatements.  The idea that the

17   defendant's annual salary was $32,500, roughly, but at the same

18   time has millions of dollars worth of property in Florida, he's

19   admitted that he travels over -- this is defense counsel's

20   proffer during the hearing down in Florida -- traveled all over

21   Africa and Europe to conduct the business, had $20,000 in cash

22   on his person when he was arrested taken off of him by the

23   agents who were there.  And most tellingly, your Honor, the

24   audio recordings show that he offered 200 and then $800,000 and

25   then $5 million to the CW.  The defendant has access to

D73TCILA

1    enormous resources.  These are on audio recordings provided to

2    the defense.

3         In addition, bank records show -- these are bank

4    records that have been produced to the defense also -- that the

5    defendant transferred two checks in 2010, one for roughly

6    100,000 and another roughly 50,000, from himself to the

7    cooperating witness.  So aside from that, the relevance of that

8    obviously to the strength of the government's case, there is

9    also:  Where are the source of those funds?  Well, your Honor,

10   the government found that those funds were transferred to the

11   defendant's bank account from a Bank Leumi account.  That Bank

12   Leumi account, it appears, is owned by the defendant, it's

13   actually in the defendant's name.  So the defendant had, at

14   least in 2010, an account at Bank Leumi in Israel, and

15   government is now endeavoring to get records from that bank

16   account.  We don't know whether that account is still existent

17   today.  We don't know where the money in that account came

18   from.  But the bank records do show that the defendant had at

19   least that foreign bank account, and we are endeavoring to get

20   those records.  So all of these things cast great doubt on the

21   defendant's claim to Pretrial Services of his $32,000 yearly

22   income.

23        Defense counsel said that the Pretrial Services

24   officer asked him about his current income.  She asked him

25   about his income, and that is what he said.  Defense counsel

D73TCILA

1    said that he didn't have an interpreter at the time.  At the

2    hearing in Florida, Kim Lee Watson, who was the Pretrial

3    Services officer, testified under oath that she had no problem

4    communicating with the defendant.  And this is in the

5    transcripts that have been provided to your Honor.

6               THE COURT:  I have read them.

7               MR. KOBRE:  Yes, your Honor.  I'm not going to.

8               THE COURT:  All 300 some-odd pages.

9               MR. KOBRE:  I appreciate that your Honor has done

10   that.  And that she asked him repeatedly, that she had no

11   problem communicating with him in English, and that's in the

12   testimony.  That's the first misstatement.

13              The second one was when he was asked about what

14   properties he owned -- and again, Ms. Watson testified that she

15   asked him repeatedly:  Do you own any more properties?  Do you

16   own any more properties?  He was able to tell the Pretrial

17   Services officer about five properties that he owned with a

18   total value of about $779,000.  He left off of those the two

19   most valuable properties that he's now proffering to the Court

20   as security for his bond, the two Hollywood Beach properties

21   with a combined value of over $2 million.  And again, those are

22   the two properties that he co-owns with these other

23   individuals, Michael Noy and Avraham Lev Ran, who are directly

24   tied to his criminal conduct.

25              He failed to disclose to Pretrial Services a second

D73TCILA

1   passport that he owned.  Although I understand he was not

2   directly asked about that by the Pretrial Services officer

3   whether he actually owned another French passport, but he

4   certainly failed to proffer that to them.  And he told the

5   Pretrial Services officer that the only account that he has is

6   a bank account in which he owns -- he has 200 Euros in a

7   checking account, that he doesn't have any savings account.  We

8   now find that he does have other accounts, he has an account

9   in -- a Wachovia Bank account, PHA Investment Account, that's I

10  believe what defense counsel was referring to, that's the

11  account to which the $150,000 flowed from his other Bank Leumi

12  account into that account and then out from that account in two

13  checks in 2010 to the cooperating witness, and then another

14  Wells Fargo bank account ending 8209 with in excess of 14 to

15  $23,000.

16          Now that is what I mentioned before, your Honor, that

17  the government is attempting to get other bank records.  There

18  were about five or six debit cards taken off the defendant

19  incident to arrest.  Some of those debit cards are what led the

20  government to bank accounts that I talked about earlier.  Other

21  of those are debit cards or credit cards on French banks.  So

22  we need to go through the MLAT process in order to get those

23  bank records.  But what I think your Honor knows -- what we

24  know objectively is that we have this Bank Leumi account, which

25  we don't have the details on, that's where the 150,000 came

D73TCILA

that went to the cooperating witness, and then we have some

other additional French accounts in addition, to the American

account that we have discovered.

        So I think, your Honor, the $32,000 income, the bank

accounts that he didn't disclose, the not disclosing the

passport, these are all in kind with I think what your Honor

pointed out, that he declined to provide any contact

information to verify -- for Pretrial Services to verify his

income, they declined to sign the consent to perform the

financial records check.  And I would also just point out the

Pretrial Services officer -- and this is a quote from her

report -- that he seemed most concerned that his financial

records and/or assets in the United States would be reviewed.

He also declined to provide any references or contact

information in either the United States or France.  These are

all things that go to the defendant's -- that the defendant

is -- it appears to be the defendant was hiding and continues

to be hiding his financial assets.

        Just, as your Honor knows, I'm not going to -- these

are all in our submission, so if I could briefly touch on them.

The defendant is not a United States citizen, he's a citizen of

France.  His only connection with the United States are these

properties that he owns here together with these other

individuals.

        THE COURT:  What about a waiver of extradition?

D73TCILA

1          MR. KOBRE:  Your Honor, I don't know what the legal

2     ramifications of that are.  That has not been proposed before

3     today, but I don't know whether that's enforceable by the

4     government, and so I don't believe that would be sufficient.

5     He's done a tremendous amount of international travel.  He

6     admits he travels all over Africa and Europe to conduct

7     business.  Somehow that all of this travel is only yielding

8     about $32,000 of income is rather incredible.  France has no

9     extradition treaty with the United States.

10          The government's evidence in this case is extremely

11     strong.  There are audio recordings, and they have been

12     provided to the defense, along with draft translations, in

13     which the defendant talks repeatedly about destroying the

14     documents, burning the documents.  Of course you have to lie is

15     what he tells the cooperating witness.  He presents her, in

16     meetings which are surveilled by the FBI, with an attestation

17     which we now have confirmed is a false attestation because in

18     that attestation it says that she never received any payments.

19     We now know that the cooperating witness in fact did receive

20     payments.

21          So the evidence in this case is extremely strong.  I

22     would just also point out for your Honor during the course of

23     these audio recordings, and I'm referring now to Bates number

24     1328 in the discovery, the defendant talks about the story that

25     they're going to tell about what his business is.  And he says

D73TCILA

1    the following, he says -- the cooperating witness says that

2    she -- he asks whether she told her family about being

3    questioned by the FBI and being asked for documents, and the

4    cooperating witness says I didn't tell them because they'll

5    panic.  And then he says:  They're going to panic.  Normally

6    the question is does it stop at you?  Everybody has to be on

7    the same page saying what is the story about this, this story

8    about this business, things like that.  Me, the only business I

9    have was I bought rice and I bought sugar and chicken necks.

10   There, that's all I bought, I bought turkey, sugar and flour.

11   What's the story you're telling me about mines?  Do I know

12   anything about mines?  Do I know anything whatever?

13        This is of a part with the defendant's story here that

14   he's a legitimate businessman, this reflects that he is not,

15   that he was going to be on the same page and that he is

16   making -- and that in fact the money that we're talking about

17   here, the money -- the millions of dollars that were offered to

18   the cooperating witness, that he has access to that money and

19   he has every intention to flee this country and avoid the

20   charges here, which, as I said, the evidence is extremely

21   strong.

22        If I could just briefly address the 24/7 security,

23   your Honor.  Regardless of the security guard, if the defendant

24   has access to these kind of resources and he was willing to

25   employ those resources to bribe a cooperating witness for

D73TCILA

1   millions of dollars, he has contacts, foreign contacts which

2   he's admitted to, a security guard is only as good as requires

3   the defendant's cooperation.  There are a few cases that have

4   dealt with security guards, your Honor, one of them is United

5   States v. Morrison.  It's an Eastern District case, your Honor,

6   Judge Hurley.  And I don't cite it for its legal analysis,

7   although it did decline to grant release, although the

8   defendant in that case offered a 24/7 security guard.  But I

9   think the point that the judge makes in that case and here's a

10  quote from the case, it's at *2, your Honor, the cite is 2009

11  Westlaw 2973481.  A security guard posted outside, video

12  cameras directed at the outside of the house, and monitoring of

13  telephone lines -- which in that case was offered -- cannot be

14  relied upon without good faith compliance from the defendant.

15          Your Honor, I do not believe in this case there will

16  be good faith compliance from the defendant.  Defense counsel

17  is essentially proposing that they're not be any financial

18  conditions, and that we have this security guard.  All of the

19  cases I think that your Honor will look at in which the

20  security guard was granted had financial conditions.  Is the

21  government's position that there are no conditions in this

22  case, but certainly substantial financial conditions like those

23  imposed by Judge Maas are necessary to reasonably assure the

24  defendant's return to court as required.

25          THE COURT:  Thank you, Mr. Kobre.

D73TCILA

1          MR. LEHR:  Could we have one moment?

2          THE COURT:  Yes, you may.

3          (Pause)

4          MS. SMITH:  Your Honor, I would like to begin my reply

5     beginning back with Avraham Lev Ran and the wire transfers to

6     Mamadie Touré.  Your Honor, we have never denied there were

7     wire transfers to Mamadie Touré, the government's informant in

8     this case, and indeed the documents that we believe the

9     government have in its possession on Mr. Cilins' thumb drive

10    and computers and email indicate they conducted legitimate

11    business over the years, including chicken, a school in Guinea,

12    the purchase of computers and other documents.  And your Honor

13    these span back 2007, 2008, 2010, 2011.  There may have been

14    some business in 2012.  These are just reams of documents that

15    I have that we believe are on the same things that the

16    government has in its possession off of emails between

17    Mr. Cilins and Mamadie Touré.  For example I have a document

18    here for $113,000 worth of computer equipment, another 97,000,

19    the building of a school in Conakry, the building of a school

20    on another piece of land, on and on, legitimate business

21    between these parties going back for years.

22          With regard to a signature on -- a purported signature

23    on the documents that the government is relying on in this

24    case, your Honor, again, if you look at some of these

25    signatures they look like patent carbon copies that have been

D73TCILA

1    cut and pasted.  So we are not --

2            THE COURT:  How is the ongoing business relationship

3    that you have just described consistent with the defense that

4    you proffer that she was blackmailing your client?

5            MS. SMITH:  Your Honor, that was hard for me to

6    understand.  I did not just rely upon speaking with my client,

7    I contacts persons who do business in Africa and various

8    assorted countries in Southern and Western and Eastern Africa.

9    It is unfortunately a part of business in Africa.  On one hand

10   you do a legitimate business and then the next thing you know:

11   Give me money, I'm going to do this, I'm going to do that, I'm

12   going to blackmail you.  But many times these people are the

13   very same people who continue to bring you business.  Most

14   companies deal with this same problem.

15           This woman has not only attempted -- or persons on her

16   behalf, let me rephrase -- to blackmail Mr. Cilins, but other

17   persons, other entities, including those in this indictment and

18   other entities in addition to that.  She was ran out of the

19   country after Lasana Conté died.  Her house was burned to the

20   ground by the military.  Dadis Camara was the current interim

21   president.  She had done something to upset several people in

22   the government of Guinea at the time, and that was in January

23   of 2009.

24           So this woman -- and the government would have us all

25   believe, if you believe everything in the indictment and

1    everything in the criminal complaint, that she had the ability

2    in 2010 and 2011, 2009, 2012, to continue to influence the

3    Guinean government.  There have been three, if not four, I have

4    to go back and look, governments since Lasana Conté's

5    government.  She has claimed to be the fourth wife of that

6    president.  There is no one legitimate person that we have

7    found in Guinea or outside of Guinea, including her own family,

8    that will admit she was his wife.  She was a consort at best,

9    at best.

10        Your Honor, so the fact that the government says there

11   are purported signatures, again, I don't believe those

12   signatures are indicative until we can test those to see if

13   they are legitimate signatures and legitimate contracts and

14   legitimate ink.  It is my position she has four times

15   previously since 2010 signed statements saying there was no

16   fraud, there was no bribery, I never received money, I never

17   received anything.

18        And an attorney on her behalf -- at least one if not

19   two, and I believe there were two, one in writing approached

20   one of the mining entities in Guinea with these very same

21   documents that the government has given to us in discovery.

22   And when confronted by that mining company and their attorneys,

23   said you oh, wait a minute, you're right, these are frauds,

24   these are forgeries, these are not legitimate documents, we

25   withdraw the claim, please go away, and they went.  These very

D73TCILA

documents are the same documents the government is saying

Mr. Cilins attempted to purchase and interfere with the grand

jury, the same documents that she has or somebody on her part

has put forth, taken away, put forth, taken away, put forth,

taken away since 2010.

Your Honor, with regard to misstatements, I think I

covered a lot of those, but I would like to begin with the

credit card application and agreement at Bates number 603.

It's for the Wells Fargo account that was in the Pha

Investments name, not Mr. Cilins' name, but he applied for a

credit card application.  I would like to submit this into

evidence.  It lists an annual income.  This was done on

March 20th, 2013, of $86,400.

Your Honor, if I could let the record reflect that I

showed Mr. Kobre the exhibit, the document.

THE COURT:  We'll deem it marked as Court Exhibit 2.

MS. SMITH:  Your Honor, Mr. Cilins has never denied

traveling.  In fact, we wholeheartedly admitted that.  I had to

chase -- basically run around like a chicken with my head cut

off, pardon the colloquialism, to chase what the government

said were two false passports in this case, only to turn out

that Mr. Cilins had been lawfully issued two concurrent

passports for at least the two passport terms in France.  His

2007 was issued.  And what they do, and what the government is

well aware of because the exhibits were admitted in Florida, is

D73TCILA

 1    both the consulate and the sous-préfet de Grasse in France said

 2    he applied to us, because he's a businessman, he's allowed to

 3    travel.  And what they explained to me was, and the same thing

 4    I explained to Judge Klindt, when you travel, many times you

 5    have to surrender your passport to get a visa, in the meanwhile

 6    as a businessman you're traveling in another country.  They

 7    have the provision, as does England and many of the EU

 8    countries, for the provision of two legitimate passports.  He

 9    had two, both in 2007 and 2008, and previously he had two

10    passports on the previous renewal.  We have never denied that.

11    He has been working in Africa and Europe doing business for

12    many, many, many years, long before 2000, 2001, 2002.

13              With regard to the revenue and the travel and the

14    government's point well, how can he travel and only make 30,000

15    a year.  The answer very simple.  Number one, she didn't ask

16    gross income or net income.  Your Honor, net income could be --

17    and your Honor, we posit his net income for 2012 to be the

18    86,000 that he listed there, the $48,000 a year for the rental

19    income and about 32,000 a year, 40,000, whatever it is, for the

20    income currently off the business.  It is not beyond the realm

21    of possibility for a business to gross a million, two million,

22    100,000 and net a thousand, 10,000, a million, whatever the

23    number is.  You have legitimate business expenses that come out

24    of gross revenue.  Any businessman would know that.  Any

25    accountant could come into this court and testify to that.

D73TCILA

1          The government makes much about the fact that

2     Mr. Cilins purportedly offered 300, 800, a million, $2 million.

3     Interestingly enough, he was supposed to, according to the

4     government, bring $300,000 to that last meeting as a payment

5     for the documents.  He had $20,000 on him, Judge.  While that

6     is a significant amount of money, it's certainly not the amount

7     of money that he told Mamadie Touré that he would have on him.

8          And the point I'm trying to make, Judge, is just like

9     a business settles nuisance lawsuits.  We see it every day in

10    the civil arena.  Somebody comes in, I slipped and fell in your

11    restaurant.  The restaurant owner knows it didn't happen, and

12    their lawyer says yeah, but it will cost you $100,000 to defend

13    the suit, pay him 75, pay him 100, pay him 125, whatever it is

14    to get him out of your face, call the accountant and write it

15    off.  That is exactly what Mr. Cilins was doing here.  These

16    documents had been put forth at least four separate times since

17    2010 as part of blackmail and extortion.  At least on one

18    occasion, if not two, the attorney for Ms. Mamadie Touré backed

19    down when their attorneys confronted them.  He would have

20    promised her the moon, the stars and the world.

21          So your Honor, as I said earlier, I was aware that he

22    had had -- the government has produced the Bank Leumi account.

23    I was aware that he had a Bank Leumi account.  Mr. Cilins has

24    indicated to Mr. Lehr while we were -- while this was going on

25    that the last time he knew there was money in the Bank Leumi

D73TCILA

account, there was over a million dollars in that Bank Leumi

account.  He does not know what is in it now, he has not had

access to for months, but the last time there was a money in a

Bank Leumi account it was a bank sitting there for monies that

he dealt with business.  And again, the business he had had

significantly more income in past years than it has had

recently.

         Your Honor, the government says that Ms. Watson

indicated that she had no problem understanding Mr. Cilins.

She also testified, if your Honor read those documents, and I

appreciate you doing so, that she was not aware of what he

understood.  She could not say for certain what he understood

from her questions.  She could understand what he said, but she

was not sure what he understood and how he interpreted her

questions.  Originally he said about 779,000 for the five

properties.  I think, your Honor, if you total up the five

properties, there at one point -- I don't have the Pretrial

Services report in front of me.  After I got involved and your

Honor is well aware that I made a statement to the Court and

also made an email to the Court, the properties that he owns --

and again, this is not the full extent of the properties, and

we corrected this in front of Judge Maas, there was Turnberry

Isle, and the documents were provided, the actual mortgages,

the tax documents were provided to Judge Klindt, the Turnberry

Isle property is missing from the list in front of your Honor.

D73TCILA

The four properties that are here are worth about $350,000, and
the Turnberry property I believe was worth about 3 or $4,000.
I do have the draft mortgages that were actually given to the
court in Jacksonville.  So that it totals about 700 to
$800,000, not much different than what he originally told them.

He did not originally tell them, but I told the Court
the very first day when he was arrested on the 14th and was
interviewed on the 15th, he did not tell them about the
properties that had one-third ownership.  I met with him on the
16th, I believe, or the 17th, and when I went up on the 18th to
the court, I informed the court of those two properties.  I
gave them partial IDs.  I gave them the tax collector
documents.  I gave an affidavit.  And those exhibits should
have been transferred to your Honor or to the court file when
the file came up from Florida.  If they weren't, I will ensure
that they get done immediately, that the original exhibits that
were admitted in that hearing be transferred to your Honor.

We disclosed those the minute he had counsel and I
could talk to him in French and explain to him what the purpose
of it was, what was the purpose of Pretrial Services, and what
he would have to show.  And the record will reflect that if you
read the hearing, you know that on April 18 I went through a
lengthy parcel ID, the mortgage, who owned the properties.  I
relied on an attorney in Miami Alan Marcus, to prepare the
affidavits.  They were not signed at the time, but I relied on

D73TCILA

1    Alan Marcus.  He inadvertently -- and have I spoken with

2    Mr. Marcus -- left off the one-third.  He said full ownership

3    of those two Hollywood surfside properties.  We anticipating

4    getting bond and having to sign the affidavits, and I sat down

5    and looked at them very hard and said we have a problem.  And I

6    immediately, as an officer of the court, made that correction

7    and apologized.  I believe you have that email in the

8    government's filings where I did that with the Court.

9            So your Honor, we take homage that he was not truthful

10   with the Court.  He has been as honest as he possibly could

11   have.  And frankly, I have too.  We have spent our time chasing

12   rabbits down a hole that the government kept throwing up.  If

13   you read the transcript, you're well aware it was one issue

14   after the other that the government kept raising that turned

15   out to be false.  And I spent a lot of time between driving

16   back and forth and chasing those rabbits.  Your Honor, we have

17   admitted to the accounts that he has.  There's been no --

18   there's been no deception there.

19           Your Honor, with not giving -- Mr. Kobre said at no

20   time did anybody receive Ms. Bure's -- which is his wife, she

21   kept her maiden name -- telephone number in France.  Your

22   Honor, as an officer of the Court, Mr. Steimel was here the day

23   of the interview.  We actually gave the telephone number and

24   offered to provide -- the interpreter that day offered to make

25   the phone call.  He said I don't think it's going to be

D73TCILA

1    necessary and did not call her.  I believe he has the telephone

2    number in the written notes that he made.  I don't know if he

3    has it on the typed notes, but in the written notes he actually

4    took her telephone number.  The interpreter was a young lady

5    from Haiti that interpreted that day for us.

6         MR. STEIMEL:  Your Honor, if I could be clear,

7    typically we do not call out of the country.  We don't have the

8    access to do so.  I apologize for interrupting.  I don't

9    believe I have her telephone number, just to be clear.

10        MS. SMITH:  Your Honor, we did give it to him.  If he

11   didn't call, he didn't call, but I was present that day and he

12   was given the number with the interpreter present that day.

13        Your Honor, finally, the government basically argues

14   that an armed guard -- first of all, he argues we are asking

15   for no financial conditions.  Your Honor, that was never our

16   request.  I'm not asking for no financial conditions.  I

17   understand the Court's need to impose some financial

18   conditions, but 15 million in this case is tantamount to no

19   bond.  He is willing to put forth all of the properties that

20   have been listed totaling at a minimum 3.6 on the low end.  We

21   have three persons who are each worth about a million, million

22   and a half willing to come forward, responsible parties in

23   Miami that are willing to sign for him.  His wife is, of

24   course, willing to sign, but she's not a U.S. citizen, she's a

25   citizen of France.  We could get others, but I tried to -- we

D73TCILA

1    could get other persons in the community to sign from Miami,

2    but we could also get lots of people from France.  It's my

3    understanding the government will not accept the French

4    signatories, but we could get persons that have $10 million

5    worth of assets, but I don't believe the government is going to

6    accept someone who is not stateside or not in the U.S.  If we

7    could get Mr. Kobre to tell us that, I would be will more than

8    happy to get those people to sign for Mr. Cilins.

9          Your Honor, we are proposing something in the

10   neighborhood of 7 to 10 million in the financial conditions.

11   We, of course, would like to have none, but that was never our

12   request, but 5 million of property, or even 5 or 6 million,

13   Mr. Cilins could actually make that bond, he could have it

14   secured, it would be secured with the properties, we could have

15   signatories.

16         And your Honor, the armed guard issue.  Mr. Kobre

17   makes much that the person has to cooperate.  While that is

18   true, there is absolutely no reason to believe that Mr. Cilins

19   would not cooperate.  He's offered an extradition waiver.  He's

20   agreed to the most stringent of conditions, including an ankle

21   monitor, home confinement.  The only time he would be allowed

22   to leave would be to go to the doctor or to go to church,

23   assuming pretrial let's him go to church, strict pretrial

24   supervision, staying in the home that is subject to seizure in

25   Miami, in Adventura, South Florida.  And your Honor, it's just

 1    disingenuous to believe a professional armed guard company who

 2    does both armed guard and security for dignitaries, companies,

 3    governments.  These are three of the biggest companies in our

 4    nation, Morrison, Hackerman and Crole.  That any one of them,

 5    who use our military and law enforcement, would be blinded by

 6    money, would not do their job and would not ensure that they

 7    wouldn't do their job.  I have spoken with the CEOs or the

 8    under -- I don't know what you call the person under the CEO,

 9    the next person down, at all three of these companies.  All of

10    them have indicated they will have him arrested.  They're

11    licensed to carry arms, they're licensed to make an arrest.

12    One of the companies actually deals very closely with law

13    enforcement and uses active law enforcement to provide

14    security.  The others provide off duty or retired law

15    enforcement.  It's just disingenuous, your Honor, to say that

16    an armed guard company could not ensure that Mr. Cilins would

17    not show up for court.

18            He has a stake in this issue.  He has a viable

19    business interest.  He has an interest in clearing his name.

20    And, your Honor, we ask that you consider lowering, as we

21    requested, the bond in this case.  We believe Judge Maas was

22    correct that there were conditions that could be fashioned,

23    that that was correct, and he did fashion conditions.  However,

24    the financial portion of those conditions is just too high.  We

25    ask that you impose a reasonable financial condition and give

D73TCILA

Mr. Cilins the opportunity to defend this case while in my

presence and while being able to sit down with Mr. Lehr and I

in Miami in South Florida and look at these documents, go

through the things we need to go through.

          Thank you, your Honor.

          THE COURT:  Thank you.

          Anything further, Mr. Kobre?

          MR. KOBRE:  Very briefly, your Honor.  Although

defense counsel sort of breezed by it, now it seems that the

defendant has admitted that's a bank account at Bank Leumi

which at last he knew had a million dollars or perhaps more in

it.  And that is in contradiction to what he told Pretrial

Services that the only account he had was a checking account

with 200 Euros.  So I mean that's just another example of the

misstatements that the defendant has made.

          And we don't know, this is just -- the investigation

we have, we're seeking additional bank records.  We have no

idea whether there are additional bank accounts, whether inside

the United States or outside the United States, that could have

millions of dollars in it.  The defendant offers the CW

millions of dollars, $5 million.  What he could do with that

sort of money and how that could enable him to flee I think

your Honor could only imagine.

          And one other last point.  I should just mention, your

Honor, that the mining contracts at issue here are billions of

D73TCILA

1    dollars of mining contracts, they're extremely, extremely

2    valuable, that are at stake.

3           I would just also point out for your Honor that

4    defense counsel said that just like settling a nuisance

5    lawsuit, that is what the defendant essentially was doing when

6    he offered money to the CW to burn documents.  The difference

7    here is, your Honor, these documents, fraudulent or not, were

8    under subpoena by the grand jury in this district and they were

9    the ones that were sought, fraudulent or not, by the grand

10   jury, and that is what the defendant intended to destroy.  And

11   so I think there's a very, very big difference between settling

12   a nuisance lawsuit lawfully and destroying documents that were

13   under subpoena by the grand jury.

14          THE COURT:  All right.  This Court has had an

15   opportunity to consider the arguments of counsel, and I have

16   also reviewed the record of the proceedings in the Middle

17   District of Florida as well as the proceedings before

18   Magistrate Judge Maas.

19          On May 15, Magistrate Judge Maas conducted a detention

20   hearing and set certain bail conditions for Mr. Cilins.  Cilins

21   moves to modify or amend the bail conditions, and the

22   government appealed Judge Maas' decision granting bail.  The

23   district court reviews a magistrate judge's decision to release

24   a defendant de novo.  United States v. Leon, 766 F.2d 77, 80

25   (2d Cir. 1985).  In deciding this case, this Court "should not

D73TCILA

1   simply defer to the judgment of the magistrate but reach its

2   own independent conclusion."  Leon, 766 F.2d, 80.

3           In determining whether a person presents a serious

4   risk of flight such that no conditions of release will ensure

5   their appearance in court, Section 3142 requires that the Court

6   take into account various factors, including the nature and

7   circumstances of the offenses charged, the weight of the

8   evidence against the person, and the history and

9   characteristics of the person.

10          Weighing these factors, this Court finds that

11  Mr. Cilins is a serious risk of flight and that there are no

12  conditions that will ensure his appearance in court.  I will

13  issue a written decision setting forth the basis for this

14  decision next week.

15          Now I understand that Judge Wood excluded time until

16  the next conference on September 9.

17          MR. KOBRE:  That is correct.

18          THE COURT:  But since we're not having a conference on

19  September 9 but rather argument on August 16, I'm going to

20  exclude time from now until August 16, 2013 from Speedy Trial

21  Act calculations.  I find that this continuance serves to

22  ensure the effective assistance of the counsel and prevents any

23  miscarriage of justice.  I exclude time so that the government

24  can continue and complete its production of discovery and the

25  defendant can review the discovery with counsel to decide what

D73TCILA

motions, if any, the defendant wishes to make.  I also exclude

the time so that the issue presented by the defendant's

proposed defense concerning the veracity of these documents can

be addressed by the Court.  I find that this continuance

outweighs the best interests of the public and the defendant in

a speedy trial pursuant to 18, U.S.C., Section 3161.

On August 16, I will fix a further pretrial schedule

regarding disclosure of 404(b) material, if there is any, and

other motions in limine in preparation for jury selection and

trial on December 2.

Are there any other issues that counsel wish to raise

at this time?

MR. KOBRE:  Just one, the question of when defense

counsel would file any motions to suppress.

THE COURT:  We're going to address that on August 16.

MR. KOBRE:  Yes, your Honor.

THE COURT:  Until they see what discovery the

government has produced, it's difficult for them to decide what

motions they want to make.

MR. KOBRE:  Understood, your Honor.

THE COURT:  If there's going to be a supression

hearing, I'll schedule a supression hearing after August 16,

but I will wait a report from defense counsel.  And I want

letter report from the government, with a copy, of course, to

defense counsel, by July 12 reporting on the status of the

D73TCILA

1   original agreements and what, if anything, the government has

2   learned as a result of the further inquiry they need to make in

3   view of Court Exhibit 1 that was received from defense counsel.

4              MR. KOBRE:  Yes, your Honor.

5              THE COURT:  Anything further from the defendant?

6              MR. LEHR:  No, your Honor.

7              THE COURT:  Very well.  This matter is concluded.  I

8   will issue a full decision on my denial of bail early next

9   week.  Thank you.

10                              o0o

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25